UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
PETER J. NYGÅRD,
NYGÅRD INTERNATIONAL PARTNERSHIP,
and NYGÅRD, INC.,

                              Plaintiffs,

        v.

LOUIS M. BACON,

                        Defendant.         <u>JURY TRIAL DEMANDED</u>
----------------------------------------------------------x

<u>COMPLAINT</u>

<u>Identity of parties</u>

1.      Peter J. Nygård is the founder, and directly or indirectly, the 100% owner of Nygård International Partnership and Nygård, Inc., who carries on business at various locations throughout the world, including substantial business in the United States, as a designer, manufacturer, distributor, and seller of women's clothing and accessories.  Mr. Nygård and his businesses are closely associated in the public eye.  One of the brands carries the name Peter Nygård.

2.      Nygård International Partnership is a registered partnership between two Canadian federal corporations, 4093887 CANADA LTD. and 4093879 CANADA LTD., which operates as Nygård International.  It is the successor to a Canadian corporation which began its business operations in 1967.  Its principal administrative office is at 1771 Inkster Boulevard, Winnipeg, Manitoba, R2X 1R3.

3.     Nygård, Inc., is a Delaware corporation, and since 2005 has carried on business at its world headquarters at 1435 Broadway, New York, NY 10018. Nygård, Inc., conducts substantial business in the United States.

4.     Defendant Louis M. Bacon is a resident of New York State, with residences in New York City and on Long Island.  Mr. Bacon is the Chairman and Chief Executive Officer of Moore Capital Management, a private investment management firm headquartered at 11 Times Square, New York, NY 10036, with additional offices in London and Hong Kong.

5.     Mr. Bacon is also Chairman of the Boards of Belvedere Property Management, LLC, a property management firm with headquarters in New York, and Wilson Mesa Ranch Holdings, LLC, a land holding company that is affiliated with Belvedere Property Management.

<u>Jurisdiction and Venue</u>

6.     Mr. Bacon and others persons associated with or employed by the enterprise described below, conducted and participated in the affairs of that enterprise through a pattern of racketeering activity, and entered an unlawful conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ["RICO"], 18 USC §§ 1962(c) and (d), thereby causing injury to business and property of plaintiffs.

7.     This court has subject matter jurisdiction over this action pursuant to 28 USC § 1331, because plaintiffs bring claims under the laws of the United States, specifically, 18 USC §§ 1964(c) and (d), providing that any person injured in his business or property by reason of 18 USC § 1962 may sue therefor in any appropriate United States District Court.

8.     This action may be brought in this judicial district pursuant to 18 USC § 1965(a) and 28 USC § 1391(b), because defendant Louis Bacon resides and transacts affairs in this district and a substantial part of the events giving rise to the claims herein occurred in this district.

<u>Background</u>

9.     Mr. Bacon, through associates, including professional investigators, has had a pattern and practice over many years of offering to pay witnesses with alleged connections to plaintiffs upon agreement or understanding that any testimony of such witnesses would be influenced.

10.     On January 14, 2015, Mr. Bacon filed an action against the three plaintiffs herein in the Supreme Court of New York, New York County, <u>Bacon v. Nygård, et al.</u>, No. 150400/2015 ["the NY case"].

11.     Law Firm #1 is a law firm located in New York City, and represented Mr. Bacon in the NY case.

Stephen Feralio

12.     Mr. Bacon submitted a declaration of Stephen Feralio, a videographer who worked for plaintiffs, in this court in an action under 28 USC § 1782.  Mr. Feralio was extensively cited in the NY case.  Mr. Bacon, through Belvedere Property Management and Wilson Mesa Ranch Holdings, has paid for Mr. Feralio's one bedroom rental apartment and has made additional payments to him.  These entities have agreed to indemnify Mr. Feralio in connection with his cooperation.

Livingston Bullard, Wisler Davilma, Clement Chea

13.     On February 12, 2015, and again on February 19, 2015, on behalf of Mr. Bacon, John J. DiPaolo, a former FBI investigator, through his firm, The D&R Agency, LLC, along with his associate James Lawson, a former FBI Senior Special Agent, met with Livingston Bullard [aka "Toggie"] and Wisler Davilma [aka "Bobo"] in Nassau, the Bahamas.  D&R is an investigative agency with multiple clients, with an array of investigative and protective security services, which holds itself out as offering these services to the general public.

