## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER J. NYGÅRD, NYGÅRD INTERNATIONAL PARTNERSHIP, and NYGÅRD INC., <br><br> Plaintiffs, <br><br> v. <br><br> LOUIS M. BACON, JOHN DOES 1-20 AND DOE CORPS. 1-10, <br><br> Defendants. | **Civil Action No. 1:2019-cv-01559-LGS-KNF** |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs PETER J. NYGÅRD, NYGÅRD INTERNATIONAL PARTNERSHIP, and NYGÅRD, INC., (hereinafter collectively referred to as "Plaintiffs" unless otherwise specifically designated) by their attorneys, Wilson Elser Moskowitz Edelman & Dicker LLP, complaining of Defendants, LOUIS M. BACON (hereinafter "Defendant" or "Louis Bacon" unless otherwise specifically designated), JOHN DOES 1-20 and DOE CORPS. 1-10 (together Louis Bacon, John Does 1-20 and Doe Corps 1-10 shall be referred to as "Defendants") allege as follows.

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 5

PARTIES ............................................................................................................... 5

OTHER RELEVANT INDIVIDUALS/ENTITIES ................................................. 8

    Zack H. Bacon ................................................................................................ 8

    Ann Colley ...................................................................................................... 9

    Robert F. Kennedy, Jr. .................................................................................. 10

    Frederick Smith ............................................................................................ 11

    Moore Capital Management ......................................................................... 13

    The Moore Charitable Foundation ............................................................... 14

    Belvedere Property Management ................................................................. 15

    Wilson Mesa Ranch Holdings L.L.C. .......................................................... 16

    Waterkeeper Alliance, Inc. ........................................................................... 17

    Save The Bays ............................................................................................. 19

    Philencia Cleare ........................................................................................... 20

    Tazhmoye Cummings ................................................................................... 21

    Samantha Storr ............................................................................................ 21

    Stephen Feralio ............................................................................................ 22

    Jestan Sands ................................................................................................ 23

    Other Unnamed Individuals Kept Hidden By Defendant .............................. 24

    Wisler Davilma ............................................................................................. 24

    Livingston Bullard ........................................................................................ 25

    Sean Merrick ................................................................................................ 26

2

Bradley Pratt ............................................................................................................ 27

Gerald "Jerry" Forrester ........................................................................................ 28

Stephen Davis .......................................................................................................... 28

Callenders & Co. ..................................................................................................... 29

Doneth Cartwright ................................................................................................... 30

Palladino & Sutherland ........................................................................................... 31

Jack Palladino ......................................................................................................... 32

Sara Ness ................................................................................................................. 33

Allison Cain ............................................................................................................. 34

D&R Agency LLC ................................................................................................... 35

John DiPaolo ........................................................................................................... 36

R. Scott Rivas ......................................................................................................... 37

James Lawson .......................................................................................................... 37

OTIA Investigations ................................................................................................ 39

Gary Marchetti ........................................................................................................ 40

New York-based Law Firm ..................................................................................... 41

Jeff Davis ................................................................................................................ 42

Anthony Beach ........................................................................................................ 43

Prominent New York Newspaper ............................................................................ 44

Internationally Known Reporter for The New York Times ...................................... 45

Canadian Bureau Chief for The New York Times .................................................... 46

Canadian Broadcasting Company ........................................................................... 47

Sistahsabused.com ................................................................................................... 47

JURISDICTION AND VENUE ......................................................................................... 48

ADDITIONAL FACTUAL ALLEGATIONS .................................................................... 49

3

2010-2012 Payments for False Statements ..................................................... 51

2014 Media Publication ................................................................................. 56

Efforts to Arrange for False Testimony to Be Used in Media, False Reports and
   Claims ...................................................................................................... 57

Livingston Bullard, Wisler Davilma, Clement Chea ..................................... 58

Philencia Cleare False Statements ................................................................ 64

Tazhmoye Cummings False Statements ........................................................ 67

Samantha Storr ............................................................................................. 71

Other People in the Private Witness Protection Program ............................. 73

Richette Ross ................................................................................................. 73

Improper Activity in 2015-2016 ................................................................... 75

Improper Activity in 2018-2019 ................................................................... 78

The Pending Media Assault .......................................................................... 79

The More Than Ten Year Conspiracy to Damage Plaintiffs Continues .......... 80

COUNT I        VIOLATIONS OF 18 U.S.C. § 1962(C) ............................................. 82

RICO enterprise .......................................................................................... 96

Racketeering activity .................................................................................. 96

Injury to business or property ..................................................................... 99

COUNT II       VIOLATIONS OF 18 U.S.C. § 1962(D) ........................................... 100

COUNT III      TORTIOUS  INTERFERENCE  WITH  PROSPECTIVE  ECONOMIC
               ADVANTAGE ............................................................................. 101

COUNT IV       AIDING AND ABETTING THE FILING OF A FALSE REPORT ............... 103

COUNT V        FILING OF A FALSE REPORT ...................................................... 104

COUNT VI       TRAFFICKING AND HARBORING CERTAIN ALIENS TO FURTHER
               A FRAUDULENT ACT .................................................................. 104

COUNT VII      ABUSE OF PROCESS .................................................................. 105

4

## INTRODUCTION

i.      This is an action to enjoin, and seek redress for, the conduct of Defendants, in concert with others, in engaging in a pattern of illicit and illegal conduct designed to improperly influence witnesses to make false statements, file false reports, abuse process, tortiously interfere with business relations and aid and abet the dissemination of false statements in conjunction with infringing copyrighted works and trademarks, all for the intentional purpose of damaging Plaintiffs, their business and their property, in violation of the Racketeer Influenced and Corrupt Organizations Act and other laws as set forth below.

ii.      For over ten years, Plaintiffs and Defendants have engaged in an ongoing conflict which initially arose out of a property owner dispute but has since spilled out to battle across multiple countries, now focused in the United States. Having failed to convince the U.S. Department of Homeland Security and the Federal Bureau of Investigation ("FBI") to work with them to complete their desired result of destroying Plaintiffs, Defendants have now turned their attention to attempting to improperly influence and providing false information to a prominent New York newspaper to assist them in their quest. In addition, Defendants have conducted other media attacks, which are often supported by fabricated and manufactured evidence, and which are often made through payments, threats, coercion and intimidation. Through the use of U.S. and foreign investigators and "guards," Defendants have created their own fake "witness protection program" to coerce witnesses to cooperate in their scheme. In addition, upon information and belief, Defendants have used a series of corporate gymnastics, including the improper use of not-for-profit entities, to funnel tens of millions of dollars to fund their illicit activities while presumably taking improper tax deductions.

## PARTIES

1.      Peter J. Nygård is a Canadian citizen and resident. He is the founder and, directly

5

or indirectly, owns or controls Nygård International Partnership and Nygård, Inc., who conducts business at various locations throughout the world, including substantial business in the United States, as a designer, manufacturer, distributor, and seller of women's clothing and accessories. Peter Nygård and his businesses are closely associated in the public eye. The companies design, manufacture, distribute and sell under several different brands, one of which carries the brand name Peter Nygård. One of the stores selling such merchandise is branded Nygård, with a location at 1431 Broadway, New York, NY 10018.

2.      Nygård International Partnership is a registered partnership between two Canadian federal corporations, 4093887 CANADA LTD. and 4093879 CANADA LTD., which is an operating entity through which the Company does business. It is the successor to a Canadian corporation which began its business operations in 1967. Its principal administrative office is at 1771 Inkster Boulevard, Winnipeg, Manitoba, R2X 1R3. Nygård International Partnership markets its products using Peter Nygård's name and his personal and photographic image.

3.      Nygård, Inc. is a Delaware corporation, and since 2005 has carried on business at its world headquarters at 1435 Broadway, New York, NY 10018. Nygård, Inc. conducts substantial business in the United States.

4.      Defendant Louis M. Bacon ("Louis Bacon") is a resident of New York State, with residences and businesses in New York City and on Long Island. Louis Bacon is the Chairman and Chief Executive Officer of Moore Capital Management, a private investment management firm headquartered at 11 Times Square, New York, NY 10036, with additional offices in London and Hong Kong.

5.      Louis Bacon is also Chairman of the Boards of Belvedere Property Management, LLC, a property management firm with headquarters in New York, and Wilson Mesa Ranch

Holdings, LLC, a land holding company that is affiliated with Belvedere Property Management.

6.      Louis Bacon is the Founder and Chairman of the Board of The Moore Charitable Foundation, Inc., a New York-based not for profit located at 11 Times Square, New York, New York 10036.

7.      Louis Bacon is a founding member and a director of Save The Bays, an organization in the Bahamas that upon information and belief relies heavily on funding and support from Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

8.      Louis Bacon has carried out and continues to carry out illegal and improper activities, and has directed, supervised and requested that others, directly and indirectly, including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to damage Plaintiffs.

9.      John Does 1-20 are those individuals (male and female) who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the individuals mentioned below.

10.      John Does 1-20 have carried out and continue to carry out illegal and improper activities, and have directed, supervised and requested that others, directly and indirectly, including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to damage Plaintiffs.

11.      Doe Corps. 1-10 are those entities who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the entities mentioned below.

12.      Doe Corps. 1-10 have carried out and continue to carry out illegal and improper activities, and have directed, supervised and requested that others, directly and indirectly,

7

including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to damage Plaintiffs.

## **OTHER RELEVANT INDIVIDUALS/ENTITIES**

Zack H. Bacon

13.     Zack H. Bacon, III ("Zack Bacon") is a New York resident.

14.     Zack Bacon is a Managing Director at Moore Capital Management.

15.     Zack Bacon is Louis Bacon's older brother.

16.     Zack Bacon has been involved in activities to further the actions taken against Plaintiffs.

17.     Zack Bacon directed many of the activities taken against Plaintiffs or in furtherance of Defendants' scheme and plan to destroy Plaintiffs.

18.     Upon information and belief, Zack Bacon was part of a plan to have the Department of Homeland Security investigate Peter Nygård.

19.     Zack Bacon was aware that information provided to the Department of Homeland Security to investigate Peter Nygård was false.

20.     Upon information and belief, Zack Bacon was part of a plan to have the FBI investigate Peter Nygård.

21.     Zack Bacon was aware that information provided to the FBI to investigate Peter Nygård was false.

22.     Upon information and belief, Zack Bacon was part of a plan using a prominent New York newspaper and other media outlets to further Defendant's scheme to damage Plaintiffs' business and property.

23.     Zack Bacon was aware that information provided to the prominent New York

8

newspaper and other media to investigate and publish about Peter Nygård was false.

24.     Upon information and belief, Zack Bacon carried out illegal and improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

25.     The actions taken by Zack Bacon against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Ann Colley</u>

26.     Ann Colley is a New York resident.

27.     Ann Colley is the Director of Public Relations and charitable giving at Moore Capital Management and the Executive Director and Vice President of The Moore Charitable Foundation ("MCF") and its affiliate foundations.

28.     Ann Colley is the lead strategic adviser to MCF's Chairman, Louis Bacon.

29.     Ann Colley serves on the Board of Trustees of Waterkeeper Alliance, Inc., a New York not-for-profit charity.

30.     Upon information and belief, Ann Colley has been involved in financial decisions regarding the funding of activities by Defendant and/or entities he controls designed to further Defendant's scheme to damage Plaintiffs' business and property.

31.     Upon information and belief, Ann Colley carried out illegal and improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

32.     The actions taken by Ann Colley against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

9

Robert F. Kennedy, Jr.

33.      Upon information and belief, Robert F. Kennedy, Jr. is a New York resident.

34.      Robert F. Kennedy, Jr. is an attorney licensed by and before the Courts of the State of New York.

35.      Robert F. Kennedy, Jr. is the Founder, President and Senior Attorney of Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

36.      Robert F. Kennedy, Jr. is a Member of the Board of Directors of Waterkeeper Alliance, Inc.

37.      Robert F. Kennedy, Jr. serves as a Council member for Waterkeeper Alliance, Inc.

38.      Robert F. Kennedy, Jr. is a Member of the Board of Directors of Save the Bays, a not-for-profit organization based in the Bahamas.

39.      As the President and Board Member of Waterkeeper Alliance, Inc., Robert F. Kennedy, Jr. had a duty and obligation to ensure that monies raised by it and flowing through it were for pure purposes and to further the mission of Waterkeeper Alliance, Inc.

40.      As a Member of the Board of Directors of Save the Bays, Robert F. Kennedy, Jr. had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

41.      Robert F. Kennedy, Jr. has been aware for many years of Defendants' desire to destroy and damage Plaintiffs.

42.      Upon information and belief, Robert F. Kennedy, Jr. carried out illegal and improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

43.      The actions taken by Robert F. Kennedy, Jr. against Plaintiffs in furtherance of

10

Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Frederick Smith</u>

44.     Frederick Smith ("Fred Smith") is a resident of the Bahamas.

45.     Fred Smith is an attorney admitted to practice at the Bars of England and Wales and the Bahamas.

46.     Fred Smith is the Senior Partner of Callenders & Co, a Bahamian law firm.

47.     Fred Smith is the Managing Partner of Callenders & Co.

48.     Fred Smith has appeared in the courts of and provided testimony regarding matters of law in England, the U.S. and Canada.

49.     Fred Smith serves as a Council member for Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

50.     Fred Smith is a Member of the Board of Directors of Save the Bays, a not-for-profit organization based in the Bahamas.

51.     Fred Smith is the "Contact" listed on the Waterkeeper Alliance, Inc.'s Clifton Western Bays Waterkeeper webpage.

52.     Upon information and belief, Fred Smith has traveled to New York to meet with Louis Bacon and/or his representatives in connection with litigation between Louis Bacon and Peter Nygård.

53.     Upon information and belief, Fred Smith has conducted business in New York and elsewhere in the U.S. on behalf of Defendant.

54.     Upon information and belief, Fred Smith has conducted business in New York and elsewhere in the U.S. on behalf of Save the Bays.

55.     Upon information and belief, Fred Smith and/or his law firm was/were paid by or

on behalf of Defendant, or an entity he controls, to carry out certain illegal or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

56.    Fred Smith's acts have damaged, continue to damage and threaten to damage Plaintiffs.

57.    As a Member of the Board of Directors of Save the Bays, Fred Smith had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

58.    Through his affiliations with the named charitable organizations and as counsel, Fred Smith had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

59.    Upon information and belief, Fred Smith was involved in a number of improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

60.    Fred Smith acted in concert with and/or as agent for Defendant in carrying out illegal or improper activities to further Defendant's scheme to damage Plaintiffs' business and property.

61.    Fred Smith acted in concert with and/or as agent for Defendant in carrying out activities designed to damage Plaintiffs.

62.    Fred Smith's actions to further Defendant's scheme to damage Plaintiffs' business and property were done not only as counsel to Defendant, but in Fred Smith's personal and business capacity as well.

63.    Upon information and belief, Fred Smith authorized, directed and carried out illegal

and improper activities to further Defendant's scheme to damage Plaintiffs' business and property in arranging for the swearing of false statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security and the FBI.

64.      Fred Smith initiated contact with a prominent New York newspaper to instigate a false story about Peter Nygård to further Defendant's scheme to damage Plaintiffs' business and property.

65.      Upon information and belief, Fred Smith provided false information to a prominent New York newspaper with the intent to have this information published to further Defendant's scheme to damage Plaintiffs' business and property.

66.      Upon information and belief, Fred Smith arranged for representatives of a prominent New York newspaper to meet with individuals who he knew would provide false information about Peter Nygård.

67.      Upon information and belief, Fred Smith arranged for representatives of a prominent New York newspaper to meet with individuals who were paid to provide the reporter with false information.

68.      Upon information and belief, Fred Smith carried out illegal and improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

69.      The actions taken by Fred Smith against Plaintiffs were authorized, directed, paid for and/or ratified by Defendant.

Moore Capital Management

70.      Moore Capital Management, L.P. ("MCM") is a Delaware Limited Partnership with its principal place of business in New York.

71.     MCM is a global investment management firm based in New York.

72.     MCM, together with its affiliates, is a private investment management firm with offices in New York, London and Hong Kong.

73.     Together MCM and its affiliates shall be referred to herein as "Moore Capital."

74.     Moore Capital's headquarters are located at 11 Times Square, New York, New York.

75.     Moore Capital was founded in 1989 by Defendant.

76.     Defendant is the Chairman and CEO of Moore Capital.

77.     Upon information and belief, Moore Capital made charitable contributions it knew were not to be used for the mission of the charities, but instead were to be used to further Defendant's scheme to damage Plaintiffs' business and property

78.     Upon information and belief, Moore Capital carried out illegal and improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

79.     The actions taken by Moore Capital against Plaintiffs in further of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>The Moore Charitable Foundation</u>

80.     The Moore Charitable Foundation, Inc. ("MCF") is a New York not-for-profit corporation formed in 1992.

81.     MCF is located at 11 Times Square, New York, New York.

82.     Defendant was the founder of MCF.

83.     Defendant is the Chairman of MCF.

84.     Upon information and belief, Defendant is the President of MCF.

14

85.     MCF has affiliate foundations across North America, including The Orton Foundation in North Carolina.

86.     Defendant is Chairman of the MCF affiliate foundations.

87.     MCF claims to be a private not-for-profit foundation committed to land and water conservation.

88.     Upon information and belief, MCF accepted charitable contributions knowing that the funds were to be used to further Defendant's scheme to damage Plaintiffs' business and property.