14.     The February 19 meeting was recorded.

15.     During the February 19 meeting, Mr. DiPaolo said he was on the telephone with lawyers with Law Firm #1 in New York.  Mr. DiPaolo or Mr. Lawson said the following to Mr. Bullard and Mr. Davilma [with page number references to a

transcript prepared from the recording]:

      (a)    "Well, obviously, I think, this, there is a progression of cooperation payments.  I don't know if they are willing to pay three million dollars up front.  This is our first conversation.  I think what they intended to do is, to give a portion of money in good faith to you today for the information that you come to the table with."  Page 10.

      (b)    "So for the totality of all of your cooperation, however long it takes, including your testimony at some point, plus everything that you are giving us, plus the continued cooperation, and meeting with Nygård, and, him coming into your car, and recording him, and so on, and so forth, you put a value of that on the totality of it of five million?"  Page 20.

      (c)    "They are going to call the main attorney, that is handling that, and call us back.  These are the people we have been directly dealing with, it is a law firm, [Law firm # 1], which is up in New York.  And, they have been retained by Mr. Bacon to represent him on this, and other matters.  He is the one that eventually hired us out of Florida to do the investigative aspect of Nygård here."  Pp. 31-32.

      (d)    "The attorneys are calling, the people we deal with out there are not top partners of the law firm.  We are dealing with people who are

delegated to deal with this.  So, now, they are talking to the partners, direct

contact with Mr. Bacon negotiating."  Page 34.

(e)     "Well, there is a judge in civil court.  So, the information, what

they want to, they wanted to use this information just to show what type of

person Nygård is, and, you know, it is not just they are looking at the whole

thing, Nygård has businesses all over the place.  He has made businesses up in

New York.  So extent of the investigation is not solely you guys here in the

Bahamas.  It is a complete investigation that goes elsewhere.  You guys are a

portion of it.  You are a big portion of it.  So, anything that we can show, that

he is doing down here, is going to be part of the whole package."  Pp. 34-35.

(f)     "We called New York, the attorneys, to share with them what

possibly we could start with today, what could eventually could lead to.  Share

with them what they expect today eventually, as far as compensation. So, they

are currently right now discussing that.  See if we can come to terms with

them, if so, we will move forward.  So, hopefully that will happen.  That is

where we are at."  Pp. 35-36.

(g)     "Well, they are very interested, they think the number was a little

high, but, they said it is it is doable.  They are very willing to pay very large

sums of money for your cooperation.  But this will be a continual going back

and forth with them being satisfied that you have the correct information that they want, with you being assured that we have got the money that you want for now, so I guess what they asked for our next step is, you say you got text messages are very damaging.  What are those text messages.  They want to know, do you have text messages, where Nygård talks about criminal behavior?"  Pp. 36-37.

(h)    "They want to know what it is that we are, that they are paying for.  They are willing to pay, they just want us to verify that it is what they want.  It is what it is.  So, somehow, we got to come to an agreement how I can relay that information to them that it is what it is.  It is what you tell, what you say it is. And, then we will continue this dialogue, and pay you large sums of money. That is, you know, it is, you know, is a continual feeling out process. It is, we are building a relationship here, they."  Page 37.

(i)    "Got to make sure, I want to make sure that you are happy with what they are willing to give you for that conversation, before we do it obviously.  Well, it depends.  They said they will pay you, they will, they told me they will pay you large sums.  I told them you (sic) your figures, they said it is a little high, but where (sic) willing to pay.  Them based on the fact that if you got text messages they want us to somehow verify that these text messages

are what they want.  They will pay for it. They will give you, they said their position, they are very excited about your cooperation.  They will pay you large sums of money.  And we are in a position to give that to you." Page 39.

(j)      "All I can say these guys have deep pockets, they have lots of money." Page 40.

(k)      "We want a continual cooperation with you.  We want you to continue to meet with Nygård.  And, continue to give us valuable information. This is just the beginning."  Page 45.

(l)      "I am just waiting to see how much money we can give you guys up front.  Like I say this is not coming out of my pocket.  They want some confidence that what they are buying is valuable.  I have no doubt what you guys have is valuable to them.  They have to see, touch, smell it.  So they know.  And they are telling me look, we are willing to pay them an incredible amount of money, but we have to understand that what we are getting is a good product.  That we are not sitting here thinking that we have this great information, which, you may think it is great information, but, it maybe, but it is not necessarily what they need or want.  So, I am sure you have what they want.  They want an example of it.  You show them an example of it, they are willing to pay.  And I am saying the phone call to Nygård, and stuff like that,

all well and good.  Something they want to do in the future.  But that is the future.  We want to establish the past.  We want to establish some past activity between you two guys that shows that you had this relationship with him.  And, that proves that it is criminal in nature, or something that they can use.  If they are happy with that, they will pay.  And we will get the money and bring it to you before.  Before we do anything more.  Okay?  Now let's wait and see what their figure is.  I have to believe a number of attorneys out there, it is not easy."  Page 65.