89.     Upon information and belief, MCF accepted charitable contributions knowing that the funds were to be used to destroy and damage Plaintiffs' business and property

90.     Upon information and belief, MCF made grants to other charitable organizations to further Defendant's scheme to damage Plaintiffs' business and property.

91.     Upon information and belief, MCF made grants to other charitable organizations knowing that the funds were to be used to destroy and damage Plaintiffs' business and property.

92.     Upon information and belief, MCF used funds to further the scheme to destroy and damage Plaintiffs.

93.     Upon information and belief, MCF carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

94.     The actions taken by MCF against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Belvedere Property Management

95.     Belvedere Property Management LLC ("Belvedere") is a Delaware Limited

Liability Company licensed to do business in New York.

96.     Belvedere is a property management entity based in New York.

97.     Belvedere is located at 11 Times Square, New York, New York.

98.     Defendant is the sole member and Chairman of the board of Belvedere.

99.     Upon information and belief, Belvedere was used as a vehicle to pay witnesses to further Defendant's scheme to damage Plaintiffs' business and property.

100.    Upon information and belief, Belvedere was used to support Defendant's private witness protection program and harbor illegal aliens.

101.    Upon information and belief, Belvedere carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

102.    The actions taken by Belvedere against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Wilson Mesa Ranch Holdings L.L.C.

103.    Wilson Mesa Ranch Holdings L.L.C. ("Wilson Mesa") is a Delaware Limited Liability Company formed in 2007.

104.    Defendant is the sole member and Chairman of the board of Wilson Mesa.

105.    Wilson Mesa is a land holding company.

106.    Wilson Mesa is affiliated with New York-based Belvedere.

107.    Wilson Mesa was a vehicle used to further the private witness protection program.

108.    Upon information and belief, Wilson Mesa carried out illegal and/or improper activities against Plaintiffs to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

109.    The actions taken by Wilson Mesa against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Waterkeeper Alliance, Inc.

110.    Waterkeeper Alliance, Inc. ("Waterkeepers") is a New York not-for-profit corporation.

111.    Waterkeepers is located at 180 Maiden Lane, Suite 603, New York, New York.

112.    Waterkeepers stated mission as shown on its website is to strengthen and grow a global network of grass roots leaders protecting everyone's right to clean water.

113.    Waterkeepers states on its website that it unites more than 300 organizations and affiliates that are on the frontlines of the global water crisis, patrolling and protecting more than 2.5 million square miles of rivers, lakes, and coastal waterways on six continents.

114.    Waterkeepers 2018 Annual Report featured five examples of Waterkeepers work on the front lines, including Columbia Riverkeeper, Waterkeepers Bangladesh, Huong Waterkeeper (Vietnam), Miami Waterkeeper and Maranon Waterkeeper (Peru).

115.    Waterkeepers 2018 Annual Report, as shown on its website, is 21 pages long and does not mention the work it is doing in the Bahamas.

116.    Waterkeepers has affiliate entities in the Bahamas.

117.    Waterkeepers has an affiliate or subsidiary known as Clifton Western Bays Waterkeeper.

118.    Fred Smith is the "Contact" for Clifton Western Bays Waterkeeper.

119.    Fred Smith uses a Cliftonbwk@gmail.com email address.

120.    Clifton Western Bays Waterkeeper's website redirects to the Savethebays.bs website.

17

121.    Waterkeepers has an affiliate or subsidiary in the Bahamas known as Waterkeepers Bahamas.

122.    Rashema Ingraham is the contact for Waterkeepers Bahamas.

123.    Rashema Ingraham was a legal secretary for approximately five years at Callenders.

124.    Rashema Ingraham's email contact information at Waterkeepers Bahamas is Rashema@savethebays.bs.

125.    Waterkeepers Bahamas' website redirects to the savethebays.bs website.

126.    In a 2010 Denver Post article, Robert F. Kennedy, Jr. was quoted as saying of Defendant, "He's never scared of a fistfight," and "He is our [Waterkeepers'] single largest supporter. He's one of the few supporters out there who are willing to fund litigation and fight long term."

127.    Since then, Defendant has continued to fund Waterkeepers through entities he controls in order to further defendant's scheme to destroy and damage Plaintiffs' business and property.

128.    Upon information and belief, Waterkeepers has funneled millions of dollars to the Bahamas for Defendant's fight against Peter Nygård.

129.    Upon information and belief, some of the funds funneled by Waterkeepers to the Bahamas were used to support Defendant's campaign to destroy and damage Plaintiffs.

130.    Upon information and belief, some of the funds funneled by Waterkeepers to the Bahamas were used to pay individuals mentioned herein to provide false statements about Plaintiffs or engage in activity otherwise mentioned herein.

131.    Upon information and belief, Waterkeepers carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the

direction of, under the supervision of, at the request of or on behalf of Defendant.

132.    The actions of Waterkeepers against Plaintiffs and in furtherance of Defendant's

scheme were authorized, directed, paid for and/or ratified by Defendant.

Save The Bays

133.    Save the Bays was initially formed as a charity in the United States.

134.    Fred Smith was the President of the Save the Bays charity formed in the United

States.

135.    Joseph Darville was the Vice President of Save the Bays charity formed in the

United States.

136.    Lindsey McCoy was the Executive Director of Save the Bays, which was based in

Ohio.

137.    Save the Bays is now a Bahamian not-for-profit organization.

138.    Defendant is on the Board of Directors of Save the Bays.

139.    Joseph Darville is on the Board of Directors of Save the Bays.

140.    Robert F. Kennedy, Jr. is on the Board of Directors of Save the Bays.

141.    Matthew McCoy, the husband of Lindsey McCoy, is on the Board of Directors of

Save the Bays.

142.    Fred Smith is on the Board of Directors of Save the Bays.

143.    The mission of Save the Bays is to preserve and protect Bahamian lands, waters

and ecosystems.

144.    The mission of Save the Bays is not to destroy and damage Plaintiffs' business and

property.

145.    Upon information and belief, Save the Bays has used funds funneled to it or through

19

it, to pay for the scheme to destroy and damage Plaintiffs business and property, including the procurement of false statements against Plaintiffs.

146.    Upon information and belief, Save the Bays carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

147.    The actions of Save the Bays against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Philencia Cleare

148.    Philencia Cleare is a Bahamian citizen residing in the United States.

149.    Philencia Cleare is living in the United States at the request of and at the expense of Defendant.

150.    Philencia Cleare was and/or is part of a private witness protection program being supported by Defendant.

151.    Upon information and belief, Philencia Cleare was paid by or on behalf of Defendant or through Defendant's agents or representatives to carry out certain activities to further Defendant's scheme to damage Plaintiffs' business and property.

152.    Philencia Cleare was paid, compensated, threatened and coerced to provide false statements for use in the destruction and damage to Plaintiffs.

153.    Philencia Cleare carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiffs' business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

154.    The actions of Philencia Cleare against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

1044774v.2

Tazhmoye Cummings

155.    Tazhmoye Cummings is a Jamaican citizen residing in the United States.

156.    Tazhmoye Cummings is living in the United States at the request of and at the expense of Defendant.

157.    Tazhmoye Cummings was and/or is part of a private witness protection program being supported by Defendant.

158.    Upon information and belief, Tazhmoye Cummings was paid by or on behalf of Defendant to carry out certain activities against Plaintiffs and in furtherance of Defendant's scheme.

159.    Tazhmoye Cummings was paid, compensated, threatened and coerced to provide false statements for use in the destruction and damage to Plaintiffs.

160.    Tazhmoye Cummings carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiffs.

161.    The acts of Tazhmoye Cummings against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Samantha Storr

162.    Samantha Storr is a Bahamian citizen residing in the United States.

163.    Samantha Storr is living in the United States at the request of and at the expense of Defendant.

164.    Samantha Storr was and/or is part of a private witness protection program being supported by Defendant.

165.    Upon information and belief, Samantha Storr was paid by or on behalf of Defendant

to carry out certain activities against Plaintiffs and in furtherance of Defendant's scheme.

166.    Samantha Storr was paid, compensated, threatened and coerced to provide false statements against Plaintiffs to destroy and damage to Plaintiffs' business and property.

167.    Samantha Storr carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiffs.

168.    The acts of Samantha Storr against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Stephen Feralio</u>

169.    Stephen Feralio is a United States citizen residing in the United States.

170.    Stephen Feralio was and/or is part of a private witness protection program being supported by Defendant.

171.    Upon information and belief, Stephen Feralio was paid by or on behalf of Defendant to carry out certain activities designed to further Defendant's scheme to damage and destroy Plaintiffs' business and property

172.    Upon information and belief, Stephen Feralio was paid by Defendant, or persons related to Defendant, or at direction of Defendant to Defendant's knowledge, to breach the confidentiality agreement that Feralio previously entered into with Plaintiffs.

173.    Upon information and belief, Stephen Feralio provided confidential information to Defendant and/or his agents without Plaintiffs' permission, and in violation of the confidentiality agreement with Plaintiffs.

174.    Upon information and belief, Stephen Feralio wrongfully revealed the confidential information for Defendant with the intent and knowledge that Defendant would use the

22

confidential information to further Defendant's scheme to damage and destroy plaintiffs business and property.

175.    Upon information and belief, Stephen Feralio carried out illegal and/or improper activities directed against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiffs.

176.    The acts and/or actions of Stephen Feralio against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for or ratified by Defendant.

<u>Jestan Sands</u>

177.    Jestan Sands is a Bahamian citizen.

178.    Jestan Sands' current residence is unknown.

179.    Upon information and belief, Jestan Sands was and/or is part of a private witness protection program being supported by Defendant.

180.    Upon information and belief, Jestan Sands was paid by or on behalf of Defendant to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiffs' business and property, including but not limited to the dissemination of false information.

181.    Jestan Sands published numerous falsehoods about Plaintiffs.

182.    Upon information and belief, Jestan Sands was paid, compensated, threatened and coerced to provide false statements in furtherance of Defendants' scheme to destroy and damage Plaintiffs' business and property.

183.    Upon information and belief Jestan Sands carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and continue to damage Plaintiffs.

184.    Upon information and belief, the acts and/or actions of Jestan Sands against

23

Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for, or ratified by Defendant.

### Other Unnamed Individuals Kept Hidden By Defendant

185.   Upon information and belief, Defendant has supported a private witness protection program, secreting away other as yet to be identified individuals who have been paid, coerced, and threatened to cooperate with Defendant and/or his agents in the enterprise discussed herein.

186.   Upon information and belief, these other as yet to be identified individuals were paid, compensated, threatened and coerced to provide false statements for use in the destruction and damage to Plaintiffs.

187.   These as yet to be identified individuals carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

188.   Upon information and belief, the actions of the as yet to be identified individuals against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

### Wisler Davilma

189.   Wisler Davilma is a Bahamian resident.

190.   Wisler Davilma is also known by the nickname "Bobo" (hereinafter Wisler Davilma shall also be referred to as "Bobo").

191.   Bobo has been paid by or on behalf of Defendant to carry out activities designed to further Defendant's scheme to damage Plaintiffs' business and property.

192.   Bobo has been paid by or on behalf of Defendant through funds originating in New York to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiffs'

business and property.

193.    Bobo has been instructed by and has coordinated with attorneys in New York.

194.    Bobo was paid, compensated, threatened and coerced to provide false statements for use in Defendant's scheme to destroy and damage to Plaintiffs' business and property.

195.    Bobo engaged in illegal and improper acts of threatening witnesses who refused to cooperate with Defendant's scheme of disseminating and gathering false statements against Plaintiffs, all at the behest of Defendant.

196.    Bobo carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs.

197.    The actions taken by Bobo against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Livingston Bullard

198.    Livingston Bullard is a Bahamian resident.

199.    Livingston Bullard is also known by the nickname "Toggi" (hereinafter Livingston Bullard shall also be referred to as "Toggi").

200.    Toggi has been paid by or on behalf of Defendant to carry out certain activities designed to further Defendant's scheme to damage Plaintiffs' business and property.

201.    Toggi has been paid by or on behalf of Defendant through funds originating in New York to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiffs' business and property.

202.    Toggi has been instructed by and has coordinated with attorneys in New York regarding the acts/actions taken by Toggi in furtherance of Defendant's scheme to damage

Plaintiffs' business and property.

203.    Toggi was paid, compensated, threatened and coerced to provide false statements for use in Defendant's scheme designed to destroy and damage Plaintiffs' business and property.

204.    Toggi engaged in illegal and improper acts of threatening witnesses who refused to cooperate with Defendant's scheme of disseminating and gathering false statements against Plaintiffs, all at the behest of Defendant.

205.    Toggi carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs.

206.    The acts and actions of Toggi in furtherance of Defendant's scheme to destroy and damage Plaintiffs have been authorized, directed, paid for and/or ratified by Defendant.

<u>Sean Merrick</u>

207.    Sean Merrick is a resident of the United States with a current residence in Los Angeles.

208.    Sean Merrick is professionally known as "Jacky Jasper" (hereinafter "Sean Merrick" or "Jacky Jasper").

209.    Jacky Jasper was also known as the "Hollywood Street King."

210.    Sean Merrick, along with others, operated a website located at diaryofahollywoodstreetking.com and at hollywoodstreetking.com.

211.    Sean Merrick, along with others, was involved in the operation of the website located at diaryofahollywoodstreetking.com and at hollywoodstreetking.com.

212.    The diaryofahollywoodstreetking.com website was registered, controlled, and operated in the United States at all relevant times pertinent hereto.

213.   The diaryofahollywoodstreetking.com website was hosted in the United States.

214.   The diaryofahollywoodstreetking.com website was provided with private and false information about Plaintiffs at the direction of Defendant, his agents or one of the individuals identified herein.

215.   Jacky Jasper had communications with Allison Cain of the Palladino & Sutherland investigation firm who were acting on behalf of Defendant.

216.   Jacky Jasper accepted material about Plaintiffs knowing it would damage Plaintiffs.

217.   Jacky Jasper carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiffs.

218.   The acts and actions of Jacky Jasper against Plaintiffs were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted and/or ratified by Defendant and/or his agents.

<u>Bradley Pratt</u>

219.   Bradley Pratt is a former Bahamian Police Officer.

220.   Upon information and belief, Bradley Pratt received money from or on behalf of Defendant to carry out certain activities directed against Plaintiffs in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

221.   Bradley Pratt was part of Defendant's scheme to compensate witnesses to make false statements about Plaintiffs in order to damage and destroy Plaintiffs business and property.

222.   Bradley Pratt carried out illegal and/or improper activities against Plaintiffs in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which activities have damaged, continue to damage, and threaten to

27

damage Plaintiffs.

223.    The acts and actions of Bradley Pratt directed against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Gerald "Jerry" Forrester

224.    Gerald "Jerry" Forrester is a U.S citizen (hereinafter "Jerry Forrester").

225.    Jerry Forrester is a former FBI agent.

226.    Upon information and belief, Jerry Forrester received money from or on behalf of Defendant to carry out certain activities directed against Plaintiffs in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

227.    Jerry Forrester was part of Defendant's scheme to compensate witnesses to make false statements about Plaintiffs in order to damage and destroy Plaintiffs' business and property.

228.    Jerry Forrester carried out illegal and/or improper activities against Plaintiffs in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs' business and property.

229.    The acts and actions of Jerry Forrester directed against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Stephen Davis

230.    Stephen Davis is a New York-based private investigator.

231.    Upon information and belief, Stephen Davis received money from or on behalf of Defendant to carry out certain activities directed against Plaintiffs in furtherance of Defendant's scheme to damage and destroy Plaintiffs' business and property.

232.    Upon information and belief Stephen Davis was part of Defendant's scheme to

28

compensate witnesses to make false statements about Plaintiffs in order to damage and destroy Plaintiffs' business and property.

233.    Upon information and belief, Stephen Davis carried out illegal and/or improper activities against Plaintiffs in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue, and threaten to damage Plaintiffs' business and property.

234.    The acts and/or actions of Stephen Davis against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Callenders & Co.

235.    Callenders & Co. ("Callenders") is a Bahamian law firm founded in 1903.

236.    Fred Smith is the Freeport Managing Partner of Callenders.

237.    Callenders has several attorneys who have acted both in the Bahamas and the United States on behalf of Defendant.

238.    Upon information and belief, Callenders was and is an integral part of the private witness protection program discussed herein.

239.    Upon information and belief, Callenders was and is part of Defendant's scheme to arrange for false witness statements to be made about Plaintiffs in an effort to destroy and damage Plaintiffs.

240.    Upon information and belief, Callenders authorized, directed and carried out activities for Defendant against Plaintiffs by, among other things, arranging for the swearing of false witness statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security and the FBI.