(m)    "The reason why this stuff is going back and forth and up and down the chain is it is going all the way up to Mr. Bacon and back.  We are talking to partners of the law firm, who is talking to [inaudible]."  Page 73.

(n)    "Again, I said this is going through these guys up to the top.  He says, I told him, I says, you showed me a text.  And, the information contained in the text.  They said that is great.  Okay.  They got to be able to tell Mr. Bacon that you have actual evidence, criminal evidence that they have that they can buy.  If you prove to them, somehow that you have that, they will pay for it.  They will pay for it.  And they will give it to you right now."  Pp. 74-75.

(o)    "I guess we are at this point, where, any business relationship, people up in the New York have to feel warm and fuzzy, that they have

information that they are willing to buy.  And, they are willing to pay exorbitant amounts of money, they have to have something in front of them to show that they have criminal behavior on the part of Nygård, evidence that they have with their buy.  They are willing to buy it.  They are going to spend incredible amount of money to do it, we understand that."  Page 82.

(p)     " . . . we have to show these attorneys that you have something to offer them as valuable evidence, in their case.  And, they said, when you show them that, they will pay you the money.  And, that is where they are at."  Pp. 91-92.

16.    During the February 19 meeting, Mr. Bullard or Mr. Davilma said:

(a)     "Come to court to testify?  I will come to court to testify."  P. 16.

(b)     "Today, and for whatever go on, We looking for five million, . . . , but for today straight up looking for three million for the evidence we give.  Because we know we have the strong evidence.  We show we have the strong evidence.  Because I am going to testify Toggie going to testify."  Page 18.

(c)     "Statement and everything 500 thousand.  And do the affidavit right now.  I could do it right now."  Page 87.

(d)     "I sell for hundred thousand dollars for an affidavit.  Honestly, and truly.  We don't want to affiliate with Nygård, but we could call Nygård,

and get hundred thousand dollars now, $50,000 right now.  Call him right now.  I will show you right now, in front of you guys." Page 105.

17.     Mr. Bullard and Mr. Davilma claimed to have information about Mr. Nygård which would be harmful to Mr. Nygård.

18.     On February 19, 2015, Mr. Bullard provided a signed statement, made in Nassau, the Bahamas, witnessed by Mr. Lawson, with the participation of Mr. DiPaolo, and other employees of D&R, for which Mr. DiPaolo paid Mr. Bullard $50,000.  This payment was made through channels from and authorized by Mr. Bacon in the United States.*  [* Contentions marked with an * are those which will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.]

19.     The February 19 statement contained false and influenced statements regarding plaintiffs, and was taken to be used in the NY case and potential future cases by Mr. Bacon against plaintiffs.  The statements included that Mr. Nygård sent out a hit list.

20.     In October 2015, while in the Cayman Islands, Mr. DiPaolo offered a substantial amount of money to another potential witness, Clement Chea, in exchange for false and influenced information regarding plaintiffs.  This activity was directed and authorized by Mr. Bacon.*

21.     On January 24, 2016, in Miami Springs, FL, with appearances by Mr. DiPaolo and two of his associates, Mr. Bullard gave at least four "sworn statements," stenographically reported by Prestige Reporting Service, Inc., Fort Lauderdale, FL.

22.     On February 4, 2016, in Santo Domingo, Dominican Republic, with appearances by Mr. DiPaolo and two of his associates, Mr. Bullard gave four "sworn statements," stenographically reported by Prestige Reporting Service.

23.     On February 4, 2016, in Santo Domingo, Dominican Republic, with appearances by Mr. DiPaolo and three of his associates, Mr. Davilma gave four "sworn statements," stenographically reported by Prestige Reporting Service.

24.     On February 4, 2016, in Santo Domingo, Dominican Republic, with appearances by Mr. DiPaolo, Mr. Lawson, and two of his associates, Mr. Bullard gave a "sworn statement," stenographically reported by Prestige Reporting Service.