241.    Upon information and belief, the attorneys at Callenders that participated in

29

Defendant's scheme did so knowingly and with malice.

242.    Attorneys at Callenders arranged for representatives of a prominent New York newspaper to meet with individuals who they knew would provide false information about Plaintiffs.

243.    Attorneys at Callenders arranged for representatives of a prominent New York newspaper to meet with individuals who were paid to provide the reporter with false information directed against Plaintiffs.

244.    Upon information and belief, Callenders carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs.

245.    The acts and/or actions of Callenders directed against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

246.    Callenders was paid for the acts and/or actions taken against Plaintiffs in furtherance of Defendant's scheme, directly or indirectly through funds originating in the United States, and particularly New York.

247.    Callenders was paid for the acts and/or actions taken against Plaintiffs in furtherance of Defendant's scheme directly or indirectly through funds directed by Defendant.

<u>Doneth Cartwright</u>

248.    Doneth Cartwright is a Jamaican citizen, residing in the Bahamas.

249.    Doneth Cartwright is a legal associate at Callenders.

250.    Doneth Cartwright has engaged in conduct in the United States on behalf of Defendant in furtherance of Defendant's scheme against Plaintiffs.

30

251.    Doneth Cartwright has been part of Defendant's scheme to solicit, through payments to witnesses, false statements against Plaintiffs to be used to destroy and damage Plaintiffs' business and property.

252.    Doneth Cartwright has used the private witness protection program to coerce witnesses to comply with Defendant's scheme to provide false statements about Plaintiffs.

253.    Doneth Cartwright arranged for representatives of a prominent New York newspaper to meet with individuals who she knew would provide false information about Plaintiff.

254.    Doneth Cartwright arranged for representatives of a prominent New York newspaper to meet with individuals who she knew were compensated to provide the reporter with false information about and against Plaintiffs in furtherance of Defendant's scheme.

255.    Upon information and belief, Doneth Cartwright authorized, directed and carried out activities against Plaintiffs and in furtherance of Defendant's scheme and for Defendant in arranging for the swearing of false witness statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security and the FBI.

256.    Upon information and belief, Doneth Cartwright carried out illegal and/or improper activities against Plaintiffs in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

257.    The acts and actions of Doneth Cartwright against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Palladino & Sutherland

258.    Palladino & Sutherland is a private detective agency located in San Francisco, California.

31

259.    Palladino & Sutherland is licensed by the Bureau of Security and Investigative Services for the State of California.

260.    Palladino & Sutherland were compensated from or on behalf of Defendant to carry out certain activities against Plaintiffs in furtherance of Defendant's scheme.

261.    Palladino & Sutherland were part of Defendant's scheme to arrange for false witness statements to be made about or against Plaintiffs in an effort to destroy and damage Plaintiffs' business and property.

262.    Upon information and belief, Palladino & Sutherland were part of Defendant's scheme to conduct a private witness protection program designed in part to coerce individuals to provide false sworn testimony about Plaintiffs in an effort to destroy and damage. Plaintiffs, and in an effort to wrongly initiate legal proceedings against Peter Nygård and/or Plaintiffs

263.    Upon information and belief, Palladino & Sutherland attempted to coerce Bianca McKinney, a United States Citizen, to provide false sworn statements against Peter Nygård, by among other things, instituting a false litigation against Plaintiffs.

264.    Upon information and belief, Palladino & Sutherland carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and continue to damage Plaintiffs.

265.    The acts and actions of Palladino & Sutherland against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Jack Palladino

266.    Jack Palladino is a U.S. citizen residing in California.

267.    Jack Palladino is a licensed Private Investigator, licensed by the Bureau of Security

32

and Investigative Services for the State of California.

268.     Upon information and belief, Jack Palladino and/or his company (Palladino & Sutherland) was paid by or on behalf of Defendant to carry out certain activities against Plaintiffs and in furtherance of Defendant's scheme to damage and destroy Plaintiffs' business and property.

269.     Upon information and belief, Jack Palladino was part of Defendant's scheme to arrange for false witness statements to be made about Plaintiffs in an effort to destroy and damage Plaintiffs' business and property.

270.     Upon information and belief, Jack Palladino carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs.

271.     The acts and/or actions of Jack Palladino against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Sara Ness

272.     Sara Ness is a U.S. citizen.

273.     Sara Ness is and/or was an investigator at Palladino & Sutherland.

274.     Upon information and belief, Sara Ness worked on projects for Defendant as an investigator at or with Palladino & Sutherland in furtherance of Defendant's scheme against Plaintiffs.

275.     Upon information and belief, Sara Ness was part of Defendant's scheme against Plaintiffs to solicit false witness statements to be used to destroy and damage Plaintiffs' business and property.

276.     Upon information and belief, Sara Ness in furtherance of Defendant's scheme

33

against Plaintiffs, coerced a witness to provide false statements against and about Plaintiffs to destroy and damage Plaintiffs.

277.    Bianca McKinney, a California resident, claimed that Sara Ness threatened her to assist in Defendant's scheme against Plaintiffs designed to destroy and damage Plaintiffs' business and property.

278.    Upon information and belief, Sara Ness carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

279.    The acts and actions of Sara Ness against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Allison Cain

280.    Allison Cain is a U.S. citizen.

281.    Upon information and belief, Allison Cain currently resides and/or works in Maryland.

282.    Allison Cain was previously associated with the Palladino & Sutherland firm.

283.    Allison Cain worked on projects for Defendant.

284.    Allison Cain was part of the scheme to solicit false statements to be used to destroy and damage Plaintiffs.

285.    Allison Cain communicated with Jacky Jasper about the private and false information published by the diaryofahollywoodstreetking.com website to further the scheme to destroy and damage Plaintiffs.

286.    Upon information and belief, Allison Cain was part of the private witness protection program designed to coerce individuals to make false statements to help destroy and damage

34

Plaintiffs.

287.    Upon information, Allison Cain carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

288.    The acts and/or actions of Allison Cain against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

D&R Agency LLC

289.    The D&R Agency, LLC ("D&R") is an investigative agency based in Fort Lauderdale, Florida.

290.    D&R is licensed by the State of Florida.

291.    Upon information and belief, D&R was retained by a New York investigation firm for or on behalf of Defendant.

292.    Upon information and belief, D&R was paid by or on behalf of Defendant to carry out certain activities.

293.    The funds paid to D&R were directed from New York.

294.    The funds paid to D&R were paid through New York.

295.    D&R engaged in activities to try to set up Peter Nygård in a murder for hire plot and other schemes designed to destroy and damage Plaintiffs.

296.    D&R used funds provided by Defendant and/or Defendants' agents through an intricate improper financial scheme to pay Bobo and Toggi significant sums of money to set up Peter Nygård and encourage the making of false statements against Plaintiffs.

297.    D&R was involved in the planning, developing and coordination of Bobo & Toggi's "murder for hire" scheme.

298.   D&R was involved in the surreptitious recording of Plaintiff, Peter Nygård, without his knowledge or consent.

299.   Upon information and belief, D&R engaged in other activities in furtherance of Defendant's scheme designed to destroy and/or damage Plaintiffs' business and property.

300.   D&R carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiffs.

301.   The acts and actions of D&R were directed against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

John DiPaolo

302.   John DiPaolo is a U.S. citizen.

303.   John DiPaolo is a resident of Florida.

304.   John DiPaolo was and/or is a member of D&R.

305.   John DiPaolo was or is President of D&R.

306.   Upon information and belief, John DiPaolo was paid by or on behalf of Defendant to carry out certain improper and/or illegal activities, against Plaintiffs in furtherance of Defendant's scheme.

307.   John DiPaolo was knowingly and actively engaged in the illegal and/or improper activities designed to destroy and damage Plaintiffs' business and property.

308.   John DiPaolo carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

36

309.    The acts and/or actions of John DiPaolo were directed against Plaintiffs and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant or Defendant's agents.

R. Scott Rivas

310.    R. Scott Rivas ("Scott Rivas") is a U.S. citizen.

311.    Scott Rivas is a resident of Florida.

312.    Scott Rivas is the CEO of The D&R Agency, LLC.

313.    Upon information and belief, Scott Rivas was paid by or on behalf of Defendant to carry out certain improper and/or illegal activities, against Plaintiffs in furtherance of Defendant's scheme.

314.    Scott Rivas was knowingly and actively engaged in the illegal and/or improper activities designed to destroy and damage Plaintiffs' business and property.

315.    Upon information and belief, Scott Rivas carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

316.    The acts and/or actions of Scott Rivas were directed against Plaintiffs and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

James Lawson

317.    James Lawson is a U.S. citizen.

318.    James Lawson is a resident of Florida.

319.    James Lawson is the President of JDL & Associates Consulting Corp. ("JDL").

320.    James Lawson is a former FBI agent.

321.    James Lawson/JDL performed work for or on behalf of Defendant in furtherance of Defendant's scheme against Plaintiffs.

322.    Upon information and belief, James Lawson/JDL was paid by or on behalf of Defendant to carry out certain illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme.

323.    Upon information and belief, in furtherance of Defendant's scheme against Plaintiffs, James Lawson/JDL followed instructions from an entity in New York.

324.    Upon information and belief James Lawson/JDL was actively and knowingly engaged in the illegal and/or improper activities designed to destroy and damage Plaintiffs' business and property.

325.    Upon information and belief James Lawson/JDL was knowingly and actively involved in developing, planning and carrying out Bobo and Toggi's murder for hire plot.

326.    James Lawson/JDL was involved in the surreptitious recordings of Peter Nygård without Peter Nygård's knowledge or consent.

327.    Upon information and belief, James Lawson/JDL has harassed and/or coerced individuals who knew Peter Nygård, including former girlfriends, employees and acquaintances, to provide false statements against Plaintiffs in an effort to damage Plaintiffs' business and property.

328.    James Lawson/JDL carried out illegal and/or improper activities against Plaintiffs at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

329.    The acts and/or actions of James Lawson/JDL were directed against Plaintiffs and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by

Defendant and/or Defendant's agents.

OTIA Investigations

330.    O'Keefe-Tatigian Investigations and Associates, Inc. is or was a Florida-based private investigation business.

331.    Upon information and belief, O'Keefe-Tatigian Investigations and Associates, Inc. was retained to conduct illegal and/or improper activities in furtherance of Defendant's scheme and for or on behalf of Defendant against Plaintiffs.

332.    O'Keefe-Tatigian Investigations and Associates, Inc. is also known as OT Investigations and Associates.

333.    Jack Tatigian was and/or is a principal of O'Keefe-Tatigian Investigations and Associates, Inc.

334.    OT Investigations and Associates ("OTIA") is a Michigan-based investigative firm operated by Jack Tatigian.

335.    OTIA performed work by or on behalf of Defendant.

336.    OTIA performed some of that work in New York.

337.    OTIA was paid by or on behalf of Defendant or through Defendant's agents to perform or carry out certain illegal or improper activities directed against Plaintiffs in furtherance of Defendant's scheme.

338.    OTIA threatened, coerced and/or harassed individuals in New York and throughout the United States in 2018 and 2019 in order to influence and gain cooperation with Defendant's scheme to destroy and damage Plaintiffs through the procurement and dissemination of false statements about the conduct of Plaintiff Peter Nygård.

339.    OTIA carried out its illegal and/or improper activities against Plaintiffs and in

39

furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

340.    The acts and/or actions of OTIA were made against Plaintiffs and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

<u>Gary Marchetti</u>

341.    Gary Marchetti is a U.S. citizen.

342.    Gary Marchetti is a resident of Michigan.

343.    Gary Marchetti is a retired Dearborn Police Department Detective Sergeant.

344.    Gary Marchetti is or was employed by or contracted by OTIA.

345.    Gary Marchetti performed work by or on behalf of Defendant.

346.    Gary Marchetti performed work in New York and elsewhere in the United States on behalf of Defendant.

347.    Gary Marchetti, on behalf of Defendant and in furtherance of Defendant's scheme aimed against Plaintiffs, threatened, coerced and/or harassed individuals in New York and throughout the United States in 2018 and 2019 in order to further Defendant's scheme to destroy and damage Plaintiffs through the procurement and dissemination of false statements about the conduct of Plaintiff Peter Nygård.

348.    Gary Marchetti carried out the illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

349.    The acts and/or actions of Gary Marchetti were made against Plaintiffs and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant.

New York-based Law Firm

350.    A New York-based law firm was paid by or on behalf of Defendant or by Defendant's agents to participate in and orchestrate the activities of agents of Defendant in furtherance of Defendant's scheme against Plaintiffs.

351.    The New York-based law firm participated in the activities designed to secure false statements from individuals about Peter Nygård in an effort to file false reports to initiate criminal and/or civil prosecution of Peter Nygård.

352.    The New York-based law firm communicated with members of the Callenders firm and other representatives/agents of Defendant in order to carry out Defendant's scheme to destroy and damage Plaintiffs' business and property.

353.    Upon information and belief, the New York-based law firm was involved in the private witness protection program.

354.    Upon information and belief, the New York-based law firm carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

355.    The New York-based law firm's acts against Plaintiffs and in furtherance of Defendant's scheme were directed, authorized, paid for and/or ratified by Defendant and/or Defendant's agents.

41

Jeff Davis

356.    Upon information and belief, Jeff Davis is a U.S. citizen.

357.    Upon information and belief, Jeff Davis worked for or on behalf of Defendant.

358.    Upon information and belief, Jeff Davis was paid by or on behalf of Defendant to carry out certain activities against Plaintiffs and in furtherance of Defendant's scheme.

359.    Upon information and belief, Jeff Davis carried out these activities at the direction of or on behalf of individuals located in New York.

360.    Jeff Davis was part of a scheme to coerce, pay and threaten individuals to provide false statements against or about Plaintiffs to destroy and damage Plaintiffs' business and property.

361.    Jeff Davis was part of Defendant's scheme to have the Department of Homeland Security investigate Peter Nygård, in order to destroy and damage Plaintiffs' business and property.

362.    Upon information and belief, the Department of Homeland Security was presented with false documentation and false witness appearances by or at the direction of Jeff Davis with the expectation that Homeland Security would proceed with formal charges and eventual prosecution against Plaintiff Peter Nygård.

363.    Upon information and belief, the Department of Homeland Security closed its case against Peter Nygård and no formal charges were brought.

364.    Jeff Davis's acts caused damage to Plaintiffs.

365.    Jeff Davis was part of a private witness protection program funded by and/or through Defendant and/or his agents in order to coerce individuals to cooperate with the scheme by providing false testimony and evidence against Peter Nygård.

366.    Jeff Davis carried out illegal and/or improper activities against Plaintiffs at the

42

direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiffs.

367.   The acts and/or actions of Jeff Davis against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

<u>Anthony Beach</u>

368.   Anthony Beach is a U.S. citizen.

369.   Anthony Beach is a resident of Georgia.

370.   Anthony Beach is a former Police Officer for the City of Sandy Springs, Georgia, and a former Police Sergeant/Detective/Uniform Officer for the DeKalb County Government.

371.   Anthony Beach was retained or hired to performed services for or on behalf of Defendant against Plaintiffs and in furtherance of Defendant's scheme.

372.   Anthony Beach was paid by or on behalf of Defendant to carry out certain illegal and/or improper activities against Plaintiffs.

373.   Anthony Beach carried out these activities at the direction of or on behalf of individuals located in New York.

374.   Anthony Beach was one of several individuals who participated in, arranged and carried out Defendant's private witness protection program on behalf of Defendant.

375.   Anthony Beach was part of a scheme to coerce, pay and threaten individuals to provide false statements about Plaintiffs in an effort to destroy and damage Plaintiffs' business and property.

376.   Anthony Beach was part of Defendant's scheme to provide false information to the Department of Homeland Security to launch an investigation into and about Peter Nygård in the

43

hopes that formal charges would be brought against him and destroy Plaintiffs' business and property.

377.    Anthony Beach worked with other "Security Guards" as yet to be identified who were all part of Defendant's scheme to coerce, pay and threaten individuals to provide false statements to destroy and damage Plaintiffs' business and property.

378.    Anthony Beach carried out illegal and/or improper activities against Plaintiffs and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to cause damage and threaten to damage Plaintiffs.

379.    The acts and/or actions of Anthony Beach and the as yet to be identified "Security Guards" against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Prominent New York Newspaper

380.    The prominent New York newspaper, the New York Times, is a New York corporation, incorporated on August 26, 1896.

381.    The New York Times's principal place of business is at 620 Eighth Avenue, New York, New York.

382.    The New York Times is a global media company.

383.    For many years, the New York Times had been recognized as a high-quality news organization providing premium content and journalistic excellence.

384.    The New York Times claims to have been awarded many industry and peer accolades, including at least 125 Pulitzer Prizes and citations, more than any other news organization.

44

385.    The New York Times operates a newspaper that is distributed globally.

386.    The New York Times operates websites, including for its newspaper, available internationally.

387.    The New York Times produces a documentary TV series called "The Weekly" which airs Sunday evenings on FX and is available for streaming on Hulu the following day.