25.     On March 9, 2016, Mr. Bacon and three other plaintiffs filed a lawsuit in the Bahamas Supreme Court against Mr. Nygård and his lawyer, Keod Smith. Smith, Bacon, et al. v. Nygård and Smith, Case No. 2016/CLE/gen/00329 ["the Bahamas case"].

26.     On March 8, 2016, Mr. DiPaolo executed an affidavit in the Bahamas filed in the Bahamas case.  The four January 24, 2016, statements above and the five February 4, 2016, statements above, were exhibits to Mr. DiPaolo's affidavit.

27.     Mr. DiPaolo's March 8 affidavit [¶ 160] acknowledges that payments were made to Mr. Bullard and Mr. Davilma, and that a schedule of payments could be prepared.

28.     The "sworn statements" above contain materially false assertions purchased with Mr. Bacon's enormous sums of money, including that Mr. Nygård prepared a hit list to murder persons, and paid Mr. Bullard and Mr. Davilma to burn a shop and an automobile.  Payments made far exceed compensating the witnesses for expenses and out-of-pocket losses.

Tazhmoye Lacey-Ann Cummings

29.     In about February 2016, Tazhmoye Lacey-Ann Cummings, said in a handwritten statement:

> "She [a person identified as Mr. Bacon's lawyer] informed me that they were ready to go all the way and I would be fully compensated and taken care of and given my own security detail. All I would have to do was agree to fly to California on February 3rd. She told me that she would be my comfort person and whatever I needed she would be there.  She had people wanting to speak to me about . . . about a case they were building.

> "She then gave me the option to completely move to California if I found it to my liking she would make it possibly [sic] for me to get residency, an apartment and a monthly allowance which she said would be a good enough amount to go shopping and completely cover all my expenses, along with a fee that was supposed to be discussed for my time there."

Richette Ross

30.     On June 28, 2016, Richette Ross, a former employee of Mr. Nygård, swore an affidavit submitted in support of Mr. Nygård in an action by Mr. Bacon and other individuals involved in or connected to the enterprise alleged herein.

31.     In a late-August 2016 encounter, Mr. Bullard accosted Ms. Ross, put his hand around her neck, and said he wanted to meet with her to offer her money to walk away from the June 28 affidavit.  Mr. Bullard told Ms. Ross that she should make herself scarce and accept money to walk away from the affidavit.  Mr. Bullard confirmed to Ms. Ross that he was paid by Mr. Bacon from the beginning of the saga between Mr. Nygård and Mr. Bacon.  Mr. Bullard told Ms. Ross that his job with Mr. Bacon was to set up Mr. Nygård by finding women who would say that they had sexual relations with Mr. Nygård and that he had treated them like slaves.

32.     On September 21, 2016, Mr. Davilma told Ms. Ross that the men with and for whom he was working really wanted to pay her to walk away from the June 28 affidavit submitted in support of Mr. Nygård.

33.     Mr. Bullard bragged to Ms. Ross about how he and Mr. Davilma, along with persons whom he said were former FBI agents from the United States, set up Mr. Nygård by having him recorded during private conversations when Mr. Bullard and Mr. Davilma unsuccessfully tried to get Mr. Nygård to endorse killing people.

## Activity in 2018, 2019

34.    In the Fall of 2018, Mr. Nygård's property in the Bahamas was burglarized.  A list of Mr. Nygård's contacts was taken.*  Soon thereafter, investigators directly or indirectly hired by Mr. Bacon, including Mr. Lawson, began contacting persons on the contact list looking for information about alleged criminal misconduct by Mr. Nygård.  Persons contacted include residents of New York, New Jersey, Georgia, and California.

35.    Based upon the practice of Mr. Bacon paying and otherwise conferring benefits on witnesses for false and influenced testimony, the statement of Mr. DiPaolo that Mr. Bacon is willing to pay "exorbitant" and "incredible" amounts of money, and the agency of Mr. Lawson for this purpose, plaintiffs are entitled to injunctive relief to prevent further harm to their business and property.

36.    Taken together, more than a dozen "statements" have been obtained by participants in the enterprise acting on behalf of Mr. Bacon, given by purported witnesses to be used against plaintiffs in the NY case, or the Bahamas case, or in potential other lawsuits in the United States, the Bahamas, or elsewhere, and also to be used in the media.

37.    These "statements" had no legitimate purpose.  The statements are to capture information, regardless of truth, to use to hurt plaintiffs in their business and

property.  The statements constitute influenced testimony within the meaning of NY

Penal Law § 215.00, bribing a witness.