388.    The Weekly is a new venture for the New York Times, having first aired in June 2019.

389.    Defendant and/or his agents contacted the New York Times and arranged to provide it with false information to publish a story in furtherance of Defendant's scheme and designed to destroy and damage Plaintiffs' business and property.

390.    The New York Times has dispatched numerous reporters who have claimed to have contacted over 250 people to interview people who knew Plaintiff Peter Nygård in order to publish an 'expose' story about Plaintiff Peter Nygård.

391.    Upon information and belief, during these interviews, reporters tried to steer the individuals to provide information to fit a story the New York Times wanted to tell.

392.    Upon information and belief, the New York Times reporter(s) have indicated that the story is to try to "bring down" Plaintiff Peter Nygård.

<u>Internationally Known Reporter for the New York Times</u>

393.    The internationally known reporter, Kim Barker, is a U.S. citizen.

394.    Kim Barker is the lead investigative reporter on a story about Peter Nygård given to the New York Times by agents for Defendant.

395.    Upon information and belief, Kim Barker, after being provided with information from Defendant and/or Defendant's agents, has indicated that her intent is to "bring down" Peter

45

Nygård.

396.    Upon information and belief, Kim Barker has stated to a third-party that Kim Barker's goal with her investigation is to bring down Peter Nygård.

397.    Upon information and belief, Kim Barker has stated to a third-party that her goal with her investigation is to bring down Peter Nygård, the way the media brought down Harvey Weinstein.

398.    Kim Barker has relied on fabricated and manufactured evidence in pursuing her story, despite being provided with information that the false statements were in fact false.

399.    Kim Barker has relied on fabricated and manufactured evidence in pursuing her story, despite being provided with information that the scheme to damage Plaintiffs using the media was planned by the Defendant and/or his agents.

<u>Canadian Bureau Chief for the New York Times</u>

400.    The Canadian Bureau Chief, Catherine Porter, is a Canadian citizen.

401.    Catherine Porter is the Canada bureau chief for the New York Times, based in Toronto.

402.    Catherine Porter is assisting Kim Barker in reporting a story on Peter Nygård at the behest of Defendant.

403.    Catherine Porter has relied on fabricated and manufactured evidence in pursuing the New York Times's story, despite being provided with information that the story was based on false statements.

404.    Catherine Porter has relied on fabricated and manufactured evidence in pursuing the New York Times's story, despite being provided with information that the scheme to damage Plaintiffs using the media was planned by the Defendant and/or his agents.

Canadian Broadcasting Company

405.    The Canadian Broadcast Company ("CBC") is a Canadian federal Crown corporation that serves as the national public broadcaster for both radio and television.

406.    The CBC previously reported a story concerning Peter Nygård that contained untrue statements that were fabricated and manufactured in exchange for payments.

407.    The CBC broadcast its Fifth Estate program about Nygård on or about April 9, 2010 which included interviews of persons who made false statements about Plaintiff Peter Nygård forcing himself on a woman to have sexual activity without her consent. Prior to the broadcast, that woman averred that such activities never took place and the statements made about her were untrue.

408.    The woman signed a notarized statement denying any sexual or inappropriate conduct on Plaintiff Peter Nygård's part.

409.    The CBC had previously worked with Defendant in damaging Plaintiffs.

410.    Upon information and belief, the CBC or its individual employees are cooperating with the New York Times and Defendant in its and his efforts to damage Plaintiffs.

Sistahsabused.com

411.    Sistahsabused.com is a domain name registered through GoDaddy, a U.S.-based registrar located in Arizona.

412.    Sistahsabused.com has hidden its registration information through Domains by Proxy, LLC, a privacy registration company.

413.    Domains by Proxy, LLC is located in Scottsdale, Arizona.

414.    The domain sistahsabused.com redirects to a Facebook page, @sistahsabused2.

415.    The @sistahsabused2 Facebook page was created on August 24, 2016.

416.    The @sistahsabused2 Facebook page is dedicated to the destruction of Plaintiffs' reputation.

417.    The @sistahsabused2 Facebook page is comprised of false statements designed to damage Plaintiffs.

418.    The @sistahsabused2 Facebook page has engaged in the unauthorized use of Plaintiffs' copyrights, images and trademarks.

419.    The @sistahsabused2 Facebook page has over 1000 "Follows."

420.    The @sistahsabused2 Facebook page seeks to damage Plaintiffs' reputation.

421.    The @sistahsabused2 Facebook page seeks to interfere with, disrupt and damage Plaintiffs' business relations.

422.    Upon information and belief, the acts and actions of those behind or supporting the @sistahsabused2 Facebook page against Plaintiffs and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

## JURISDICTION AND VENUE

423.    Louis Bacon and others persons associated with or employed by the enterprise, conducted and participated in the affairs of that enterprise through a pattern of racketeering activity, and entered an unlawful conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), thereby causing injury to business and property of Plaintiffs.

424.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiffs bring claims under the laws of the United States, specifically, 18 U.S.C. §§ 1964(c) and (d), providing that any person injured in his business or property by reason of 18 U.S.C. § 1962 may sue therefor in any appropriate United States District Court. This Court has

1044774v.2

supplemental jurisdiction over Plaintiffs' state law claims for relief pursuant to 28 U.S.C. § 1367 because those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus form part of the same case or controversy under Article III of the United States Constitution.

425.   This action may be brought in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), because Defendant resides and transacts affairs in this district and a substantial part of the events giving rise to the claims herein occurred in this district.

426.   This judicial district is further appropriate insofar as the actions giving rise to the claims was directed, authorized and/or ratified in this judicial district in New York, a significant number of the witnesses are located in New York, the requested relief is sought to be enforced in the State of New York, and there is no better venue for this dispute to be litigated.

## ADDITIONAL FACTUAL ALLEGATIONS

427.   Several years ago, Louis Bacon, through his companies, foundations and associates, including professional investigators, began a pattern and practice of coercing and offering to pay individuals who currently or previously were allegedly connected with Plaintiffs to provide knowingly false and fabricated statements against Plaintiffs for the purpose of destroying Plaintiffs' business and property.

428.   As early as 2000, at a dinner at his home, Louis Bacon is purported to have said that that he wished Peter Nygård would: "fall off the end of the earth and disappear". At the same dinner, Defendant, Robert F. Kennedy, Jr. and their compatriots were attempting to find a way to remove Peter Nygård from his home in Lyford Cay, and made it very clear they were attempting to discredit Peter Nygård in the eyes of the public.

429.   At a second dinner, also in 2000, which was attended by Robert F. Kennedy, Jr.,

49

Defendant's now-deceased property manager Dan Tuckfield showed off a room in Defendant's residence that was used as a central command to spy on Peter Nygård, his guests, and his property (Nygård Cay) adjacent to Louis Bacon's property at Lyford Cay.

430.   Defendant and/or his agents made an offer to Peter Nygård to buy Nygård Cay.

431.   Peter Nygård rejected the offer.

432.   Defendant and/or his agents told Peter Nygård that he would get the property one way or the other.

433.   Thereafter, Defendant proceeded to shape his enterprise and plan his racketeering activity designed to destroy and damage Plaintiffs so he could rid himself of Peter Nygård at Lyford Cay.

434.   The racketeering activity described herein affects interstate or foreign commerce, and includes, among numerous other activities, paying and offering to pay individuals to harass Plaintiffs, assert untruthful statements about Plaintiffs, influence or intimidate other individuals in their dealings with Plaintiffs, including their business dealings with Plaintiffs, filing false reports about Plaintiffs, making false statements and providing false information to the authorities to prompt criminal action, and to support anticipated legal actions brought by Defendant and his agents or conduits and cohorts against Plaintiffs, including paying and offering to pay witnesses in actions or proceedings upon agreement or understanding that the testimony of such witnesses will thereby be influenced, within the meaning of NY Penal Law § 215, bribing a witness.

435.   Upon information and belief, the racketeering activity further includes paying and offering to pay individuals to harass Plaintiffs, assert untruthful statements about Plaintiffs, and provide false information to the authorities in connection with filing false reports about Plaintiffs within the meaning of NY Penal Law §240.50, and within the meaning of 18 U.S.C. §287.

50

436.   This illegal activity is part of a conspiracy to deprive Plaintiffs of their property and damage their business. Additional illegal activities include harassing and threatening witnesses, manufacturing accusations to be asserted or filed against Plaintiffs, and suborning perjury.

437.   Louis Bacon, through associates, including attorneys and professional investigators, has had a pattern and practice over many years of offering to pay witnesses with alleged connections to Plaintiffs upon agreement or understanding that any testimony of such witnesses would be influenced.

438.   This pattern and practice has continued from at least 2010 up through the present.

439.   The activities identified herein were directed, authorized, paid for and/or ratified by Defendant from New York.

<u>2010-2012 Payments for False Statements</u>

440.   In the fall of 2008, Peter Nygård and his business associates learned that the CBC was working on the development of a negative story about him and his company.

441.   The subsequent CBC program called the "Fifth Estate" was first aired on April 9, 2010.

442.   During this period of time, Peter Nygård and Defendant had a dispute pertaining to the use of their Bahamian properties.

443.   Defendant engaged a Bahamian lawyer, Pericles Maillis, to attack Peter Nygård on various grounds, in an effort to force Peter Nygård to leave the Bahamas.

444.   Pericles Maillis stated to Vivian Whylly in September 2011 that he was seeking girls who would make statements that Peter Nygård drugged and abused them. Pericles Maillis advised that these girls would be taken care of, and told what to say.

445.   Numerous unfounded allegations of misconduct by Peter Nygård found their way

51

into the public, some of which the CBC eventually reported.

446.   An investigation was conducted and revealed that the CBC used corrupt and discredited sources for the purpose of an exposé story.

447.   This included paying admitted dishonest investigators to "find" witnesses who became party to a conspiracy to defame Peter Nygård.

448.   Defendant facilitated with others in the development, production and airing of a CBC Fifth Estate program entitled "Larger than Life" which first aired on its main network on April 9, 2010 and on its website. This program broadcast inaccurate and false information about Plaintiffs from witnesses who, at the direction and encouragement of Defendant with others, provided false statements. Stephen Davis, a private investigator based in New York and Defendant's head of security and investigations, played a pivotal role in this scheme.

449.   For the making of this program, Stephen Davis worked with, and was in regular contact with, Timothy Sawa, a CBC employee and producer and director of the Fifth Estate program about Plaintiffs. During the CBC program, the CBC broadcast to the public unfounded and false allegations of misconduct by Peter Nygård.

450.   Jerry Forrester, an investigator based in the United States who works or worked for Louis Bacon, also worked with Timothy Sawa on the CBC program. Jerry Forrester stated that he could recruit people to appear on the program and say anything disparaging about Peter Nygård provided they were paid. Even after these statements by Jerry Forrester, Timothy Sawa and the CBC continued to retain Jerry Forrester and broadcast statements procured by Jerry Forrester, when he was working for Defendant. The CBC paid Jerry Forrester $1,500 per day for his efforts. Jerry Forrester also paid two former property managers employed by Peter Nygård for services at Nygård Cay. These managers engaged in improper conduct and appeared in the CBC program to

falsely assert that they assisted one of Plaintiffs' associates to escape from Peter Nygård. The bribery procured by Defendant, through his surrogates, Stephen Davis, Jerry Forrester, and others, resulted in the Fifth Estate program suggesting that Peter Nygård was guilty of sexual misconduct in New York and at Nygård Cay.

451.    Jerry Forrester's history of misconduct is evidenced by his own words, which included audio/video recorded statements on September 28 and 29, 2010.

452.    One of the individuals Jerry Forrester worked with, Mary Braithwaite, a senior administrator at Lyford Cay, stated that she wanted to make sure that Plaintiffs could not sell another blouse anywhere in the world.

453.    Jerry Forrester was a good friend of and worked with Stephen Davis, Defendant's private investigator based in New York.

454.    Jerry Forrester suggested that women be paid to make false statements about the conduct of Peter Nygård.

455.    The CBC retained and paid Jerry Forrester despite knowing that this was his plan.

456.    Upon information and belief, Jerry Forrester offered to supply girls who would be willing to make up allegations if they were paid.

457.    Jerry Forrester involved Bradley Pratt who would control the process and pay the girls to make up allegations.

458.    On or about September 15, 2010, Jerry Forrester and Bradley Pratt traveled to London to meet with a representative of Defendant, whereat they reiterated that they could find witnesses who would talk about Peter Nygård, provided the witnesses were paid.

459.    Pericles Maillis was recorded offering to pay $10,000 to a girl to make a false allegation of serious sexual abuse.

53

460.     Others, including but not limited to Princess Pratt and Bradley Pratt, contacted individuals who had attended parties at Nygård Cay to obtain falsified damaging testimony about alleged criminal sexual misconduct. The women were offered $5,000 to $10,000 to lie and make up a juicy sex story about Peter Nygård.

461.     Other women, who had never been to Nygård Cay were similarly offered compensation to make up stories about Peter Nygård.

462.     A criminal lawsuit was filed in the Bahamas and statements from these witnesses were submitted to the court in 2012. Subsequently, a civil Bahamian civil lawsuit was launched against Louis Bacon and his co-conspirators.

463.     Witness A averred that on July 22, 2010, a man identifying himself as Bradley Pratt contacted her asking her to meet.

464.     On August 18, 2010, Bradley Pratt and Witness A met.

465.     Bradley Pratt told Witness A that he was authorized by Defendant Louis Bacon to offer her $300/hr. to sit and talk with a Canadian television network for the production of a story on Peter Nygård.

466.     Bradley Pratt told Witness A that "the better [she made] up the stories, the more [she] will get paid."

467.     Bradley Pratt told Witness A that "he wanted stories about forceful sex, indecent assault and underage girls even if they are not true."

468.     Bradley Pratt asked if Witness A "could help him to find at least three (3) girls who had sex with Peter Nygård before and were prepared to make up stories that Peter Nygård had indecently assaulted them and to relate that on camera to the Canadian television network."

469.     Bradley Pratt told Witness A that if she was able to organize these girls, she would

54

share in the money Louis Bacon would pay, and "the more false juicy stories you make up, the more money" he could pay her.

470.    Bradley Pratt later offered Witness A $10,000 to provide false intimate sexual details about Peter Nygård, intimating that the money was coming from Defendant.

471.    A copy of Witness A's signed statement was provided to the New York Times in February 2019.

472.    Witness B averred that in February 2011, she "received a call from a Princess Bradley who [she] previously met at Nygård Cay. [Princess Bradley] asked [Witness B] to give information on Peter Nygård and Nygård Cay and said she would make sure [Witness B was] paid for [her] time."

473.    Princess Bradley asked Witness B "if [Witness B] could find girls that would be prepared to make up bad stories about [Peter Nygård] even if it was not true."

474.    Princess Bradley offered Witness B money for this task.

475.    Princess Bradley conceded to Witness B that the money was financed by "Mr. Nygård's neighbor" who "does not like Mr. Nygård who wants to drive him out of Nygård Cay." The neighbor being referred to was Louis Bacon.

476.    Princess Bradley offered Witness B up to $10,000 for "made up and false criminal sex stories involving Mr. Nygård." She said, "Just make them up even if they are not true."

477.    Princess Bradley offered Witness B even more money if she would go on camera with the CBC and "there was another $10,000 in it for [her] and anybody [she] could recruit."'

478.    Princess Bradley ended the offer with a threatening warning that she should keep the conversation confidential because "these are very dangerous people who would hurt you badly if you got them into trouble."

479.    This signed statement was provided to the New York Times in February 2019.

480.    Other similar statements were procured and they were also provided to the New York Times in February 2019.

481.    The CBC also used statements from individuals about others that were clearly false.

482.    The CBC used statements from Allan and Michelle May, who upon information and belief were improperly influenced, claiming that a woman from the Dominican Republic had been mistreated as an underage girl by Peter Nygård. However, the subject of the statements had denied the allegations that were made.

483.    The CBC nevertheless broadcast the statements to, upon information and belief, damage Plaintiffs.

484.    Defendant's conduct and the conspiracy developed during the 2008-2012 time frame is being repeated now.

2014 Media Publication

485.    Upon information and belief, on or about January 25, 2014, Samantha Storr and Philencia Cleare, former friends of Peter Nygård demanded $500,000 from Peter Nygård in an extortion scheme at the behest of, or in conjunction with, the efforts of Defendant. Samantha Storr and Philencia Cleare communicated their extortion scheme, in which they stated they would destroy six videos upon the payment of $500,000, through email using their personal email addresses and sent to Peter Nygård's email account. Upon refusal to comply with the extortion demands, private videos and correspondence were leaked to a gossip website "Diary of a Hollywood Street King" operated by Sean Merrick. Articles citing the materials in the extortion scheme were published on the website on various dates in February through May, 2014. The articles reference documents and media stolen from Peter Nygård, and detail Peter Nygård

56

engaging in deviant sexual acts and verbal abuse of employees for the purposes of harming Plaintiffs' reputation and damaging their business.