<u>Count I - Violations of 18 USC § 1962(c)</u>

38.     Plaintiffs incorporate by reference ¶¶ 1 - 37 above as if fully set forth at

length herein.

39.     18 USC § 1964(c) provides a private right of action to any person whose

business or property is injured by reason of a violation of the activities prohibited by

18 USC § 1962.

40.     To establish a RICO claim, plaintiff must show: (1) violation of 18 USC

§ 1962; (2) injury to business or property; and (3) the injury was caused by the

violation of § 1962.  To establish such a violation, plaintiff must show (1) conduct

(2) of an enterprise (3) through a pattern (4) of racketeering activity.

41.     Under 18 USC § 1961(4), an "enterprise" is any "group of individuals

associated in fact although not a legal entity," for a common purpose of engaging in

a course of conduct, proved by evidence of an ongoing organization, formal or

informal, whereby the various associates function as a continuing unit.  A collection

of RICO "persons" may, together, make up a RICO enterprise, where persons

conducted or participated in the enterprise's affairs, not just their own affairs.

42.     Under 18 USC § 1961(1)(A), "racketeering activity" means any act or

threat involving bribery chargeable under State law and punishable by imprisonment

for more than one year.  This includes NY Penal Law § 215.00, bribing a witness:

> "A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced, . . . ."

43.    Under 18 USC § 1961(1)(B), "racketeering activity" means any act

indictable under Title 18 of the US Code, including § 1956, "relating to laundering

of monetary instruments."

44.    Under 18 USC § 1961(5), a "pattern of racketeering activity" means "at

least two acts of racketeering activity" within a ten-year period.

<u>RICO enterprise</u>

45.    The "enterprise" here is the association in fact of numerous individuals

and entities, including, but not limited to, Mr. Bacon, Mr. Bullard, Mr. Davilma, Mr.

DiPaolo, and Mr. Lawson, who have banded together to obtain false and influenced

statements and affidavits for the purpose of damaging plaintiffs in their business and

property in the United States.  Mr. Bullard and Mr. DiPaolo referred to the

association in fact as a "team" [2/19/15 transcript at 32].

Racketeering activity - NY Penal Law - bribing a witness

46.     The "racketeering activity" here under 18 USC § 1961(1)(A) includes

violations of NY Penal Law § 215.00, in which when Mr. Bacon and his associates,

including Mr. DiPaolo and Mr. Lawson conferred, or offered or agreed to confer,

benefits upon witnesses or persons about to be called as witnesses, namely, Mr.

Feralio, Mr. Bullard, Mr. Davilma, Mr. Chea, and Ms. Ross, in any action or

proceeding, including the NY case and the Bahamas case, upon agreements or

understandings that the testimony of such witnesses will thereby be influenced.

47.     NY Penal Law § 215.00 is a class D felony under New York law.

"Felony" means an offense for which a sentence to a term of imprisonment in excess

of one year may be imposed.

Racketeering activity - money laundering

48.     The "racketeering activity" here under 18 USC § 1961(1)(B) includes

violations of 18 USC § 1956, laundering of monetary instruments.

49.     Pursuant to 18 USC § 1956(a)(2)(A), whoever transports, transmits, or

transfers, or attempts to transport, transmit, or transfer a monetary instrument or

funds from a place in the United States to or through a place outside the United

States or to a place in the United States from or through a place outside the United

States with the intent to promote the carrying on of specified unlawful activity, is

subject to a fine, or imprisonment, or both.

50.     Pursuant to 18 USC § 1956(c)(7)(B)(vi), "specified unlawful activity" means "an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States."

51.     The "specified unlawful activity" here is the bribery of witnesses alleged above.

52.     Bribing witnesses would subject violators to prosecution in the United States or extradition under the United Nations Convention Against Transnational Organized Crime ("Convention"), given that such conduct contravenes numerous sections of the Bahamas Penal Code carrying potential deprivations of liberty of at least four years.  For examples: Convention Articles 2, 5, 16, 23; Bahamas Penal Code Chapter 84, Title xxviii, §§ 346 (Extortion), 423 (Perjury), 424 (Perjury); Bahamas Justice Protection (Amendment) Act, 2014, Chapter 64A (Obstruction of Justice); Bahamas Penal Code (Amendment) Act, 2014 (Organized Crime).

53.     The transfers of money by Mr. Bacon and his associates from a place within the United States, directly or indirectly, to Mr. Bullard, Mr. Davilma, their agents or proxies, outside the United States, for the purpose of bribing them, were violations of the money laundering statute, 18 USC § 1956, and thereby racketeering

activity under 18 USC § 1961(1)(B).