486.    The articles were removed from the Diary of a Hollywood Street King website only after a lawsuit was filed against Sean Merrick, for which a judgment was obtained on March 8, 2016. These articles caused damage to Plaintiffs' reputation which continues today.

Efforts to Arrange for False Testimony to Be Used in Media, False Reports and Claims

487.    On January 14, 2015, Louis Bacon filed an action against all three Plaintiffs in the Supreme Court of New York, New York County, Bacon v. Nygård, et al., No. 150400/2015 ("the NY Case").

488.    In preparation for filing suit, Defendant and/or his agents and representatives procured false statements to assist in the filing of that claim.

489.    Defendant and/or his agents induced Stephen Feralio to breach his contract and duties to Plaintiffs by revealing confidential information and providing information designed to assist Defendant as a plaintiff in the NY Case and otherwise.

490.    Stephen Feralio is being paid and provided housing while the NY Case is pending through an agreement entered into between Stephen Feralio and Defendant through his companies, Belvedere and Wilson Mesa. In addition, Defendant agreed to indemnify Stephen Feralio if he was sued by Plaintiffs.

491.    On November 21, 2011, Steven Feralio entered into an independent contractor agreement with Plaintiffs, and accepted a position as a creative director, to take video and document Peter Nygård's travel and effectively be his documentarian. Less than two months later, Stephen Feralio told Plaintiffs he was leaving his position due to a difference in work expectations. On February 15, 2013, Stephen Feralio entered into another agreement with Plaintiffs to act in the

57

same role he had left previously. The effective date of the agreement was September 10, 2012.

492.    Stephen Feralio signed an intellectual property agreement on August 13, 2013.

493.    On or about March 24, 2014, Stephen Feralio reached out to the offices of Louis Bacon to inform Defendant that he was in possession of video footage of Peter Nygård that might be of interest to Defendant. Stephen Feralio used a pseudonym: "Mark Beauchamp" purportedly in order to maintain anonymity while in conversation with Zack Bacon, working at the behest of Defendant, regarding the video footage.

494.    After Defendant's private investigator, Jack Palladino, and Defendant's attorneys at the New York law firm determined for themselves that the video footage provided to them was real, Stephen Feralio entered into the agreement with Belvedere and Wilson Mesa on behalf of Defendant.

495.    Stephen Feralio was induced by Defendant and/or his agents to violate his agreements with Plaintiffs in exchange for a monetary payment that continues today.

496.    Stephen Feralio has since worked with Defendant to recruit others to help damage Plaintiffs. Stephen Feralio provided confidential information to Defendant, including names and contact information for investigators to harass and to coerce information for use in potential accusations and claims to be asserted against Plaintiffs.

497.    Upon information and belief, Stephen Feralio is in the private witness protection program authorized, directed and paid for by Defendant.

Livingston Bullard, Wisler Davilma, Clement Chea

498.    On February 12, 2015, and again on February 19, 2015, on behalf of Louis Bacon, John J. DiPaolo, a former FBI investigator, through his firm, The D&R Agency, LLC, along with his associate James Lawson, a former FBI Senior Special Agent, met with Livingston Bullard (aka

"Toggi") and Wisler Davilma (aka "Bobo") in Nassau, the Bahamas.

499.    Wisler Davilma recorded the February 19, 2015 meeting on a concealed phone.

500.    During the February 19, 2015 meeting, John DiPaolo said he was on the telephone with lawyers with the New York law firm. John DiPaolo or James Lawson said the following to Bobo and Toggi:

(a)     "Well, obviously, I think, this, there is a progression of cooperation payments. I don't know if they are willing to pay three million dollars up front. This is our first conversation. I think what they intended to do is, to give a portion of money in good faith to you today for the information that you come to the table with."

(b)     "Like I said, Fred is our person that is the conduit with, for the money."

(c)     "So for the totality of all of your cooperation, however long it takes, including your testimony at some point, plus everything that you are giving us, plus the continued cooperation, and meeting with Nygård, and, him coming into your car, and recording him, and so on, and so forth, you put a value of that on the totality of it of five million?"

(d)     "They are going to call the main attorney, that is handling that, and call us back. These are the people we have been directly dealing with, it is a law firm, which is up in New York. And, they have been retained by Mr. Bacon to represent him on this, and other matters. He is the one that eventually hired us out of Florida to do the investigative aspect of Nygård here."

(e)     "The attorneys are calling, the people we deal with out there are not top partners of the law firm. We are dealing with people who are delegated to deal with this. So, now, they are talking to the partners, direct contact with Mr. Bacon negotiating."

(f)     "So, the information, what they want to, they wanted to use this information just to show what type of person Nygård is, and, you know, it is not just they are looking at the whole

59

thing, Nygård has businesses all over the place. He has made businesses up in New York. So extent of the investigation is not solely you guys here in the Bahamas. It is a complete investigation that goes elsewhere. You guys are a portion of it. You are a big portion of it. So, anything that we can show, that he is doing down here, is going to be part of the whole package."

(g)     "We called New York, the attorneys, to share with them what possibly we could start with today, what could eventually could lead to. Share with them what they expect today eventually, as far as compensation. So, they are currently right now discussing that. See if we can come to terms with them, if so, we will move forward. So, hopefully that will happen. That is where we are at."

(h)     "Well, they are very interested, they think the number was a little high, but, they said it is it is doable. They are very willing to pay very large sums of money for your cooperation. But this will be a continual going back and forth with them being satisfied that you have the correct information that they want, with you being assured that we have got the money that you want for now, so I guess what they asked for our next step is, you say you got text messages are very damaging. What are those text messages. They want to know, do you have text messages, where Nygård talks about criminal behavior?"

(i)     "They want to know what it is that we are, that they are paying for. They are willing to pay, they just want us to verify that it is what they want… So, somehow, we got to come to an agreement how I can relay that information to them that it is what it is… And, then we will continue this dialogue, and pay you large sums of money…"

(j)     "They said they will pay you, they will, they told me they will pay you large sums. I told them you (sic) your figures, they said it is a little high, but where (sic) willing to pay… they said their position, they are very excited about your cooperation. They will pay you large sums of

60

money. And we are in a position to give that to you."

(k)     "All I can say these guys have deep pockets, they have lots of money."

(l)     "We want a continual cooperation with you. We want you to continue to meet with Nygård. And, continue to give us valuable information. This is just the beginning."

(m)     "I am just waiting to see how much money we can give you guys up front. Like I say this is not coming out of my pocket. They want some confidence that what they are buying is valuable. I have no doubt what you guys have is valuable to them. They have to see, touch, smell it. So they know. And they are telling me look, we are willing to pay them an incredible amount of money, but we have to understand that what we are getting is a good product. That we are not sitting here thinking that we have this great information, which, you may think it is great information, but, it maybe, but it is not necessarily what they need or want..."

(n)     "The reason why this stuff is going back and forth and up and down the chain is it is going all the way up to Mr. Bacon and back. We are talking to partners of the law firm, who is talking to [inaudible]."

(o)     "Again, I said this is going through these guys up to the top…"

(p)     "I guess we are at this point, where, any business relationship, people up in the New York have to feel warm and fuzzy, that they have information that they are willing to buy. And, they are willing to pay exorbitant amounts of money, they have to have something in front of them to show that they have criminal behavior on the part of Nygård, evidence that they have with their buy. They are willing to buy it. They are going to spend incredible amount of money to do it, we understand that."

(q)     ". . . we have to show these attorneys that you have something to offer them as valuable evidence, in their case. And, they said, when you show them that, they will pay you the

61

money. And, that is where they are at."

501.    During the February 19, 2015 meeting, Bobo or Toggi said:

(a)      "Come to court to testify? I will come to court to testify."

(b)      "Today, and for whatever go on, We looking for five million, . . . , but for today straight up looking for three million for the evidence we give. Because we know we have the strong evidence. We show we have the strong evidence. Because I am going to testify Toggie going to testify."

(c)      "Statement and everything 500 thousand. And do the affidavit right now. I could do it right now."

(d)      "I sell for hundred thousand dollars for an affidavit. Honestly, and truly. We don't want to affiliate with Nygård, but we could call Nygård, and get hundred thousand dollars now, $50,000 right now. Call him right now. I will show you right now, in front of you guys."

502.    Bobo and Toggi claimed to have information about Peter Nygård which would be harmful to Peter Nygård.

503.    Upon information and belief, on February 19, 2015, Livingston Bullard provided a signed statement, made in Nassau, the Bahamas, witnessed by James Lawson, with the participation of John DiPaolo, and other employees of D&R, for which John DiPaolo paid Livingston Bullard $50,000. This payment was made through channels from and authorized by Louis Bacon in the United States.

504.    The February 19, 2015 statement contained false and influenced statements regarding Plaintiffs, and was taken to be used for potential claims by Louis Bacon against Plaintiffs and for submission of a false report to the authorities. The statements included the purported fact

that Peter Nygård sent out a hit list.

505.    In an attempt to prove the content of the affidavits true after they were signed, the D & R Investigative Agency made arrangements in New York, Florida and the Bahamas to capture Peter Nygård trying to enlist Bobo and Toggi in a murder for hire plot, so that this could be used in potential accusations and claims against Peter Nygård and for the false report to the authorities.

506.    Upon information and belief, in October 2015, while in the Cayman Islands, John DiPaolo offered a substantial amount of money to another potential witness, Clement Chea, in exchange for false and influenced information regarding Plaintiffs. This activity was authorized, directed and/or ratified authorized by Defendant and/or his agents.

507.    On January 24, 2016, in Miami Springs, Florida, in the presence of John DiPaolo and two of his associates, Livingston Bullard gave several "sworn statements," stenographically reported by Prestige Reporting Service, Inc., Fort Lauderdale, Florida.

508.    On February 4, 2016, in Santo Domingo, Dominican Republic, in the presence of John DiPaolo and two of his associates, Livingston Bullard gave several "sworn statements," stenographically reported by Prestige Reporting Service.

509.    On February 4, 2016, in Santo Domingo, Dominican Republic, in the presence of John DiPaolo and three of his associates, Wisler Davilma gave several "sworn statements," stenographically reported by Prestige Reporting Service.

510.    These statements, which contained falsehoods, were designed to support a future claim against Peter Nygård.

511.    On March 8, 2016, the Florida-based investigator, John DiPaolo, executed an affidavit in the Bahamas to be used in an anticipated claim against Peter Nygård. The January 24, 2016 and the February 4, 2016 statements were exhibits to John DiPaolo's affidavit.

512.     On or about March 9, 2016, Louis Bacon and three other plaintiffs filed a lawsuit in the Bahamas Supreme Court against Peter Nygård and his lawyer, Keod Smith. Smith, Bacon, et al. v. Nygård and Smith, Case No. 2016/CLE/gen/00329 ("the Bahamas Case").

513.     John DiPaolo's March 8, 2016 affidavit, with the false statements of Bobo and Toggi, was used in the Bahamas Case and it acknowledges that payments were made to Livingston Bullard and Wisler Davilma, and that a schedule of payments could be prepared.

514.     The "sworn statements" by Bobo, Toggi and John DiPaolo contain materially false assertions purchased with Defendant's sums of money, including that Peter Nygård prepared a hit list to murder persons, and paid Bobo and Toggi to burn a shop and an automobile.

515.      The payments made to Bobo and Toggi by Defendants and/or his agents far exceed compensating the witnesses for expenses and out-of-pocket losses.

Philencia Cleare False Statements

516.     Philencia Cleare tried to extort Peter Nygård.

517.     Upon information and belief, Defendant and/or his agents tried to use Philencia Cleare to entrap and extort Peter Nygård.

518.     Upon information and belief, Philencia Cleare was coerced by Defendant's agents to travel to the United States in 2016.

519.     Upon information and belief, Philencia Cleare was told by Defendant's agents that Peter Nygård was trying to hurt her and that she needed protection.

520.     Upon information and belief, Defendant's agents lied to Philencia Cleare to convince her to act against the interests of Plaintiffs.

521.     Upon information and belief, Philencia Cleare was placed into the private "witness protection program" created by Defendant and his agents.

522.    Upon information and belief, Philencia Cleare was told that Defendant would pay to have her educated and to arrange for a permanent visa for her to remain in the United States.

523.    Upon information and belief, Philencia Cleare was offered room and board and a monthly stipend to assist Defendant in his scheme against Plaintiffs.

524.    Upon information and belief, Defendant's agents arranged for Philencia Cleare to have a place to live, free of charge.

525.    Upon information and belief, Defendant's agents placed Philencia Cleare in hotel rooms and apartments, often moving her around.

526.    Upon information and belief, Defendant placed Philencia Cleare in Colorado where she now resides with her costs still being paid for by Defendant and/or his agents.

527.    Upon information and belief, Defendant supplied security guards who ensured that Philencia Cleare remained in Defendant's private witness protection program.

528.    Upon information and belief, Defendant's retained security guards coerced Philencia Cleare to work against the interests of Plaintiffs by lying to her about Peter Nygård, by paying her money and by threatening her.

529.    Upon information and belief, Philencia Cleare has been in the U.S. longer than permitted under a tourist visa, and she is now an illegal alien.

530.    Upon information and belief, Philencia Cleare is being harbored in the United States by Defendant and/or his agents in violation of 8 U.S.C. § 1324.

531.    Upon information and belief, Philencia Cleare was forced by Defendant and/or his agents to sign false statements against Peter Nygård in order to stay in Defendant's private witness protection program.

532.    Upon information and belief, Philencia Cleare was paid by Defendant and/or his

agents to provide false statements against Peter Nygård.

533.    Upon information and belief, Defendant intended to and has used Philencia Cleare's false statements to damage Plaintiffs.

534.    Upon information and belief, Defendant and/or his agents used Philencia Cleare to file a false report about Peter Nygård.

535.    Upon information and belief, the false statements made by Philencia Cleare were made with the knowledge and intent to harm Plaintiffs.

536.    In 2018, Philencia Cleare disavowed statements she had made against Peter Nygård.

537.    On or about March 1, 2018, Zack Bacon spoke with Philencia Cleare and other women in Defendant's private witness protection program revealing Defendant's plan to "allow the free press to destroy [Plaintiffs] the way they did with Cosby, Moore, Winestine (sic)."

538.    On March 3, 2018, Philencia Cleare apologized to Peter Nygård for the actions she took.

539.    On that same day, Philencia Cleare revealed to Peter Nygård that Defendant was planning a "civil action" against him which would use the false statements.

540.    On March 16, 2018, Philencia Cleare admitted that Defendant wanted her "to make up stories about [Peter Nygård] with younger girls."

541.    Philencia Cleare admitted that Defendant had her meet with "the Jamaican Consulate Office in Miami" in February 2018, to have her "sign this paperwork filled with lies about [Peter Nygård] and girls younger 14-17 years."

542.    Upon information and belief, Philencia Cleare did not meet with the Jamaican Consulate, but rather with Jeff Davis and Doneth Cartwright, agents for Defendant.

66

543.    Upon information and belief, another false statement was prepared with the assistance of Jeff Davis and Doneth Cartwright.

544.    Upon information and belief, Philencia Cleare was threatened with the cut off of her money if she did not sign the false statement.

545.    In February 2019, emails confirming Philencia Cleare's admissions were provided to the New York Times.

546.    Upon information and belief, a reporter, likely Kim Barker, for the New York Times, met with Philencia Cleare after receiving the emails and interviewed her for the story it was preparing.

547.    Philencia Cleare had previously admitted being offered money by Defendant's agents to make up false stories about Peter Nygård.

548.    Upon information and belief, Philencia Cleare's false statements were used to influence media outlets to publish false information about Plaintiffs, to file false reports about Plaintiffs and to plan for future claims to be filed against Plaintiffs.

549.    Philencia Cleare's acts and actions against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Tazhmoye Cummings False Statements

550.    Defendant and/or his agents also secured the false statements of Tazhmoye Cummings to use in potential claims against Plaintiff, for use in filing false reports with the authorities and for use in providing such statements to the media, including the New York Times, all designed to destroy and damage Plaintiffs.

551.    Upon information and belief, Defendant also tried to use Tazhmoye Cummings to entrap Peter Nygård and extort him.

67

552.    Tazhmoye Cummings did extort Peter Nygård.

553.    Tazhmoye Cummings also recorded a video statement in two parts.

Part 1 provides in relevant part:

"It's April 8ᵗʰ 2016. I Tazhmoye Cummings, is definitely willing to sign an affidavit, stating I will not press any criminal charges against Nygård, in the Bahamas, or California or anywhere else in the states …. As long as I am satisfied with my settlement, I'm willing to swear to never press any criminal charges. Under one condition. The condition is that no more time is wasted in this matter because the other side has been waiting patiently for me to commit to my statement which in... (Undecipherable voice coaching statement) I will be left with no choice but to sign a statement with them, and commit to a statement, if I am left waiting in vain by this current side. So as long as the offer is something that I am pleased with, I would be willing to sign a sworn affidavit."