54.     The predicate acts include multiple payments each to Mr. Bullard and

Mr. Davilma.  The total requested amount of the payments was $5,000,000

[Transcript at 20].

55.     The source of the payments is Mr. Bacon or entities controlled by him

inside the United States.*  Mr. Bacon, directly or indirectly, hired associates to

obtain the false and influenced statements against plaintiffs alleged herein.  Mr.

Bacon also worked with individuals in the New York office of Law Firm # 1.

During Mr. DiPaolo's February 2015 discussions with Mr. Bullard and Mr. Davilma,

references were made about obtaining money from the New York office of Mr.

Bacon's worldwide law firm, meaning Law Firm # 1, to be used as payments to Mr.

Bullard and Mr. Davilma in exchange for the false and influenced statements.

56.     The pattern of activity is offering to pay, agreeing to pay, and paying

witnesses, as well as influencing witnesses, including Mr. Bullard and Mr. Davilma,

to provide false and influenced statements, in connection with testimony or

prospective testimony.

Injury to business or property

57.    As a direct result of the racketeering activity alleged above, as well as

the conduct of other participants in the RICO enterprise, plaintiffs have been injured

in their business and property as follows:

(1)    Plaintiffs have spent significant amounts of money in the United States

to defend legal proceedings prosecuted against plaintiffs through the use of the false

and influenced statements and affidavits alleged above.

(2)    Plaintiffs have spent money for public relations fees in the United States

to combat damages resulting from the use of false and influenced statements in the

press in the United States.

(3)    Plaintiffs lost a long-existing line of credit to be used in the United

States (among other places).  In late 2015, a banking institution with which plaintiffs

had a relationship of nearly 20 years renewed plaintiffs' substantial credit facility.

On March 14, 2016 (within a week after the Bahamas case was filed), that banking

institution sent an e-mail message regarding the "serious allegations" in the Bahamas

case and attached an article from the internet (which was available in the United

States) discussing several of the statements.  Plaintiffs directed that banking

institution to a press release issued in the United States that was intended to combat

the false and influenced statements in the Bahamas case.  Nevertheless, about two

months later, that banking institution terminated its relationship with plaintiffs.
Plaintiffs used money from that institution's credit line in the United States.

(4)     Plaintiffs lost a long-standing client and expansion of business with
Canadian retailers into the United States.

(5)     Plaintiffs lost business their good will and reputation in the United
States.  Mr. Nygård and his businesses are closely identified in the public mind,
similar to other fashion houses.  The false and influenced statements about Mr.
Nygård, have damaged Nygard Partnership and Nygard Inc. through loss of good
will, irreparable harm to their reputation, and lost business and money.

58.     To date, the damages suffered by plaintiffs exceed $1 million.

59.     Such expenditures and financial losses are neither speculative nor
intangible.  As the enterprise continues to operate in the manner alleged herein into
the future, plaintiffs will continue to suffer damages as alleged.

<u>Count II - Violations of 18 USC § 1962(d)</u>

60.     Plaintiffs incorporate by reference ¶¶ 1 - 59 above as if fully set forth at length herein.

61.     Mr. Bacon entered an agreement with other participants in the RICO enterprise, including Mr. DiPaolo and Mr. Lawson, to violate § 1962(c) by obtaining, through unlawful means, false and influenced statements and affidavits to be used against plaintiffs to injure them in their business and property.*

62.     In accordance with the above-described agreement, Mr. Bacon obtained, through unlawful means, the false and influenced statements and affidavits alleged above.

63.     As a direct result of the conspiracy among Mr. Bacon and the other participants in the RICO enterprise, plaintiffs have been injured in their business and property as described above.

WHEREFORE, plaintiffs demand judgment in their favor and against defendant Louis M. Bacon, as follows:

(1)     Awarding actual damages as will be determined at trial;

(2)     Awarding treble damages, attorney fees, interest and other relief provided by statute;

(3)     Preliminarily and permanently enjoining Louis Bacon and those acting in concert with him from paying or conferring benefits upon prospective witnesses in proceedings involving plaintiffs; and,

(4)     Such other and further relief as this court deems just and proper.


_/s/_ *Michael S. Fettner*
Michael S. Fettner
LYMAN & ASH
43 West 43rd Street, Suite 85
New York, NY 10036-7424
(212) 225-8130
michael@lymanash.com

Counsel for Plaintiffs