554.    Part 2 of the video statement provides:

"Also, just to confirm, I haven't signed any affidavit or made any affidavits with the other side as it stands at this moment. Or signed any commitments with the other side as it stands. They're waiting patiently for me to, but I haven't as yet. I'm still making up my mind. Which in I have decided to go with this side if this side is serious about my wishes"

555.    In about February 2016, Tazhmoye Cummings made a handwritten statement in which she wrote:

"Last July, I was contacted by Louis Bacons lawyer "Allison Cain" offering me a weekend trip to Miami at the Four Seasons hotel and compensation for any job opportunities I would of missed while being out of the country."

556.    The statement includes Tazhmoye Cummings' admission that she sold a story to the Diary of a Hollywood Street King website "as a plot to get back at" Peter Nygård.

557.    The statement continues: "She [Allison Cain] then inquired about how old I was when [a blog] was created in 2014. My response was that I was 19 years old. She then asked about my age two years prior when the story was taking place. I told her I was 17 years old when I met Peter in the summer of 2012."

558.    The statement continues:

"She [Allison Cain] then inquired about me telling my story to a team of lawyers… I then

told her that in order for me to go in depth …I would need compensation and very good compensation… She then told me that paying for information is illegal so she wouldn't be able to do that but I could be compensated in other ways so I should think about it. The conversation simmered down and she then asked how much lost wages did I encounter for taking the time to be here. I told her she would need to reimburse me $3,000 for my weekend being out of the country. On the final night we had dinner, she gave me $2,000 cash and assured me that she would transfer the remainder of the funds through "money gram" which she did.

559.    The statement continues:

"She informed me that they were ready to go all the way and I would be fully compensated and taken care of and given my own security detail. All I would have to do was agree to fly to California on February 3rd. She told me that she would be my comfort person and whatever I needed she would be there. She had people wanting to speak to me about . . . about a case they were building... She then gave me the option to completely move to California if I found it to my liking she would make it possibly [sic] for me to get residency, an apartment and a monthly allowance which she said would be a good enough amount to go shopping and completely cover all my expenses, along with a fee that was supposed to be discussed for my time there."

560.    Tazhmoye Cummings extorted Peter Nygård for several hundred thousand dollars and claimed that she had "another offer [from Defendant and/or his agents] for living expenses, whatever [her] heart desires basically, an awesome job opportunity that [she] would love in the US, everything that [she] would need in the US to be comfortable basically."

561.    Tazhmoye Cummings took the other offer when Peter Nygård would not pay her hundreds of thousands of dollars.

562.    Tazhmoye Cummings thereafter made false statements to assist Defendant in his conspiracy against Plaintiffs.

563.    Tazhmoye Cummings made such false statements, willfully and knowingly.

564.    Upon information and belief, Tazhmoye Cummings has since made false statements, including to a reporter for the New York Times, all designed to be used in a media story designed to disparage and damage Plaintiffs, to be used with a potential claim against Plaintiffs, and to be used to make false reports to the authorities.

69

565.    Upon information and belief, Tazhmoye Cummings has been paid to make further false allegations against Peter Nygård.

566.    Upon information and belief, Tazhmoye Cummings is resident in the United States on an expired visa and is part of Defendant's private witness protection program.

567.    Upon information and belief, Tazhmoye Cummings has had and may still have a security detail paid for by Defendant so that no one could interfere with her plan to assist Defendant in destroying Plaintiffs.

568.    Upon information and belief, Tazhmoye Cummings is being harbored as an illegal alien in the United States solely for Defendant's use to support false claims against Peter Nygård.

569.    Upon information and belief, Defendant and/or his agents are harboring Tazhmoye Cummings as an illegal alien in violation of 8 U.S.C. 1324.

570.    Upon information and belief, Tazhmoye Cummings is being paid a monthly stipend of several thousands of dollars to stay in the United States illegally to assist in Defendant's scheme to damage and destroy Plaintiffs.

571.    Upon information and belief, Tazhmoye Cummings is also having her lodging paid for on a monthly basis.

572.    Upon information and belief, Tazhmoye Cummings has a security detail being directly or indirectly paid for by Defendant.

573.    Upon information and belief, Tazhmoye Cummings has been interviewed by a reporter, likely Kim Barker, for the New York Times, for use in its newspaper story and for use in its television program. Statements made by Tazhmoye Cummings contain falsehoods designed to destroy and damage Plaintiffs.

574.    Tazhmoye Cummings has committed acts and actions against Plaintiffs in

70

furtherance of Defendant's scheme that were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

<u>Samantha Storr</u>

575.   In 2014, Samantha Storr tried to extort Peter Nygård for $500,000 along with Philencia Cleare and Robbyn Toni.

576.   Samantha Storr indicated that she would work with Defendant against Plaintiffs if the extortion money was not paid.

577.   Plaintiffs refused to pay extortion money.

578.   Upon information and belief, Samantha Storr was coerced by Defendant's agents to travel to the United States in or about 2016.

579.   Upon information and belief, Samantha Storr was told by Defendant's agents that Peter Nygård was trying to hurt her and that she needed protection.

580.   Upon information and belief, Defendant's agents lied to Samantha Storr to convince her to act against the interests of Plaintiffs.

581.   Upon information and belief, Samantha Storr was placed into Defendant's private witness protection program.

582.   Upon information and belief, Samantha Storr was told that Defendant would pay to arrange for a permanent visa for her to remain in the United States.

583.   Upon information and belief, Samantha Storr was offered room and board and a monthly stipend to assist Defendant in his scheme.

584.   Upon information and belief, Defendant's agents arranged for Samantha Storr to have a place to live, free of charge.

585.   Upon information and belief, Defendant's agents placed Samantha Storr in hotel

71

rooms and apartments, often moving her around.

586.    Upon information and belief, Defendant placed Samantha Storr in Dallas, Texas where she now resides with the costs still being paid for by Defendant and/or his agents.

587.    Upon information and belief, Defendant supplied security guards who ensured that Samantha Storr remained in Defendant's private witness protection program.

588.    Upon information and belief, Defendant's retained security guards coerced Samantha Storr to work against the interests of Plaintiffs by lying to her about Peter Nygård, by paying her money and by threatening her.

589.    Upon information and belief, Samantha Storr has been in the U.S. longer than permitted under a tourist visa, and she is now an illegal alien.

590.    Upon information and belief, Samantha Storr is being harbored in the United States by Defendant and/or his agents in violation of 8 U.S.C. § 1324.

591.    Upon information and belief, Samantha Storr was forced by Defendant and/or his agents to sign false statements against Peter Nygård in order to stay in the witness protection program.

592.    Upon information and belief, Samantha Storr was paid by Defendant and/or his agents to provide false statements against Peter Nygård.

593.    Upon information and belief, Defendant intended to and has used Samantha Storr's false statements to damage Plaintiffs.

594.    Upon information and belief, Defendant and/or his agents used Samantha Storr to file a false report about Peter Nygård.

595.    Upon information and belief, the false statements made by Samantha Storr were made with the knowledge and intent to harm Plaintiffs.

72

596.    Samantha Storr has met and been interviewed by a reporter, likely Kim Barker, for the New York Times.

597.    Upon information and belief, Samantha Storr has repeated false statements to the New York Times that are damaging to Plaintiffs.

598.    The acts and actions of Samantha Storr against Plaintiffs in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Other People in the Private Witness Protection Program

599.    There are other witnesses in the private witness protection program located in the United States who Defendant and/or his agents are paying or have paid to make false statements about Peter Nygård.

600.    There are other individuals who Defendant's agents have coerced, threatened, and/or paid to provide Defendant and/or his agents with false statements to be used against Plaintiffs.

601.    Upon information and belief, these other as yet to be identified individuals have repeated certain of these false statements to the New York Times to damage Plaintiffs.

602.    Upon information and belief, these as yet to be identified individuals have issued false statements to be used to file false reports and/or file false claims against Plaintiffs, including in the United States.

Richette Ross

603.    Defendant and/or his agents or representatives tried to have others swear false statements with the promise of money or based on threats, and tampered with witnesses who were positioned against Defendant.

73

604.     On June 28, 2016, Richette Ross, a former employee of Peter Nygård, swore an affidavit submitted in support of Peter Nygård in an action by Louis Bacon and other individuals involved in or connected to the enterprise alleged herein.

605.     The affidavit addressed a recorded conversation between Richette Ross and Livingston Bullard that occurred on April 4, 2016. During this conversation, Livingston Bullard admitted to Richette Ross that he worked for Defendant.

606.     A second recorded conversation occurred on June 13, 2016 in which Livingston Bullard asked Richette Ross for information about girls who were around Peter Nygård. Livingston Bullard indicated that he "needs two girls" and noted that Defendant is paying him to get information on Peter Nygård. In this conversation, Livingston Bullard acknowledged that Defendant made multiple payments to him amounting to close to $6 million, and the first time he met Defendant's agents they gave him $50,000. Livingston Bullard told Richette Ross she too could make money if she told Defendant's agents what they wanted to hear.

607.     In a late-August 2016 encounter, Livingston Bullard accosted Richette Ross, put his hand around her neck, and said he wanted to meet with her to offer her money to walk away from her June 28, 2016 affidavit. Livingston Bullard told Richette Ross that she should make herself scarce and accept money to walk away from the affidavit. Livingston Bullard confirmed to Richette Ross that he was paid by Louis Bacon from the beginning of the saga between Peter Nygård and Louis Bacon. Livingston Bullard told Richette Ross that his job with Louis Bacon was to set up Peter Nygård by finding women who would say that they had sexual relations with Peter Nygård and that he had treated them like slaves.

608.     On September 21, 2016, Wisler Davilma told Richette Ross that the men with and for whom he was working really wanted to pay her to walk away from the June 28, 2016 affidavit

74

submitted in support of Peter Nygård.

609.    Livingston Bullard bragged to Richette Ross about how he and Wisler Davilma,

along with persons whom he said were former FBI agents from the United States, set up Peter

Nygård by having him recorded during private conversations when Livingston Bullard and Wisler

Davilma unsuccessfully tried to get Peter Nygård to endorse killing people.

610.    Upon information and belief, following the filing of the initial Complaint in this

case, where Richette Ross' name was revealed, she was visited by an agent for Defendant who

threatened her and coerced her to refrain from cooperating with Plaintiffs.

Improper Activity in 2015-2016

611.    In or about 2016, investigators working for Defendant started to harass Plaintiffs'

employees, friends and acquaintances.

612.    These investigators harassed numerous people in an effort to disrupt Plaintiffs'

business relations and damage Plaintiffs.

613.    For example, in the summer of 2016, Danielle Gaines was approached by two men

who she described as harassing and threatening.

614.    In September 2015, Darlyne Lucchesi was approached by a woman from San

Francisco (believed to be Sara Ness) claiming to have been hired by Zack Bacon and Louis Bacon,

and that she was working for them for four years. Darlyne Lucchesi was shown documents which

had been claimed to have come from Plaintiffs.

615.    Sara Ness repeated false allegations to Darlyne Lucchesi claiming that a woman

was being held against her will by Plaintiffs, forced to engage in sexual acts and was raped. Sara

Ness further claimed that this was part of a pattern of events considered to be "Satanical Rituals."

616.    When Darlyne Lucchesi protested and denied that any such acts took place, Sara

Ness heightened her claims of falsehoods, including allegations of rape, penis enlargements, mental illness, and sexually transmitted diseases, while making racial slurs to Darlyne Lucchesi.

617.    Sara Ness then indicated to Darlyne Lucchesi that her client, Louis Bacon, was concerned that Peter Nygård may be dangerous and violent.

618.    Sara Ness was trying, through false statements, to coerce Darlyne Lucchesi to assist Defendant in potential claims against Plaintiffs.

619.    On or about March 13, 2015, Sara Ness contacted Maribel Rodriguez inquiring about Plaintiff Peter Nygård.

620.    Maribel Rodriguez understood from her conversations with Sara Ness that Sara Ness worked for Defendant and wanted her to lie about the conduct of Plaintiff Peter Nygård.

621.    Sara Ness confirmed to Maribel Rodriguez that she worked for an investigation firm called Palladino & Sutherland and they were hired by Louis Bacon and his New York law firm to investigate Plaintiff Peter Nygård.

622.    Sara Ness informed Maribel Rodriguez that they had already talked to many people about their experiences with Plaintiff Peter Nygård and that "most people did not have a good experience."

623.    Sara Ness offered to visit Maribel Rodriguez in Santiago to hear about her experiences. In the alternative, Sara Ness offered to "fly [Maribel Rodriguez] anywhere [she would] like (such as Miami), take care of all the expenses, compensate [her] for [her] time if [she missed] work."

624.    Unprompted, Sara Ness wrote to Maribel Rodriguez offering "If you are concerned about retribution (by Nygård) you should know that [her] client, Louis Bacon, would do anything in his power to ensure her safety."

625.     Upon information and belief, Sara Ness was trying to intimidate Maribel Rodriguez by intimating that Peter Nygård was trying to hurt her, when there was no reason, proof or allegation that he was.

626.     When Maribel Rodriguez asked what she would get in exchange for her interview, Sara Ness indicated that was "an understandable question" and promised to consult with her group.

627.     Maribel Rodriguez understood that Defendant Louis Bacon's agents were trying to get her to lie about experiences with Plaintiff Peter Nygård, and they were willing to pay for such information.

628.     In 2015, Defendant retained a New York-based investigative firm, Ergo, who dispatched Matt Moneyhon and Kate Crumrine to investigate Peter Nygård in connection with a claim or potential claim by Louis Bacon and/or others against Peter Nygård. Despite being advised that individuals had non-disclosure agreements, these investigators induced employees to breach these agreements to further Defendant's efforts to damage Plaintiffs.

629.     In 2016, Defendant and/or his agents met with the FBI to attempt to initiate a criminal action against Peter Nygård.

630.     Upon information and belief, the FBI did not find any merit to the claim and did not pursue it.

631.     In 2016, Defendant and/or his agents contacted the Department of Homeland Security to attempt to initiate a criminal investigation.

632.     Upon information and belief, the Department of Homeland Security did not find any merit to the claim and abandoned its investigation.

633.     Upon information and belief, Defendant and/or his agents provided the authorities with false information.

634.     As a result of the initiation of these investigations, Plaintiffs' employees, friends, and business associates were contacted and were asked questions about Plaintiffs, which harmed them.

Improper Activity in 2018-2019

635.     Upon information and belief, in the fall of 2018, while Peter Nygård's property in the Bahamas was under the custody of Fred Smith, Defendant's attorney and agent, the property was burglarized. Upon information and belief, a list of Peter Nygård's contacts was taken. Soon thereafter, investigators directly or indirectly hired by Defendant, including James Lawson/JDL, began contacting persons on the contact list looking for information about alleged criminal misconduct by Peter Nygård. Persons contacted include residents of New York, New Jersey, Georgia, and California.

636.     Among the people contacted from the list was Imani Iddeen. Imani Iddeen lived in California and had been approached at her front door by investigators who bypassed security in her building.

637.     Imani Iddeen signed an affidavit on December 22, 2018 confirming that she was contacted by investigators known to be under the employ of Defendant who were looking to speak with her about Plaintiffs. Despite her pleas to leave her alone, Imani Iddeen was harassed by these investigators several times thereafter, up through February 2019.

638.     Danielle Gaines was another person contacted in California by Defendant's investigators. Danielle Gaines signed an affidavit on December 13, 2018 to confirm that she too was contacted by investigators known to be under the employ of Defendant and she too was harassed.

639.     SueLyn Medeiros was also approached in California by investigators who

pressured her to cooperate with their investigation. She too was harassed and signed an affidavit to that effect.

640.    Other women in the United States were approached on numerous occasions and harassed about their relationships with Peter Nygård. Some women were told that a big media story was about to break and if they had any chance of being kept out of the story, they had to work with Defendant's investigators.

641.    These women were further told that if they did not cooperate, they risked being named as a victim, a witness or an accomplice.

642.    Some of these women felt threatened and were concerned about Defendant's agents' tactics.

643.    The investigators did not stop with just former employees and friends. Current employees were contacted and told of stories about to be released to the media about Plaintiffs.

The Pending Media Assault

644.    No later than February 2019, reporters with the New York Times started contacting people from a list that upon information and belief was provided to them by or on behalf of Defendant.

645.    The reporters from the New York Times made statements to various individuals about conduct being alleged against Peter Nygård. They repeated the false statements made to them by individuals working in concert with Defendant in order to get others to similarly make statements, false or otherwise, designed to damage Plaintiffs.

646.    The reporters from the New York Times claim to have interviewed in excess of 250 people.

647.    Upon information and belief, the reporters have been invited to the Bahamas by

79

Fred Smith.

648. Upon information and belief, the reporters have been hosted in the Bahamas by Fred Smith.

649. Upon information and belief, Fred Smith provided the reporters with access to witnesses who were influenced by or on behalf of Defendant to provide false information for the newspaper's story.

650. Upon information and belief, Fred Smith provided the reporters with documents to be used in reporting the story.

651. One of the items Fred Smith provided included a manuscript described by the author as a fairy tale.

652. Kim Barker contacted the ghost writer to learn more information about the source of the manuscript, since the author of the manuscript had been killed.

653. In inquiring about the reasons for the investigation, Kim Barker told the individual that she was trying to bring down Peter Nygård.

654. Upon information and belief, Kim Barker claimed that the media would bring down Peter Nygård the way it had done with Bill Cosby and Harvey Weinstein.

655. Kim Barker tried to coerce the ghost writer's involvement by claiming Peter Nygård was responsible for the death of the author, and suggesting that ghost writer seek vengeance.

The More Than Ten Year Conspiracy to Damage Plaintiffs Continues

656. Upon information and belief, Defendant is a billionaire.

657. Defendant has indicated and/or demonstrated that he will spend millions of dollars just to destroy Plaintiffs.

80

658.    Defendants have utilized illegal and improper methods to destroy and damage Plaintiffs.

659.    Defendant and/or his agents and surrogates have made false statements about Plaintiffs, and has solicited, coerced and paid for false statements to be used to damage Plaintiffs, to be used to file false reports with authorities about Plaintiffs, and to be used for claims and potential claims against Plaintiffs.

660.    Defendant has assembled dozens of individuals and entities to assist him in this assault, spreading money around to accomplish his intended desire to destroy Plaintiffs.

661.    Based upon the practice of Defendant paying and otherwise conferring benefits on witnesses for false and influenced testimony, the statement of John DiPaolo that Louis Bacon is willing to pay "exorbitant" and "incredible" amounts of money, and the agency of James Lawson/JDL for this purpose, Plaintiffs are entitled to injunctive relief to prevent further harm to their business and property.

662.    Taken together, more than a dozen "statements" have been obtained by participants in the enterprise acting on behalf of Defendant, given by purported witnesses to be used against Plaintiffs in various litigations, both pending and anticipated, and more particularly, to be used in abusing process by filing false reports, and by conspiring with media outlets to publicize the false statements. In addition, upon information and belief Defendant is in the process of arranging for a civil action to be filed against Plaintiffs using false statements, to be bolstered by media publications, because he was unable to convince the FBI and the Department of Homeland Security to prosecute Peter Nygård based on false information.

663.    The false statements had no legitimate purpose. The statements are to capture false information, regardless of truth, and used to damage Plaintiffs in their business and property. The

81

statements constitute influenced testimony within the meaning of NY Penal Law § 215.00, bribing a witness.

664.     Defendant and other individuals and entities, knowingly and with malice, acting with or on behalf of Defendant, or participants in the enterprise acting on behalf of Defendant, established, provided content for, or encouraged purported witnesses to provide false statements, including content for the sistahsabused.com domain. Functioning through Facebook, this publicly available website contains disparaging content about Plaintiffs. This content includes falsified accusations against Plaintiffs, including encouraging actual or prospective consumers to not purchase Plaintiffs' fashion products and to dissuade a major department store from continuing its business relationship with Plaintiffs by ceasing to carry Plaintiffs' fashion products. These accusations have no legitimate purpose and are designed to injure Plaintiffs in their business relationships and property.

## COUNT I - VIOLATIONS OF 18 U.S.C. § 1962(C)

665.     Plaintiffs incorporate by reference ¶¶ 1 - 664 above as if fully set forth at length herein.

666.     18 U.S.C. § 1964(c) provides a private right of action to any person whose business or property is injured by reason of a violation of the activities prohibited by 18 U.S.C. § 1962.

667.     Defendant has: (1) violated 18 U.S.C. § 1962; (2) Plaintiffs have sustained injury to business or property; and (3) the injury was caused by the violation of § 1962.

668.     Defendant and those acting in concert with him committed (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

669.     Under 18 U.S.C. § 1961(4), an "enterprise" is any "group of individuals associated in fact although not a legal entity," for a common purpose of engaging in a course of conduct,

proved by evidence of an ongoing organization, formal or informal, whereby the various associates function as a continuing unit. A collection of RICO "persons" may, together, make up a RICO enterprise, where persons conducted or participated in the enterprise's affairs, not just their own affairs.

670.    Defendant directed, authorized, paid for and/or ratified the conduct alleged to have been done by others in this Amended Complaint.

671.    Defendant acted in concert with those identified in this Amended Complaint.

672.    Under 18 U.S.C. § 1961(1)(A), "racketeering activity" means any act or threat involving bribery chargeable under state law and punishable by imprisonment for more than one year. This includes NY Penal Law § 215.00, bribing a witness:

> "A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced…."

673.    Defendant has and continues to violate NY Penal Law by bribing witnesses for false statements and by paying, threatening and coercing witnesses to provide false statements, and to perform the other illegal and improper conduct identified herein.

674.    Under 18 U.S.C. § 1961(1)(B), "racketeering activity" means any act indictable under Title 18 of the US Code, including § 1956, "relating to laundering of monetary instruments."

675.    Upon information and belief, Defendant has violated this Act by, inter alia, making payments through various entities, incorporating not-for-profit entities to further his personal agendas despite the prohibition of using those entities for that purpose, and upon information and belief by taking tax deductions when such actions are not charitable.

676.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1351 by engaging in fraud in foreign labor contracting, and committed the violation more than two times

1044774v.2

within the past ten years.

677.    Defendant and others acting in concert with him, knowingly and with intent to defraud, recruited, solicited or hired persons outside the United States for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

678.    Defendant's witness protection program encompassed fraud in foreign labor contracting, through the utilization of false or fraudulent pretenses, representations or promises, involving persons outside of the United States, such as Bahamians, for employment in the United States, including through allowing witness visas to expire, limiting or terminating payments or financial support to witnesses, and the use of threats communicated to witnesses, to procure statements against Plaintiffs, including false statements to disparage or damage Plaintiffs in their business or property. This includes Defendant and/or his agents harboring Philencia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, and their inclusion in the witness protection program.

679.    Defendant and others acting in concert with him have violated 18 U.S.C. § 201(b) and committed the violation more than two times within the past ten years.

680.    Defendant and others acting in concert with him have violated 18 U.S.C. § 201(b)(3) by directly or indirectly, corruptly giving, offering, or promising financial compensation, including through the witness protection program, of value to the witnesses, or offering or promising the witnesses financial compensation, including through the witness protection program, with the intent to influence the witnesses' testimony under oath or affirmation before a court, the FBI, or the Department of Homeland Security, or officer authorized by United States law to hear evidence or take testimony, through testimony against Plaintiffs, including false

84

statements to disparage or damage Plaintiffs in their business or property, or with the intent to influence the witnesses to absent themselves therefrom.

681.     Others acting in concert with Defendant have violated 18 U.S.C. § 201(b)(4) by directly or indirectly, corruptly demanding, seeking, receiving, accepting, or agreeing to receive or accept financial compensation, including through the witness protection program, in return for being influenced in testimony under oath or affirmation as witnesses upon any such trial, hearing, or other proceeding, including statements against Plaintiffs, including false statements to disparage or damage Plaintiffs in their business or property, or in return for absenting themselves therefrom.

682.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1341 through frauds and swindles and committed the violation more than two times within the past ten years.

683.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1341 by having devised or intending to devise a scheme or artifice to defraud, including through the witness protection program and the procuring of false statements to disparage or damage Plaintiffs in their business or property, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, including through the witness protection program and the procuring of false statements to coerce and extort Peter Nygård to provide his property in the Bahamas to Defendant, and upon information and belief, for the purpose of executing the scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, matter, including statements to disparage or damage Plaintiffs, correspondence or financial compensation, to be sent or delivered by the Postal Service, or deposited or caused to be deposited matter, including statements to disparage or damage Plaintiffs, correspondence or financial compensation, to be sent or delivered by any private or commercial interstate carrier, or took or

85

received therefrom the foregoing matter, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, the foregoing matter.

684.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343 through fraud and committed the violation more than two times within the past ten years.

685.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343 by, having devised or intending to devise a scheme or artifice to defraud, including through the witness protection program and the procuring of false statements to disparage or damage Plaintiffs in their business or property, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, including through the witness protection program and the procuring of false statements to coerce and extort Peter Nygård to provide his property in the Bahamas to Defendant, for the purpose of executing the scheme or artifice, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds, including the transmission of false statements, the domestic and international transmission of millions of dollars to not-for-profit entities to fund the illicit activities, including the witness protection program, and the participation in the CBC's broadcasting of false statements about Plaintiffs and the the New York Times's planned publication of false statements.

686.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1465 through the production and transportation of obscene matters for distribution and committed the violation more than two times within the past ten years.

687.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1465 by knowingly producing with the intent to transport, distribute, or transmit in interstate or foreign

commerce, or knowingly transporting or traveling in, or using a facility or means of, interstate or foreign commerce or an interactive computer service in or affecting such commerce, for the purpose of sale or distribution of any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, including through the procurement of false statements against Plaintiffs, and the acts and actions of Jacky Jasper against Plaintiffs, which were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted or ratified by Defendant and his agents.

688.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1512 through tampering with a witness, victim, or an informant and committed the violation more than two times within the past ten years.

689.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1512(a)(2) by using physical force or the threat of physical force, or attempting to do so, against witnesses to procure false statements, including through the witness protection program, with the intent to influence, delay, or prevent the testimony of the witnesses in official proceedings, including before courts, the FBI, and the Department of Homeland Security, or caused or induced the witnesses to withhold testimony, or withhold a record, document, or other object, from an official proceeding, and, in the case of Stephen Feralio, to evade legal process summoning him to appear as a witness, or to produce a record, document, or other object, in an official proceeding in the United States, or to be absent from an official proceeding to which he had been summoned by legal process.

690.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1513 through retaliating against a witness, victim, or an informant and committed the violation more

than two times within the past ten years.

691.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1513 by knowingly engaging in the witness protection program or retailing against witnesses against Defendant or those acting in concert with Defendant and threatening the bodily injury of these witnesses or threatening to or damaging the tangible property of these witnesses, with the intent to retaliate against the witnesses for the attendance of the witnesses at an official proceeding, or any testimony given or any record, document, or other object produced by the witnesses in an official proceeding, including court proceedings and FBI and Department of Homeland Security investigations.

692.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1581 through engaging in peonage and committed the violation more than two times within the past ten years.

693.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1581 by holding witnesses in the witness protection program to a condition of peonage, coercing witnesses with expired visas, coerced financial obligations including housing and living expenses, for which employment through the provision of false statements against Plaintiffs is required for the satisfaction or ongoing provision of these financial obligations. This includes Defendant and/or his agents harboring Philencia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, and their inclusion in the witness protection program.

694.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1589 through engaging in forced labor and committed the violation more than two times within the past ten years.

695.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1589

88

by knowingly providing or obtaining the labor or services of witnesses to procure false statements against Plaintiffs, including through the witness protection program, by means of force, threats of force, physical restraint, or threats of physical restraint to the witnesses, including through expired visas or restricted or precluded movement through the witness protection program, or by means of serious harm or threats of serious harm to those witnesses, or by means of the abuse or threatened abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of any scheme, plan, or pattern intended to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Plaintiffs, that person or another person would suffer serious harm or physical restraint. Defendant and those acting in concert with him have knowingly benefitted, financially or by receiving of items of value, from participating in a venture that has engaged in the providing or obtaining of labor or services by the above means, knowingly or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by these means.

696.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1590 through trafficking in peonage, involuntary servitude and forced labor and committed the violation more than two times within the past ten years.

697.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1590 by knowingly recruiting, harboring, transporting, providing, or obtaining witnesses to procure false statements, for labor or services in violation of peonage, involuntary servitude and forced labor law, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philencia Cleare, Tazhmoye

89

Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiffs and to obtain commercial advantage or private financial gain to the detriment of Plaintiffs.

698.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1592 through interstate and foreign travel or transportation in aid of racketeering enterprises and committed the violation more than two times within the past ten years.

699.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1592 by traveling in interstate or foreign commerce or using the mail or facilities in interstate or foreign commerce, with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, including extortion or bribery to procure false statements, the witness protection program, and the domestic and international transmission of millions of dollars to not-for-profit entities to fund the illicit activities, and thereafter performed or attempted to perform the procurement of false statements, including through the witness protection program.

700.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 through the laundering of monetary instruments and committed the violation more than two times within the past ten years.

701.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 by, knowing that property involved in a financial transaction represents the proceeds of unlawful activity, conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of the unlawful activity with the intent to promote the carrying on of the unlawful activity, including through payments improperly funneled through not-for-profit entities to be used and used for the witness protection program and the procurement of false statements against

90

Plaintiffs.

702.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 with the intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986, or knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under state or federal law, including making payments through various entities, incorporating not-for-profit entities to further Defendant's personal agendas despite the prohibition of using those entities for that purpose, including through payments improperly funneled through not-for-profit entities to be used and used for the witness protection program and the procurement of false statements against Plaintiffs, and upon information and belief by taking tax deductions when such actions are not charitable.

703.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1957 through engaging in monetary transactions in property derived from the unlawful activity that violated 18 U.S.C. § 1596 and committed the violation more than two times within the past ten years.

704.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1957 by knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000, derived from the unlawful activity that violated 18 U.S.C. § 1596, the offense took place in the United States and outside the United States but Defendant is a United States person, including through the deposit, withdrawal, or transfer, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution, including making payments through various entities, incorporating not-for-profit entities to further Defendant's personal agendas despite the prohibition of using those entities for

91

that purpose, including through payments improperly funneled through not-for-profit entities to be used for the witness protection program and the procurement of false statements against Plaintiffs, and upon information and belief by taking tax deductions when such actions are not charitable.

705.     Defendant and others acting in concert with him have violated 18 U.S.C. § 2314 through transporting in interstate or foreign commerce stolen goods exceeding $5,000 in value and committed the violation more than two times within the past ten years.

706.     Defendant and others acting in concert with him have violated 18 U.S.C. § 2314 by transporting, transmitting, or transferring in interstate or foreign commerce goods or merchandise, exceeding $5,000 in value, knowing the goods or merchandise was stolen, converted or taken by fraud; including the transporting, transmitting or transferring of the videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant, and his provision of videos stolen, converted or fraudulently taken from Peter Nygård to provide to Defendant or those in concert with Defendant, videos and other materials sent by or to Jacky Jasper and posted online, against Plaintiffs, which were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted or ratified by Defendant, and documents stolen or procured by fraud from Peter Nygård that others working in concert with Defendant obtained, including documents submitted to the Department of Homeland Security.

707.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324 by bringing in and harboring aliens and committed the violation more than two times within the past ten years.

708.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324 by knowingly or in reckless disregard of the fact that aliens have come to, entered, or remain in the United States in violation of law, concealing, harboring, or shielding from detection, or

attempting to conceal, harbor, or shield from detection, the aliens in any place, including any building or any means of transportation, by encouraging or inducing aliens to come to, enter, or reside in the United States, knowingly or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; engaging in a conspiracy to commit the preceding acts, and aiding or abetting the commission of the preceding acts, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philencia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiffs and to obtain commercial advantage or private financial gain to the detriment of Plaintiffs.

709.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324a by unlawfully employing aliens and committed the violation more than two times within the past ten years.

710.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324a by hiring for employment in the United States aliens knowing the aliens are unauthorized with respect to such employment, or continuing to employ aliens in the United States knowing the aliens are or have become unauthorized with respect to such employment, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philencia Cleare, Tazhmoye Cummings, Samantha Storr

93

and/or others in the United States, done for the purpose of procuring false statements against Plaintiffs and to obtain commercial advantage or private financial gain to the detriment of Plaintiffs.

711.   Defendant and others acting in concert with him have engaged in commercial bribery under New York law and committed the violation more than two times within the past ten years.

712.   Defendant and others acting in concert have engaged in commercial bribery under New York law by conferring, or offering or agreeing to confer, a benefit upon an employee or agent or fiduciary of Plaintiffs without the consent of Plaintiffs, with the intent to influence his conduct in relation to Plaintiffs' affairs, and the value of the benefit conferred or offered or agreed to be conferred exceeded $1,000 and caused economic harm to Plaintiffs of over $250, including, upon information and belief, conferring, or offering or agreeing to confer, over $1,000 to Stephen Feralio, who worked for Peter Nygård, without the consent of Peter Nygård, to influence Stephen Feralio's conduct in relation to Peter Nygård's affairs, and caused more than $250 in harm to Peter Nygård, including the transporting, transmitting or transferring of the videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant, and his provision of videos stolen, converted or fraudulently taken from Peter Nygård to provide to Defendant or those in concert with Defendant, and including upon information and belief, James Lawson/JDL's and others acting in concert with Defendant's coercion of Peter Nygård's employees to provide false statements against Plaintiffs, including through the witness protection program, and including Jerry Forrester paying two property managers who were employed by Peter Nygård to engage in improper conduct and appear in the CBC program to falsely assert that they assisted one of Plaintiffs' associates to escape from Peter Nygård, and the bribery procured by Defendant, through

94

his surrogates, Stephen Davis, Jerry Forrester, and others, resulted in the Fifth Estate program suggesting that Peter Nygård was guilty of sexual misconduct in New York and at Nygård Cay.

713.   Defendant and others acting in concert with him have engaged in coercion/extortion under New York law and committed the violation more than two times within the past ten years.

714.   Defendant and others acting in concert have engaged in coercion/extortion under New York law by compelling or inducing persons to engage in conduct which the persons have a legal right to abstain from engaging in, or to abstain from engaging in conduct in which they have a legal right to engage, by means of instilling in them a fear that, if the demand is not complied with, Defendant or those acting in concert with him will engage in other conduct constituting a crime or perform any other act which would not in itself materially benefit the persons but is calculated to harm Plaintiffs materially with respect to their business, reputation or personal relationships, and committed the crime by instilling in the victim a fear that he or she will cause physical injury to a person or cause damage to property, or compelling or inducing the persons to commit or attempt to commit a felony, including through the witness protection program, by means of force, threats of force, physical restraint, or threats of physical restraint to the witnesses, including through expired visas or restricted or precluded movement through the witness protection program, or by means of serious harm or threats of serious harm to those witnesses, or by means of the abuse or threatened abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of any scheme, plan, or pattern intended to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Plaintiffs, that person or another person would suffer serious harm or physical restraint, including through the submission of false statements to the FBI and the

95

Department of Homeland Security.

715.    Under 18 U.S.C. § 1961(5), a "pattern of racketeering activity" means "at least two acts of racketeering activity" within a ten-year period.

716.    As set forth herein, the pattern of racketeering activity undertaken by Defendant throughout the last ten years far exceeds two acts.

RICO enterprise

717.    The "enterprise" here is the association in fact of numerous individuals and entities, including, but not limited to, Louis Bacon, Zack Bacon, Fred Smith/Callenders, Livingston Bullard, Wisler Davilma, John DiPaolo, James Lawson/JDL, and others who have banded together to obtain false and influenced statements and affidavits for the purpose of damaging Plaintiffs in their business and property in the United States.

718.    On or about February 19, 2015, Livingston Bullard and John DiPaolo referred to the association in fact as a "team."

Racketeering activity

719.    The "racketeering activity" here under 18 U.S.C. § 1961(1)(A) includes the acts set forth in this Amended Complaint, including but not limited to the violations alleged above under this Count I, and violations of NY Penal Law § 215.00, in which when Defendant and his associates, as set forth herein, conferred, or offered or agreed to confer, including through the witness protection program, benefits upon witnesses or persons about to be called as witnesses, in pending and anticipated litigation, in reports filed with the authorities, in false information being distributed on line and in working with the New York Times and its companion television program, upon agreements or understandings that the testimony of such witnesses will thereby be influenced.

720.    NY Penal Law § 215.00 is a class D felony under New York law. "Felony" means

96

an offense for which a sentence to a term of imprisonment in excess of one year may be imposed.

721.    In addition, the racketeering activity includes violating the statutes listed above in this Count I, such as 8 U.S.C. § 1324, through the bringing in and harboring of certain aliens, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philencia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiffs and to obtain commercial advantage or private financial gain to the detriment of Plaintiffs.

722.    The "racketeering activity" here under 18 U.S.C. § 1961(1)(B) includes violations of 18 U.S.C. § 1956, laundering of monetary instruments.

723.    Pursuant to 18 U.S.C. § 1956(a)(2)(A), whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, is subject to a fine, or imprisonment, or both.

724.    Pursuant to 18 U.S.C. § 1956(c)(7)(B)(vi), "specified unlawful activity" means "an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States."

725.    The "specified unlawful activity" here includes the allegations set forth above, including the bribery of witnesses alleged herein.

97

726.    Bribing witnesses would subject violators to prosecution in the United States or extradition under the United Nations Convention Against Transnational Organized Crime ("Convention"), given that such conduct contravenes numerous sections of the Bahamas Penal Code carrying potential deprivations of liberty of at least four years. For example: Convention Articles 2, 5, 16, 23; Bahamas Penal Code Chapter 84, Title xxviii, §§ 346 (Extortion), 423 (Perjury), 424 (Perjury); Bahamas Justice Protection (Amendment) Act, 2014, Chapter 64A (Obstruction of Justice); Bahamas Penal Code (Amendment) Act, 2014 (Organized Crime).

727.    The transfers of money by Louis Bacon and his associates from a place within the United States, directly or indirectly, to Livingston Bullard, Wisler Davilma, their agents or proxies, outside the United States, for the purpose of bribing them, were violations of the money laundering statute, 18 U.S.C. § 1956, and thereby racketeering activity under 18 U.S.C. § 1961(1)(B).

728.    The predicate acts include multiple payments each to Livingston Bullard and Wisler Davilma. Upon information and belief, the total requested amount of the payments was approximately $5,000,000.

729.    The predicate acts also include multiple payments to others including Philencia Cleare, Tazhmoye Cummins, Samantha Storr, Fred Smith/Callenders and investigators, lawyers, security guards, not-for-profit organizations, and others.

730.    The source of the payments is Defendant or entities controlled by him inside the United States.

731.    Defendant, directly or indirectly, hired associates to obtain the false and influenced statements against Plaintiffs alleged herein. Defendant also worked with individuals in New York and elsewhere to file false reports, disseminate false information and plant a false story with the New York Times.

732.     The pattern of activity is offering to pay, agreeing to pay, and paying witnesses, as well as influencing witnesses, including witnesses in the U.S. and the Bahamas to provide false and influenced statements, in connection with testimony, prospective testimony, false reports to the U.S. authorities, online defamation and the damaging and destruction of reputation by attempting to plant a false story in the New York Times which has a television program seen around the world.

Injury to business or property

733.     As a direct result of the racketeering activity alleged herein, as well as the conduct of other participants in the RICO enterprise, Plaintiffs have been injured in their business and property including:

(1)     Plaintiffs have spent significant amounts of money in the United States to defend legal proceedings and criminal investigations prosecuted against Plaintiffs through the use of the false and influenced statements alleged herein.

(2)     Plaintiffs have spent money for public relations fees in the United States to combat damages resulting from the use of false and influenced statements in the media and on social media in the United States.

(3)     Plaintiffs lost a long-existing line of credit to be used in the United States (among other places). In late 2015, a banking institution with which Plaintiffs had a relationship of nearly 20 years renewed Plaintiffs' substantial credit facility. On March 14, 2016 (after the disclosure of false statements), that banking institution sent an e-mail message regarding the "serious allegations" in the Bahamas Case and attached an article from the internet (which was available in the United States) discussing several of the statements. Plaintiffs directed that banking institution to a press release issued in the United States that was intended to combat the false and influenced

99

statements in the Bahamas Case and on the internet. Nevertheless, about two months later, that banking institution terminated its relationship with Plaintiffs. Plaintiffs used money from that institution's credit line in the United States.

(4)     Plaintiffs lost a long-standing client and expansion of business with Canadian retailers into the United States, harming Plaintiffs' businesses, including business located in New York.

(5)     Plaintiffs lost business, their good will and reputation in the United States. Peter Nygård and his businesses are closely identified in the public mind, similar to other fashion houses. The false and influenced statements about Peter Nygård have damaged Nygård International Partnership and Nygård Inc. through loss of good will, irreparable harm to their reputation, and lost business and money.

734.     To date, the damages suffered by Plaintiffs total millions of dollars.

735.     Such expenditures and financial losses are neither speculative nor intangible. As the RICO enterprise continues to operate in the manner alleged herein into the future, Plaintiffs will continue to suffer damages as alleged.

736.     Should the New York Times publish the false statements, and broadcast its television program, the damage to Plaintiffs' business, good will and reputation will likely be catastrophic.

737.     Should Defendant promote and direct the filing of a civil action against Plaintiffs, the damage to Plaintiffs' business, good will and reputation will likely be catastrophic.

738.     If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiffs.

### COUNT II - VIOLATIONS OF 18 U.S.C. § 1962(D)

739.     Plaintiffs incorporate by reference ¶¶ 1 - 738 above as if fully set forth at length

herein.

740.    Defendant Louis Bacon entered an agreement with other participants in the RICO

enterprise, including John DiPaolo, James Lawson/JDL, Fred Smith, Philencia Cleare, Tazhmoye

Cummings, Samantha Storr and others mentioned herein to violate § 1962(c) by obtaining, through

unlawful means, false and influenced statements and affidavits to be used against Plaintiffs to

injure them in their business and property.

741.    In accordance with the agreements described herein, Louis Bacon obtained,

through unlawful means, the false and influenced statements alleged herein.

742.    As a direct result of the conspiracy among Defendant Louis Bacon and the other

participants in the RICO enterprise, Plaintiffs have been injured in their business and property as

described herein.

743.    If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiffs.

## COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

744.    Plaintiffs incorporate by reference ¶¶ 1 - 743 above as if fully set forth at length

herein.

745.    Plaintiffs are engaged in the fashion business and have existing and prospective

business relationships with consumers that do or may purchase their fashion brands and major

department stores carry, or may carry, Plaintiffs' fashion brands.

746.    Defendant and others acting with him or on his behalf interfered with Plaintiffs'

business relationships and Plaintiffs' opportunities to sell their fashion brands.

747.    Defendant and these other individuals, knowingly and with malice, established,

provided content for, or encouraged purported witnesses to provide false statements, including

content for the sistahsabused.com domain. The website contains disparaging content about

101

Plaintiffs. This content includes falsified accusations against Plaintiffs, including encouraging actual or prospective consumers to not purchase Plaintiffs' fashion products and to dissuade a department store customer from continuing its business relationship with Plaintiffs by ceasing to carry Plaintiffs' fashion products.

748.    Defendant and these other individuals, knowingly and with malice, established, provided content for, or encouraged purported witnesses to provide false statements, including content for the New York Times. Based upon statements made by the reporters to numerous witnesses interviewed to date and the stated goal of trying to bring down Peter Nygård, the news story is expected to contain disparaging content about Plaintiffs. This content includes falsified accusations against Plaintiffs.

749.    These accusations have no legitimate purpose and are designed to injure Plaintiffs in their business relationships with consumers and entities that sell their fashion brands.

750.    Defendant intentionally sought to frustrate the benefits that Plaintiffs reasonably expected through the sale of their fashion brands to consumers and stores that carry their brands. Plaintiffs had a reasonable probability that they and these consumers and stores would have entered into business and contractual relationships, with economic benefits to Plaintiffs. Defendant wrongfully and intentionally prevented these relationships from developing. As a result, Plaintiffs will not be able to enjoy the benefit of their bargain in selling their fashion brands to current and prospective future consumers and stores that carry their brands.

751.    Plaintiffs have been wrongfully prevented from expanding or continuing their business relationships with consumers or entities that carry or may carry their fashion brands as a result of Defendant's wrongful conduct. For example, Plaintiffs lost a long-standing client and expansion of business with Canadian retailers into the United States, harming Plaintiffs'

businesses, including business located in New York. In addition, Plaintiffs lost a long-existing line of credit to be used in the United States.

752.    As a proximate cause of the wrongful conduct, Plaintiffs' prospective and existing business relationships have been tortuously harmed, and Plaintiffs have been significantly and irreparably injured in an amount to be determined at trial. Plaintiffs have suffered quantifiable reputational and financial damages though the diminishment of ongoing and prospective customer and business relationships.

753.    As a result of Louis Bacon's willful and wanton conduct, which was in reckless disregard for Plaintiffs' rights, which showed a high degree of moral turpitude, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

754.    If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiffs.

## COUNT IV – AIDING AND ABETTING THE FILING OF A FALSE REPORT

755.    Plaintiffs incorporate by reference ¶¶ 1 - 754 above as if fully set forth at length herein.

756.    Defendant has, through bribery and intimidation of witnesses, intentionally caused and substantially assisted these individuals to make false police reports and false reports to other law enforcement and governmental entities in the United States about Plaintiffs.

757.    Defendant Louis Bacon intended these false reports to implicate Plaintiffs for unlawful conduct they did not commit, or as personal revenge against Plaintiffs. Defendant knowingly aided and abetted the procurement and dissemination of these false reports.

758.    The filing of the false reports violates 18 U.S.C. § 287 and NY Penal Law § 240.50.

759.    The filing of the false reports in violation of the law, and the aiding and abetting of these filings, has, as a direct and natural result, caused damage to Plaintiffs.

103

## COUNT V – FILING OF A FALSE REPORT

760.    Plaintiffs incorporate by reference ¶¶ 1 - 759 above as if fully set forth at length herein.

761.    Defendant Louis Bacon has, through bribery and intimidation of witnesses, intentionally caused the filing of false police reports and false reports to other law enforcement and governmental entities in the United States about Plaintiffs.

762.    Defendant Louis Bacon intended these false reports to implicate Plaintiffs for unlawful conduct they did not commit, or as personal revenge against Plaintiffs.

763.    The filing of the false reports violates 18 U.S.C. § 287 and NY Penal Law § 240.50.

764.    The filing of the false reports in violation of the law has caused damage to Plaintiffs.

765.    The filing of the false reports was also an abuse of process.

## COUNT VI – TRAFFICKING AND HARBORING CERTAIN ALIENS TO FURTHER A FRAUDULENT ACT

766.    Plaintiffs incorporate by reference ¶¶ 1 - 765 above as if fully set forth at length herein.

767.    Defendant and/or his agents have brought aliens to the United States with promises of education, money and permanent visas provided they further his fraudulent and illegal conspiracy against Plaintiffs.

768.    Defendant and/or his agents have transported, moved, harbored, shielded from detection and provided the means for aliens, including Philencia Cleare, Tazhmoye Cummings, Samantha Storr and/or others, in violation of 8 U.S.C. § 1324.

769.    Defendant and/or his agents committed these acts to coerce the individual aliens to cooperate in his conspiracy to destroy and damage Plaintiffs.

770.    As a result of Defendant's acts, Plaintiffs have been damaged.

771.    If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiffs.

### COUNT VII – ABUSE OF PROCESS

772.    Plaintiffs incorporate by reference ¶¶ 1 – 771 above as if fully set forth at length herein.

773.    Defendant caused legal process to be issued against Plaintiffs in the lawsuits alleged herein that were filed against Plaintiffs.

774.    Defendant intended to harm Plaintiffs without justification or excuse.

775.    Defendant used legal process in an improper manner to obtain a collateral objective against Plaintiffs. Defendant misused legal process in the lawsuits alleged herein that were filed against Plaintiffs to obtain and utilize the false statements against Plaintiffs alleged herein, precipitate the coercion of witnesses and obtaining of additional false statements against Plaintiffs alleged herein, to coerce and cause financial institutions not to do business with Plaintiffs as alleged herein, to influence consumers and businesses to not do business with Plaintiffs and to refrain from and cease doing business with Plaintiffs through carrying Plaintiffs' fashion brands, as alleged herein, and to extort Peter Nygård to turn over his property in the Bahamas to Defendant, as alleged herein.

776.    Defendant's purpose of this process was to achieve an end that was not legally obtainable, with an ulterior motive and with malice, as alleged herein. Defendant acted with a conscious disregard for the rights of Plaintiffs because his ulterior purpose in misusing legal process was: (1) harassing and damaging Plaintiffs through the utilization and obtaining of false statements against Plaintiffs to damage Plaintiffs' business, good will and reputation; (2) harassing and damaging Plaintiffs through coercing and causing financial institutions not to do business with

105

Plaintiffs; (3) harassing and damaging Plaintiffs through coercing and causing to influence consumers and businesses to not do business with Plaintiffs and to refrain from and cease doing business with Plaintiffs through carrying Plaintiffs' fashion brands; and (4) harassing and extorting Peter Nygård to turn over his property in the Bahamas to Defendant.

777.    Defendant's conduct was a substantial factor in causing Plaintiffs' damages, and the depravity of Defendant's conduct fulfills the requirements for an award of exemplary damages.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant Louis M. Bacon, as follows:

(1)    Awarding actual damages as will be determined at trial;

(2)    Awarding treble damages, attorney fees, interest and other relief provided by statute;

(3)    Preliminarily and permanently enjoining Louis Bacon and those acting in concert with him from paying or conferring benefits upon, or threatening individuals to make false statements to be used against Plaintiffs in legal proceedings, anticipated legal proceedings, reports to authorities, and the dissemination of defamatory statements on line, in print publications, on television and any other media; and,

(4)    Such other and further relief as this court deems just and proper.

Dated: White Plains, New York
November 8, 2019

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**

 /s/ David M. Ross
David M. Ross, Esq., *admitted pro hac vice*
1500 K Street, N.W., Suite 330
Washington, DC 20005
Tel: (202) 626-7660
Fax: (202) 626-3606
david.ross@wilsonelser.com

106

Cynthia S. Butera, Esq.
Rebecca R. Gelozin, Esq.
1133 Westchester Avenue
White Plains, NY 10604
Tel: (914) 872-7000
Fax: (914) 323-7001
cynthia.butera@wilsonelser.com
rebecca.gelozin@wilsonelser.com

***Counsel for Plaintiffs***