**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETER J. NYGÅRD,<br><br>                    Plaintiff,<br><br>                    v.<br><br>LOUIS M. BACON, JOHN DOES 1-20 AND DOE CORPS.<br>1-10,<br><br>                    Defendants. | **Civil Action No.**<br>**1:2019-cv-01559-LGS-KNF** |

## FIRST AMENDED COMPLAINT

Plaintiff PETER J. NYGÅRD, by his attorneys, Wilson Elser Moskowitz Edelman &
Dicker LLP, complaining of Defendants, LOUIS M. BACON, JOHN DOES 1-20 and DOE
CORPS. 1-10 (together Louis Bacon, John Does 1-20 and Doe Corps 1-10 shall be referred to as
"Defendant") alleges as follows:

# TABLE OF CONTENTS

**Page**

INTRODUCTION ... 6

PARTIES ... 7

OTHER RELEVANT INDIVIDUALS/ENTITIES ... 9

    Zack H. Bacon ... 9

    Ann Colley ... 10

    Robert F. Kennedy, Jr. ... 11

    Frederick Smith ... 12

    Moore Capital Management ... 16

    The Moore Charitable Foundation ... 17

    Belvedere Property Management ... 18

    Wilson Mesa Ranch Holdings L.L.C. ... 18

    Waterkeeper Alliance, Inc. ... 19

    Save The Bays ... 21

    Philincia Cleare ... 22

    Tazhmoye Cummings ... 23

    Samantha Storr ... 24

    Robynn Toni Smith ... 25

    Stephen Feralio ... 26

    Jestan Sands ... 28

    Other Unnamed Individuals Kept Hidden By Defendant ... 30

    Wisler Davilma ... 31

    Livingston Bullard ... 32

1107729v.1

Sean Merrick                                                          33

Bradley Pratt                                                        34

Princess Pratt                                                       35

Mary Braithwaite                                                     36

Gerald "Jerry" Forrester                                             36

Stephen Davis                                                        37

Callenders & Co.                                                     38

Doneth Cartwright                                                    39

Palladino & Sutherland                                              41

Jack Palladino                                                       42

Sara Ness                                                            43

Allison Cain                                                         45

D&R Agency LLC                                                      46

John DiPaolo                                                         47

Damian McLaughlin                                                    48

R. Scott Rivas                                                       48

James Lawson                                                         49

Michael Pintard                                                      50

OTIA Investigations                                                 51

Gary Marchetti                                                       52

New York-based Law Firm                                             53

Jeff Davis                                                           54

Anthony Beach                                                        55

Prominent New York Newspaper                                        56

Internationally Known Reporter for The New York Times               58

1107729v.1

Canadian Bureau Chief for The New York Times 58

Canadian Broadcasting Company 59

Sistahsabused.com 60

JURISDICTION AND VENUE 62

ADDITIONAL FACTUAL ALLEGATIONS 63

2010-2012 Payments for False Statements 66

2014 Media Publication 72

Efforts to Arrange for False Testimony to Be Used in Media, False Reports and Claims 73

Toggi, Bobo, Clement Chea 75

Philincia Cleare False Statements 81

Tazhmoye Cummings False Statements 84

Samantha Storr 88

Other People in the Private Witness Protection Program 91

Richette Ross 91

Litira Fox 93

Deidre Miller 93

Improper Activity in 2015-2016 94

Improper Activity in 2018-2019 97

The Pending Media Assault 98

The More Than Ten Year Conspiracy to Damage Plaintiff Continues 100

Improper Activity in 2020 102

COUNT I       VIOLATIONS OF 18 U.S.C. § 1962(C) 112

RICO Enterprise 130

Racketeering Activity 131

Injury to Business or Property 134

1107729v.1

COUNT II          VIOLATIONS OF 18 U.S.C. § 1962(D)                                     137

COUNT III         TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
                  ADVANTAGE                                                             137

COUNT IV          AIDING AND ABETTING THE FILING OF A FALSE REPORT                      140

COUNT V           FILING OF A FALSE REPORT                                              140

COUNT VI          TRAFFICKING AND HARBORING CERTAIN ALIENS TO FURTHER
                  A FRAUDULENT ACT                                                      141

COUNT VII         ABUSE OF PROCESS                                                      142

1107729v.1

## INTRODUCTION

i.      This is an action to enjoin, and seek redress for, the conduct of Defendant, in concert with others, in engaging in a pattern of illicit and illegal conduct designed to improperly influence witnesses to make false statements, file false reports, abuse process, tortiously interfere with business relations and aid and abet the dissemination of false statements in conjunction with infringing copyrighted works and trademarks, all for the intentional purpose of damaging Plaintiff, his business and property, in violation of the Racketeer Influenced and Corrupt Organizations Act and other laws as set forth below.

ii.     For over ten years, Plaintiff and Defendant have engaged in an ongoing conflict, which initially arose out of a property owner dispute in the Bahamas but has since expanded, and has extended across multiple countries, now primarily the United States. To complete his desired result of destroying Plaintiff, and businesses associated with Plaintiff, Defendant turned his attention to funding salacious lawsuits against Plaintiff, and businesses associated with Plaintiff, in the Bahamas, California, and New York, and influencing and providing false information to media outlets such as The New York Times and others to assist him in his quest. Defendant's orchestrated lawsuits and media attacks are often supported by fabricated and manufactured evidence, and are often made through payments, threats, coercion and intimidation. Through the use of U.S. and foreign investigators and "guards," Defendant has created his own fake "witness protection program" to coerce witnesses to cooperate in his scheme against Plaintiff. In addition, upon information and belief, Defendant has used a series of corporate gymnastics, including the improper use of not-for-profit entities, to funnel tens of millions of dollars to fund his illicit activities while presumably taking improper tax deductions.

iii.    Defendant's misconduct has been successful in damaging, if not destroying, Plaintiff and businesses associated with Plaintiff. Beginning in early 2020, Defendant's improper

1107729v.1

efforts against Plaintiff have culminated in the filing of "Jane Doe" lawsuits in California and New York against Plaintiff alleging sexual misconduct, related FBI raids in California and New York, numerous associated media reports in The New York Times and other media outlets (including traditional media, social media and a tabloid book), the dropping of Plaintiff's fashion brands by retailers such as Dillard's and other former business partners, the prompting of Peter Nygård's resignation from certain companies with which he was associated, the appointment of a receiver involving companies with which Peter Nygård was associated, and the institution of receivership proceedings (and subsequent U.S. Bankruptcy Court proceedings) involving certain companies. Defendant's role in these events is indisputable. The New York Times and other media outlets have reported on his role.

## PARTIES

1.     Peter J. Nygård ("Peter Nygård") is a Canadian citizen and resident. Through early 2020, Peter Nygård conducted business at various locations throughout the world, including business in the United States, promoting the design, manufacture, distribution, and sale of women's clothing and accessories. Until 2020, Peter Nygård and businesses with which he was associated were closely associated in the public eye, as his face and name adorned the branding of the companies, including one that used the brand name Peter Nygård. One of the stores selling such merchandise was branded Nygård, with a location at 1431 Broadway, New York, NY 10018.

2.     Defendant Louis M. Bacon ("Louis Bacon") is a resident of New York State, with residences and businesses in New York City and on Long Island. Louis Bacon is the Chairman and Chief Executive Officer of Moore Capital Management, a private investment management firm headquartered at 11 Times Square, New York, NY 10036, with additional offices in London and Hong Kong.

1107729v.1

3. Louis Bacon is also Chairman of the Boards of Belvedere Property Management, LLC, a property management firm with headquarters in New York, and Wilson Mesa Ranch Holdings, LLC, a land holding company that is affiliated with Belvedere Property Management.

4. Louis Bacon is the Founder and Chairman of the Board of The Moore Charitable Foundation, Inc., a New York-based not-for-profit located at 11 Times Square, New York, New York 10036.

5. Louis Bacon is a founding member and a director of Save the Bays, an organization in the Bahamas that, upon information and belief, relies heavily on funding and support from Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

6. Upon information and belief, Louis Bacon is the founder and benefactor of a charity known as Sanctuary, which has as a primary purpose the provision of funds for use in the advancement of the false statements made against Plaintiff.

7. Upon information and belief, until sometime in 2013, Louis Bacon was the primary client of Citco Fund Services in the Bahamas, a financial institution through which certain of Defendant's money may have flowed to fund activities referenced herein.

8. Louis Bacon has carried out and continues to carry out illegal and improper activities, and has directed, supervised and requested that others, directly and indirectly, including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to further damage Plaintiff.

9. John Does 1-20 are those individuals (male and female) who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the individuals mentioned below.

10. John Does 1-20 have carried out and continue to carry out illegal and improper

activities, and have directed, supervised and requested that others, directly and indirectly, including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to further damage Plaintiff.

11.     Doe Corps. 1-10 are those entities who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the entities mentioned below.

12.     Doe Corps. 1-10 have carried out and continue to carry out illegal and improper activities, and have directed, supervised and requested that others, directly and indirectly, including those listed herein, carry out illegal and improper activities, all of which have damaged and threaten to further damage Plaintiff.

## OTHER RELEVANT INDIVIDUALS/ENTITIES

Zack H. Bacon

13.     Zack H. Bacon, III ("Zack Bacon") is a New York resident.

14.     Zack Bacon is a Managing Director at Moore Capital Management.

15.     Zack Bacon is Louis Bacon's older brother.

16.     Zack Bacon has been involved in activities to further the actions taken against Plaintiff.

17.     Zack Bacon directed many of the activities taken against Plaintiff or in furtherance of Defendant's scheme and plan to destroy Plaintiff.

18.     Upon information and belief, Zack Bacon was part of a plan to have the Department of Homeland Security investigate Peter Nygård.

19.     Zack Bacon was aware that information provided to the Department of Homeland Security to investigate Peter Nygård was false.

20. Upon information and belief, Zack Bacon was part of a plan to have the FBI investigate Peter Nygård.

21. Zack Bacon was aware that information provided to the FBI to investigate Peter Nygård was false.

22. Upon information and belief, Zack Bacon was part of a plan using The New York Times and other media outlets to further Defendant's scheme to damage Plaintiff's business and property.

23. Upon information and belief, Zack Bacon stated in a recording provided to The New York Times that he intended to take advantage of the #MeToo movement to destroy Peter Nygård in the press and commence a class action lawsuit against him using the most aggressive lawyers in the world.

24. Zack Bacon was aware that information provided to The New York Times and other media outlets to investigate and publish about Peter Nygård was false.

25. Upon information and belief, Zack Bacon carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

26. The actions taken by Zack Bacon against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Ann Colley</u>

27. Ann Colley is a New York resident.

28. Ann Colley is the Director of Public Relations and charitable giving at Moore Capital Management and the Executive Director and Vice President of The Moore Charitable Foundation ("MCF") and its affiliate foundations.

29.     Ann Colley is the lead strategic adviser to MCF's Chairman, Louis Bacon.

30.     Ann Colley serves on the Board of Trustees of Waterkeeper Alliance, Inc., a New York not-for-profit charity.

31.     Upon information and belief, Ann Colley has been involved in financial decisions regarding the funding of activities by Defendant and/or entities he controls designed to further Defendant's scheme to damage Plaintiff's business and property.

32.     Upon information and belief, Ann Colley carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

33.     The actions taken by Ann Colley against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Robert F. Kennedy, Jr.

34.     Upon information and belief, Robert F. Kennedy, Jr. is a New York resident.

35.     Robert F. Kennedy, Jr. is an attorney licensed by and before the courts of the State of New York.

36.     Robert F. Kennedy, Jr. is the Founder, President, and Senior Attorney of Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

37.     Robert F. Kennedy, Jr. is a Member of the Board of Directors of Waterkeeper Alliance, Inc.

38.     Robert F. Kennedy, Jr. serves as a Council member for Waterkeeper Alliance, Inc.

39.     Robert F. Kennedy, Jr. is a Member of the Board of Directors of Save the Bays, a not-for-profit organization based in the Bahamas.

40.     As the President and Board Member of Waterkeeper Alliance, Inc., Robert F.

Kennedy, Jr. had a duty and obligation to ensure that monies raised by it and flowing through it were for proper purposes and to further the mission of Waterkeeper Alliance, Inc.

41.     As a Member of the Board of Directors of Save the Bays, Robert F. Kennedy, Jr. had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

42.     Robert F. Kennedy, Jr. has been aware for many years of Defendant's desire to destroy and damage Plaintiff.

43.     Upon information and belief, Robert F. Kennedy, Jr. carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

44.     The actions taken by Robert F. Kennedy, Jr. against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Frederick Smith</u>

45.     Frederick Smith ("Fred Smith") is a resident of the Bahamas.

46.     Fred Smith is an attorney admitted to practice at the Bars of England and Wales and the Bahamas.

47.     Fred Smith is the Senior Partner of Callenders & Co., a Bahamian law firm.

48.     Fred Smith is the Managing Partner of Callenders & Co.

49.     Fred Smith has appeared in the courts of and has provided testimony regarding matters of law in England, the U.S. and Canada.

50.     Fred Smith serves as a Council member for Waterkeeper Alliance, Inc., a New York not-for-profit corporation.

51.     Fred Smith is a Member of the Board of Directors of Save the Bays, a not-for-profit

organization based in the Bahamas.

52.     Fred Smith was and/or is the "Contact" listed on the Waterkeeper Alliance, Inc.'s Clifton Western Bays Waterkeeper webpage.

53.     Upon information and belief, Fred Smith has traveled to New York to meet with Louis Bacon and/or his representatives in connection with litigation between Louis Bacon and Peter Nygård.

54.     Upon information and belief, Fred Smith has conducted business in New York and elsewhere in the U.S. on behalf of Defendant.

55.     Upon information and belief, Fred Smith has conducted business in New York and elsewhere in the U.S. on behalf of Save the Bays.

56.     Upon information and belief, Fred Smith and/or his law firm was/were paid by or on behalf of Defendant, or an entity he controls, to carry out certain illegal or improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

57.     As managing partner of Callenders & Co., Fred Smith has instructed and/or directed attorneys working for him and/or the firm to undertake actions for or on behalf of Defendant to further the scheme alleged and damage Plaintiff.

58.     Fred Smith's acts have damaged, continue to damage and threaten to further damage Plaintiff.

59.     As a Member of the Board of Directors of Save the Bays, Fred Smith had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

60.     Through his affiliations with the named charitable organizations, and as counsel,

13

Fred Smith had a duty and obligation to ensure that monies raised by it and expended by it were in furtherance of its charitable mission.

61.     Upon information and belief, Fred Smith was involved in a number of improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

62.     Fred Smith acted in concert with and/or as an agent for Defendant in carrying out illegal or improper activities to further Defendant's scheme to damage Plaintiff's business and property.

63.     Fred Smith acted in concert with and/or as an agent for Defendant in carrying out activities designed to damage Plaintiff.

64.     Fred Smith's actions to further Defendant's scheme to damage Plaintiff's business and property were done not only as counsel to Defendant, but in Fred Smith's personal and business capacity as well.

65.     Upon information and belief, Fred Smith authorized, directed and carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property in arranging for the swearing of false statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security, the FBI and other representatives of the Department of Justice.

66.     Fred Smith initiated contact with The New York Times to instigate a false story about Peter Nygård to further Defendant's scheme to damage Plaintiff's business and property.

67.     Upon information and belief, Fred Smith provided false information to The New York Times with the intent to have this information published to further Defendant's scheme to damage Plaintiff's business and property.

14

68.     Upon information and belief, Fred Smith arranged for representatives of The New York Times to meet with individuals who he knew would provide false information about Peter Nygård.

69.     Upon information and belief, Fred Smith arranged for representatives of The New York Times to meet with individuals who were paid to provide the reporter with false information.

70.     Upon information and belief, Fred Smith carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

71.     Upon information and belief, Fred Smith arranged for Richette Ross to be moved into a gated community, and arranged for $5,000 per month in expenses to be paid for or on her behalf.

72.     Upon information and belief, Fred Smith gave Richette Ross an additional $500 per week to work on another potential lawsuit against Peter Nygård.

73.     The actions taken by Fred Smith against Plaintiff were authorized, directed, paid for and/or ratified by Defendant.

74.     Furthermore, upon information and belief, Fred Smith, acting on behalf of Defendant, compensated two witnesses (Litira Fox and Richette Ross) who found alleged victims.

75.     Upon information and belief, Fred Smith paid Litira Fox and Richette Ross to find women who would make false statements about Peter Nygård and sex.

76.     Upon information and belief, Litira Fox and Richette Ross accepted money from Fred Smith and arranged for women to lie about alleged sexual encounters with Peter Nygård.

77.     The actions taken by Fred Smith against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

15

Moore Capital Management

78.     Moore Capital Management, L.P. ("MCM") is a Delaware Limited Partnership with its principal place of business in New York.

79.     MCM is a global investment management firm based in New York.

80.     MCM, together with its affiliates, is a private investment management firm with offices in New York, London and Hong Kong.

81.     Together MCM and its affiliates shall be referred to herein as "Moore Capital."

82.     Moore Capital's headquarters are located at 11 Times Square, New York, New York.

83.     Moore Capital was founded in 1989 by Defendant.

84.     Defendant is the Chairman and CEO of Moore Capital.

85.     Upon information and belief, Moore Capital made charitable contributions it knew were not to be used for the mission of the charities, but instead were to be used to further Defendant's scheme to damage Plaintiff's business and property

86.     Upon information and belief, Moore Capital carried out illegal and improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

87.     Upon information and belief, Moore Capital made, authorized or arranged for transactions through Citco Fund Services in the Bahamas in support of certain activities in furtherance of the conspiracy.

88.     The actions taken by Moore Capital against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

1107729v.1

The Moore Charitable Foundation

89.     MCF is a New York not-for-profit corporation formed in 1992.

90.     MCF is located at 11 Times Square, New York, New York.

91.     Defendant is the founder of MCF.

92.     Defendant is the Chairman of MCF.

93.     Upon information and belief, Defendant is the President of MCF.

94.     MCF has affiliate foundations across North America, including The Orton Foundation in North Carolina.

95.     Defendant is Chairman of the MCF affiliate foundations.

96.     MCF claims to be a private not-for-profit foundation committed to land and water conservation.

97.     Upon information and belief, MCF accepted charitable contributions knowing that the funds were to be used to further Defendant's scheme to damage Plaintiff's business and property.

98.     Upon information and belief, MCF made grants to other charitable organizations knowing that the funds were to be used to destroy and damage Plaintiff's business and property.

99.     Upon information and belief, MCF used funds to further the scheme to destroy and damage Plaintiff.

100.     Upon information and belief, MCF carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

101.     The actions taken by MCF against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

1107729v.1

Belvedere Property Management

102.    Belvedere Property Management LLC ("Belvedere") is a Delaware Limited Liability Company licensed to do business in New York.

103.    Belvedere is a property management entity based in New York.

104.    Belvedere is located at 11 Times Square, New York, New York.

105.    Defendant is the sole member and Chairman of the Board of Belvedere.

106.    Upon information and belief, Belvedere was used as a vehicle to pay witnesses to further Defendant's scheme to damage Plaintiff's business and property.

107.    Upon information and belief, Belvedere was used to support Defendant's private witness protection program and harbor illegal aliens.

108.    Upon information and belief, Belvedere carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

109.    The actions taken by Belvedere against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Wilson Mesa Ranch Holdings L.L.C.

110.    Wilson Mesa Ranch Holdings L.L.C. ("Wilson Mesa") is a Delaware Limited Liability Company formed in 2007.

111.    Defendant is the sole member and Chairman of the Board of Wilson Mesa.

112.    Wilson Mesa is a land holding company.

113.    Wilson Mesa is affiliated with New York-based Belvedere.

114.    Wilson Mesa was a vehicle used to further the private witness protection program.

115.    Upon information and belief, Wilson Mesa carried out illegal and/or improper

activities against Plaintiff to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

116.   The actions taken by Wilson Mesa against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Waterkeeper Alliance, Inc.

117.   Waterkeeper Alliance, Inc. ("Waterkeepers") is a New York not-for-profit corporation.

118.   Waterkeepers is located at 180 Maiden Lane, Suite 603, New York, New York.

119.   Waterkeepers' stated mission, as shown on its website, is to strengthen and grow a global network of grassroots leaders protecting everyone's right to clean water.

120.   Waterkeepers states on its website that it unites more than 300 organizations and affiliates that are on the frontlines of the global water crisis, patrolling and protecting more than 2.5 million square miles of rivers, lakes, and coastal waterways on six continents.

121.   Waterkeepers has affiliate entities in the Bahamas.

122.   Waterkeepers has an affiliate or subsidiary known as Clifton Western Bays Waterkeeper.

123.   Fred Smith is the "Contact" for Clifton Western Bays Waterkeeper.

124.   Fred Smith uses a Cliftonbwk@gmail.com email address.

125.   Clifton Western Bays Waterkeeper's website redirects to the Savethebays.bs website.

126.   Waterkeepers has an affiliate or subsidiary in the Bahamas known as Waterkeepers Bahamas.

127.   Rashema Ingraham is the contact for Waterkeepers Bahamas.

128.    Rashema Ingraham was a legal secretary for approximately five years at Callenders.

129.    Rashema Ingraham's email contact information at Waterkeepers Bahamas is Rashema@savethebays.bs.

130.    Waterkeepers Bahamas' website redirects to the savethebays.bs website.

131.    In a 2010 Denver Post article, Robert F. Kennedy, Jr. was quoted as saying of Defendant, "He's never scared of a fistfight," and "He is our [Waterkeepers'] single largest supporter. He's one of the few supporters out there who are willing to fund litigation and fight long term."

132.    Since then, Defendant has continued to fund Waterkeepers through entities he controls in order to further Defendant's scheme to destroy and damage Plaintiff's business and property.

133.    Upon information and belief, Waterkeepers has funneled millions of dollars to the Bahamas for Defendant's fight against Peter Nygård.

134.    Upon information and belief, some of the funds funneled by Waterkeepers to the Bahamas were used to support Defendant's campaign to destroy and damage Plaintiff.

135.    Upon information and belief, some of the funds funneled by Waterkeepers to the Bahamas were used to pay individuals mentioned herein to provide false statements about Plaintiff or engage in activity otherwise mentioned herein.

136.    Upon information and belief, Waterkeepers carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

137.    The actions of Waterkeepers against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Save the Bays

138.     Save the Bays was initially formed as a charity in the United States.

139.     Fred Smith was the President of the Save the Bays charity formed in the United States.

140.     Joseph Darville was the Vice President of Save the Bays charity formed in the United States.

141.     Lindsey McCoy was the Executive Director of Save the Bays, which was based in Ohio.

142.     Save the Bays is now a Bahamian not-for-profit organization.

143.     Defendant is on the Board of Directors of Save the Bays.

144.     Joseph Darville is on the Board of Directors of Save the Bays.

145.     Robert F. Kennedy, Jr. is on the Board of Directors of Save the Bays.

146.     Matthew McCoy, the husband of Lindsey McCoy, is on the Board of Directors of Save the Bays.

147.     Fred Smith is on the Board of Directors of Save the Bays.

148.     The stated mission of Save the Bays is to preserve and protect Bahamian lands, waters and ecosystems.

149.     The stated mission of Save the Bays is not to destroy and damage Plaintiff's business and property.

150.     Upon information and belief, Save the Bays has used funds funneled to it or through it, to pay for the scheme to destroy and damage Plaintiff's business and property, including the procurement of false statements against Plaintiff.

151.     Upon information and belief, Save the Bays carried out illegal and/or improper

21

activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

152.     The actions of Save the Bays against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Philincia Cleare

153.     Philincia Cleare is a Bahamian citizen residing in the United States.

154.     Philincia Cleare is living in the United States at the request of and at the expense of Defendant.

155.     Philincia Cleare was and/or is part of a private witness protection program being supported by Defendant.

156.     Upon information and belief, Philincia Cleare was paid by or on behalf of Defendant, or through Defendant's agents or representatives, to carry out certain activities to further Defendant's scheme to damage Plaintiff's business and property.

157.     Philincia Cleare was paid, compensated, threatened and coerced to provide false statements for use in the destruction of and damage to Plaintiff.

158.     Philincia Cleare extorted Peter Nygård.

159.     Philincia Cleare demanded in excess of $500,000 from Peter Nygård in exchange for an agreement to refrain from providing false statements and other personal information to the media and governmental authorities or assisting Defendant to destroy Peter Nygård. Peter Nygård refused to pay the extortionist demands and Philincia Cleare has since provided false statements for money for use by Defendant in his conspiracy to damage Plaintiff. Philincia Cleare further disseminated false statements through the media, provided false testimony to the media and to governmental authorities, and assisted in damaging Plaintiff Peter Nygård.

160.     Philincia Cleare carried out illegal and/or improper activities to further Defendant's scheme to damage Plaintiff's business and property at the direction of, under the supervision of, at the request of or on behalf of Defendant.

161.     The actions of Philincia Cleare against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Tazhmoye Cummings</u>

162.     Tazhmoye Cummings is a Jamaican citizen residing in the United States.

163.     Tazhmoye Cummings is living in the United States at the request of and at the expense of Defendant.

164.     Tazhmoye Cummings was and/or is part of a private witness protection program being supported by Defendant.

165.     Upon information and belief, Tazhmoye Cummings was paid by or on behalf of Defendant to carry out certain activities against Plaintiff and in furtherance of Defendant's scheme.

166.     Tazhmoye Cummings extorted Peter Nygård.

167.     Tazhmoye Cummings demanded that Peter Nygård pay up to $800,000 in order to avoid her making a false statement as requested by Defendant, alleging she had engaged in sex with Plaintiff in California when she was 17. Tazhmoye Cummings knew any such statement about Plaintiff engaging in underage sex with her was false. Peter Nygård refused to pay the $800,000 she was seeking. In return, Tazhmoye Cummings tried to further negotiate a deal with Plaintiff, claiming that Defendant Louis Bacon was willing to pay her more money to provide such false statements. When Plaintiff refused to pay the extortionist demand, Ms. Cummings worked with Defendant to make false statements about Plaintiff, disseminate false statements to the media, provide false testimony to the media and governmental authorities and assist in damaging Plaintiff.

168.    Tazhmoye Cummings was paid, compensated, threatened and coerced to provide false statements for use in the destruction of and damage to Plaintiff.

169.    Tazhmoye Cummings carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiff.

170.    The acts of Tazhmoye Cummings against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Samantha Storr</u>

171.    Samantha Storr is a Bahamian citizen residing in the United States.

172.    Samantha Storr is living in the United States at the request of and at the expense of Defendant.

173.    Samantha Storr was and/or is part of a private witness protection program being supported by Defendant.

174.    Upon information and belief, Samantha Storr was paid by or on behalf of Defendant to carry out certain activities against Plaintiff and in furtherance of Defendant's scheme.

175.    Samantha Storr was paid, compensated, threatened and coerced to provide false statements against Plaintiff to destroy and damage to Plaintiff's business and property.

176.    Samantha Storr extorted Peter Nygård.

177.    Samantha Storr demanded that Peter Nygård pay in excess of $500,000 in exchange for an agreement not to provide false statements and other personal information to the media and governmental authorities, and to assist Defendant to destroy Peter Nygård. Peter Nygård refused to pay the extortionist demands and Samantha Storr has since provided false statements for money for use by Defendant in his conspiracy to damage Plaintiff. Samantha Storr further disseminated

false statements through the media, provided false testimony to the media and to governmental authorities, and assisted in damaging Plaintiff.

178.    In or about January of 2014, Samantha Storr extorted Peter Nygård by threatening that she would provide incriminating and offensive video recordings of Peter Nygård to Defendant unless Peter Nygård paid her $500,000. However, upon information belief, she had no incriminating video recordings and instead was operating from a directive provided by Defendant and his agents.

179.    Samantha Storr carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiff.

180.    The acts of Samantha Storr against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Robynn Toni Smith

181.    Upon information and belief, Robynn Toni Smith is a close friend of Tazhmoye Cummings.

182.    Upon information and belief, Robynn Toni Smith encouraged Tazhmoye Cummings to confront Peter Nygård about Defendant's "unsavory approach."

183.    Upon information and belief, Robynn Toni Smith acted in conjunction with Samantha Storr, Philincia Cleare, and Tazhmoye Cummings in their effort to extort Peter Nygård for money in exchange for their promise not to work with Defendant against Peter Nygård.

184.    Upon information and belief, Robynn Toni Smith negotiated an extortion scheme on behalf of Tazhmoye Cummings.

185.    In 2016, Robynn Toni Smith acted as the conduit for Tazhmoye Cummings

25

demanding $800,000 from Peter Nygård to refrain from providing false information and statements to Defendant about Peter Nygård engaging in sex with underage women. Robynn Toni Smith knew such claims were false, represented such claims were false, and was willing to arrange a statement to that effect, if she was paid for her efforts. When Plaintiff refused to pay her, Tazhmoye Cummings opted to work with Defendant to destroy Plaintiff by providing false statements to the media and governmental authorities.

186.    Upon information and belief, while the extortion scheme was advanced by Robynn Toni Smith, it was fostered at the request of Defendant and/or his agents.

Stephen Feralio

187.    Stephen Feralio is a United States citizen residing in the United States.

188.    Stephen Feralio was formerly employed by and contracted by Plaintiff or businesses associated with Plaintiff.

189.    Upon information and belief, in or about May of 2011, Stephen Feralio began working for Peter Nygård as Creative Director for Nygård International Partnership.

190.    Over the next few years, Stephen Feralio entered into additional employment agreements and contractor agreements for creative development services.

191.    In or about March of 2014, Stephen Feralio's employment with Nygård International Partnership ended.

192.    Following the end of Stephen Feralio's employment with Nygård International Partnership, Stephen Feralio was instructed to return all Nygård-owned property.

193.    Stephen Feralio was and/or is part of a private witness protection program being supported by Defendant.

194.    Upon information and belief, Stephen Feralio was paid by or on behalf of

Defendant to carry out certain activities designed to further Defendant's scheme to damage and destroy Plaintiff's business and property.

195.    Upon information and belief, Stephen Feralio began communicating and working with Defendant on the scheme to damage Plaintiff prior to his termination of employment/retention by Nygård International Partnership.

196.    In or about April of 2014, Stephen Feralio met with Jack Palladino, a San Francisco-based investigator who had been working for Defendant Louis Bacon in the scheme to damage Plaintiff. Jack Palladino and his female associate met with Stephen Feralio for the purpose of providing information to Defendant's agents about Peter Nygård. These purposes ran afoul of Stephen Feralio's agreement with Nygård International Partnership, and his duties of privacy and privilege running to Plaintiff.

197.    Upon information and belief, Stephen Feralio was paid by Defendant, or persons related to Defendant, or at direction of Defendant to Defendant's knowledge, to breach the confidentiality agreement that Feralio previously entered into with Plaintiff or businesses associated with Plaintiff.

198.    On or about July 31, 2014, Stephen Feralio entered into an agreement [titled "The Agreement"] with Belvedere and Wilson Mesa.

199.    In or about August of 2014, Stephen Feralio submitted an affidavit confirming he had accepted a stipend and indemnity in exchange for his cooperation.

200.    Upon information and belief, Stephen Feralio provided Defendant's investigator with the written agreement he had with Nygård International Partnership.

201.    Upon information and belief, Stephen Feralio provided confidential information to Defendant and/or his agents without Plaintiff's or businesses associated with Plaintiff's

permission, and in violation of the confidentiality agreement with Plaintiff or businesses associated with Plaintiff.

202.    Upon information and belief, Stephen Feralio wrongfully revealed confidential information to Defendant with the intent and knowledge that Defendant would use the confidential information to further Defendant's scheme to damage and destroy Plaintiff's business and property.

203.    Upon information and belief, in addition to providing proprietary and personal information, in violation of his contractual agreements and in violation of Plaintiff's privacy rights, Stephen Feralio provided Defendant with assistance in procuring false statements by, among other things, identifying people for Defendant's agents to contact to solicit false and damaging statements.

204.    Stephen Feralio acted as Defendant's agent in contacting others for assistance in destroying Plaintiff, including suggesting that others could be given a similar deal to the deal given to Stephen Feralio by Defendant.

205.    Upon information and belief, Stephen Feralio carried out illegal and/or improper activities directed against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant, which have damaged and threaten to damage Plaintiff.

206.    The acts and/or actions of Stephen Feralio against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for or ratified by Defendant.

207.    Upon information and belief, in or about August 2014, Belvedere began paying Stephen Feralio's monthly rent.

Jestan Sands

208.    Jestan Sands is a Bahamian citizen.

28

209.    Jestan Sands' current residence is unknown.

210.    On or about June 23, 2015, Jestan Sands became a Nygård employee in the Bahamas.

211.    Upon information and belief, Jestan Sands was and/or is part of the private witness protection program being supported by Defendant.

212.    Upon information and belief, Jestan Sands was paid by or on behalf of Defendant to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiff's business and property, including but not limited to the dissemination of false information.

213.    Upon information and belief, Jestan Sands served as a liaison between Samantha Storr, Philincia Cleare, and Robynn Toni Smith and Peter Nygård for purposes of extorting funds from Peter Nygård.

214.    In or about January of 2014, Samantha Storr and Philincia Cleare admitted to Jestan Sands that they were extorting Peter Nygård for $500,000 each. Upon information and belief, Jestan Sands assisted them in their scheme at the behest of Defendant.

215.    In or about 2017, Jestan Sands published numerous falsehoods about Plaintiff.

216.    Jestan Sands claimed that during his time working for Plaintiff or businesses associated with Plaintiff, which began in 2007, he knew that Plaintiff Peter Nygård engaged in coerced sex acts and bribery. However, Jestan Sands knew these statements to be false when he made them.

217.    In July 2013, after the time period in which he claimed the coerced sex acts and bribery took place, Jestan Sands introduced and presented Peter Nygård with a Leadership Award at a youth and government conference. At the ceremony, Jestan Sands' mother, Arleen B. Sands, the First Elder, Freeport Seventh-day Adventist Church, gave the welcoming remarks.

218.    Jestan Sands left the employ of Plaintiff or businesses associated with Plaintiff and later returned to the employ of Plaintiff or businesses associated with Plaintiff briefly in 2015. Upon information and belief, Jestan Sands was working for Defendant and his agents while employed by Plaintiff or businesses associated with Plaintiff.

219.    Upon information and belief, in December 2015, Jestan Sands left the Bahamas and entered into Defendant's private witness protection program, where he was provided money, housing and guards.

220.    Upon information and belief, Jestan Sands' statements about Plaintiff, made after Plaintiff gave him an award and he returned to work for Plaintiff or businesses associated with Plaintiff, were influenced by Defendant and/or his agents.

221.    Upon information and belief, Jestan Sands was paid, compensated, threatened and coerced to provide false statements in furtherance of Defendant's scheme to destroy and damage Plaintiff's business and property.

222.    Upon information and belief Jestan Sands carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and continue to damage Plaintiff.

223.    Upon information and belief, the acts and/or actions of Jestan Sands against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for, or ratified by Defendant.

Other Unnamed Individuals Kept Hidden By Defendant

224.    Upon information and belief, Defendant has supported a private witness protection program, hiding away other as yet to be identified individuals who have been paid, coerced, and threatened to cooperate with Defendant and/or his agents in the enterprise discussed herein.

30

225.    Upon information and belief, these other as yet to be identified individuals were paid, compensated, threatened and coerced to provide false statements for use in the destruction of and damage to Plaintiff.

226.    These as yet to be identified individuals carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

227.    Upon information and belief, the actions of the as yet to be identified individuals against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Wisler Davilma

228.    Wisler Davilma is a Bahamian resident.

229.    Wisler Davilma is also known by the nickname "Bobo" (hereinafter Wisler Davilma shall also be referred to as "Bobo").

230.    Bobo has been paid by or on behalf of Defendant to carry out activities designed to further Defendant's scheme to damage Plaintiff's business and property.

231.    Bobo has been paid by or on behalf of Defendant through funds originating in New York to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiff's business and property.

232.    Bobo has been instructed by and has coordinated with attorneys in New York.

233.    Bobo was paid, compensated, threatened and coerced to provide false statements for use in Defendant's scheme to destroy and damage Plaintiff's business and property.

234.    Bobo engaged in illegal and improper acts of threatening witnesses who refused to cooperate with Defendant's scheme of disseminating and gathering false statements against

31

Plaintiff, at the behest of Defendant.

235.    Bobo carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff.

236.    The actions taken by Bobo against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Livingston Bullard</u>

237.    Livingston Bullard is a Bahamian resident.

238.    Livingston Bullard is also known by the nickname "Toggi" (hereinafter Livingston Bullard shall also be referred to as "Toggi").

239.    Toggi has been paid by or on behalf of Defendant to carry out certain activities designed to further Defendant's scheme to damage Plaintiff's business and property.

240.    Toggi has been paid by or on behalf of Defendant through funds originating in New York to carry out certain activities in furtherance of Defendant's scheme to damage Plaintiff's business and property.

241.    Toggi has been instructed by and has coordinated with attorneys in New York regarding the acts/actions taken by Toggi in furtherance of Defendant's scheme to damage Plaintiff's business and property.

242.    Toggi was paid, compensated, threatened and coerced to provide false statements for use in Defendant's scheme designed to destroy and damage Plaintiff's business and property.

243.    Toggi engaged in illegal and improper acts of threatening witnesses who refused to cooperate with Defendant's scheme of disseminating and gathering false statements against Plaintiff, at the behest of Defendant.

244.    Toggi carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff.

245.    The acts and actions of Toggi in furtherance of Defendant's scheme to destroy and damage Plaintiff have been authorized, directed, paid for and/or ratified by Defendant.

Sean Merrick

246.    Sean Merrick is a resident of the United States with a current residence in Los Angeles.

247.    Sean Merrick is professionally known as "Jacky Jasper" (hereinafter "Sean Merrick" or "Jacky Jasper").

248.    Jacky Jasper was also known as the "Hollywood Street King."

249.    Sean Merrick, along with others, operated a website located at diaryofahollywoodstreetking.com and at hollywoodstreetking.com.

250.    Sean Merrick, along with others, was involved in the operation of the website located at diaryofahollywoodstreetking.com and at hollywoodstreetking.com.

251.    The diaryofahollywoodstreetking.com website was registered, controlled, and operated in the United States at all relevant times pertinent hereto.

252.    The diaryofahollywoodstreetking.com website was hosted in the United States.

253.    The diaryofahollywoodstreetking.com website was provided with private and false information about Plaintiff at the direction of Defendant, his agents or one of the individuals identified herein.

254.    On or about February 6, 2012, an article authored by Jacky Jasper was published on diaryofahollywoodstreetking.com website. Subsequent to this article, Jacky Jasper published

33

additional outlandish articles on the diaryofahollywoodstreetking.com website and on Twitter.

255.    Upon further information and belief, these articles by Jacky Jasper, published on diaryofahollywoodstreetking.com website, contained false allegations regarding Peter Nygård's private, personal life.

256.    Upon further information and belief, the articles by Jacky Jasper led to a complaint for defamation by Plaintiff and businesses associated with Plaintiff which resulted in a judgment in their favor against Jacky Jasper.

257.    Jacky Jasper had communications with Allison Cain of the Palladino & Sutherland investigation firm who were acting on behalf of Defendant.

258.    Jacky Jasper accepted material about Plaintiff knowing it would damage Plaintiff.

259.    Jacky Jasper carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and threaten to damage Plaintiff.

260.    The acts and actions of Jacky Jasper against Plaintiff were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted and/or ratified by Defendant and/or his agents.

Bradley Pratt

261.    Bradley Pratt is a former Bahamian Police Officer.

262.    Upon information and belief, Bradley Pratt received money from or on behalf of Defendant to carry out certain activities directed against Plaintiff in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

263.    Bradley Pratt was part of Defendant's scheme to compensate witnesses to make false statements about Plaintiff in order to damage and destroy Plaintiff's business and property.

264.     Bradley Pratt carried out illegal and/or improper activities against Plaintiff in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which activities have damaged, continue to damage, and threaten to damage Plaintiff.

265.     The acts and actions of Bradley Pratt directed against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Princess Pratt

266.     Princess Pratt is a Bahamian citizen and relative of Bradley Pratt.

267.     Princess Pratt attempted to bribe and coerce women to make up false stories about Peter Nygård for use in a scheme to damage him and his business, which scheme was directed by, paid for and authorized by Defendant.

268.     Upon information and belief, in or about late 2010, Mary Ramona Elkenya Brown-Taylor ("Mona Brown") determined that Princess Pratt, acting on behalf of Defendant, was paying women up to $10,000 to make up stories about Peter Nygård, specifically, the bigger the lie, the more money the women were offered.

269.     Mona Brown was also informed that if women were prepared to go on television for the CBC Fifth Estate program and talk about the untrue stories, Defendant would pay them even more money.

270.     Shortly thereafter, upon information and belief, in or about 2011, Mona Brown received threats and had her car's front passenger window smashed by Defendant's agents.

271.     Upon information and belief, Helen Nesbitt was approached by Princess Pratt to make up stories about Nygård in exchange for cash.

272.     Mona Brown spoke with Helen Nesbitt about the approach by Princess Pratt and

35

was subsequently threatened by Princess Pratt.

273.    The actions of Princess Pratt were directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant.

Mary Braithwaite

274.    Upon information and belief, Mary Braithwaite was the General Manager of Lyford Cay Property Owners Association ("LCPOA").

275.    In a recorded conversation, Mary Braithwaite admitted that she wanted to get rid of Peter Nygård not only from Lyford Cay, but from the Bahamas.

276.    Upon information and belief, Mary Braithwaite hired Jerry Forrester as the LCPOA Security Consultant.

277.    Upon information and belief, Mary Braithwaite and Jerry Forrester conspired together to find a young woman to say she was abused by Peter Nygård. The stated purpose of this objective was to ensure that Nygård could not sell another blouse anywhere in the world.

278.    Upon information and belief, Mary Braithwaite hired Pericles Maillis to represent LCPOA against Peter Nygård.

279.    Mary Braithwaite, in furtherance of Defendant's objectives, had discussions about ways to devalue Nygård Cay and determine the potential value of the property if it was to be sold and Peter Nygård was gone.

280.    Mary Brathwaite's actions directed against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Gerald "Jerry" Forrester

281.    Gerald "Jerry" Forrester is a U.S citizen (hereinafter "Jerry Forrester").

282.    Jerry Forrester is a former FBI agent.

36

283.    Upon information and belief, Jerry Forrester received money from or on behalf of Defendant to carry out certain activities directed against Plaintiff in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

284.    Jerry Forrester was part of Defendant's scheme to compensate witnesses to make false statements about Plaintiff in order to damage and destroy Plaintiff's business and property.

285.    Jerry Forrester carried out illegal and/or improper activities against Plaintiff in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff's business and property.

286.    The acts and actions of Jerry Forrester directed against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

<u>Stephen Davis</u>

287.    Stephen Davis is a New York-based private investigator.

288.    Upon information and belief, Stephen Davis received money from or on behalf of Defendant to carry out certain activities directed against Plaintiff in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

289.    Upon information and belief Stephen Davis was part of Defendant's scheme to compensate witnesses to make false statements about Plaintiff in order to damage and destroy Plaintiff's business and property.

290.    Upon information and belief, Stephen Davis carried out illegal and/or improper activities against Plaintiff in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue, and threaten to damage Plaintiff's business and property.

1107729v.1

291.    The acts and/or actions of Stephen Davis against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Callenders & Co.

292.    Callenders & Co. ("Callenders") is a Bahamian law firm founded in 1903.

293.    Fred Smith is the Freeport Managing Partner of Callenders.

294.    Callenders has several attorneys who have acted both in the Bahamas and the United States on behalf of Defendant.

295.    Upon information and belief, Callenders was and is an integral part of the private witness protection program discussed herein.

296.    Upon information and belief, Callenders was and is part of Defendant's scheme to arrange for false witness statements to be made about Plaintiff in an effort to destroy and damage Plaintiff.

297.    Upon information and belief, Callenders authorized, directed and carried out activities for Defendant against Plaintiff by, among other things, arranging for the swearing of false witness statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security and the FBI.

298.    Upon information and belief, the attorneys at Callenders that participated in Defendant's scheme did so knowingly and with malice.

299.    Attorneys at Callenders arranged for representatives of a prominent New York newspaper to meet with individuals who they knew would provide false information about Plaintiff.

300.    Attorneys at Callenders arranged for women to meet with a Florida attorney who eventually would become counsel of record in a 2020 lawsuit commenced by Jane Does against

Plaintiff in the United States District Court for the Southern District of New York (the "Class Action Counsel").

301.     Attorneys at Callenders arranged for women to have legal counsel and their expenses paid for meetings held with the authorities in New York whereat the women would repeat their false statements about Peter Nygård.

302.     Attorneys at Callenders arranged for representatives of a prominent New York newspaper to meet with individuals who were paid to provide the reporter with false information directed against Plaintiff.

303.     Upon information and belief, Callenders carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff.

304.     The acts and/or actions of Callenders directed against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

305.     Callenders was paid for the acts and/or actions taken against Plaintiff in furtherance of Defendant's scheme, directly or indirectly through funds originating in the United States, and particularly New York.

306.     Callenders was paid for the acts and/or actions taken against Plaintiff in furtherance of Defendant's scheme directly or indirectly through funds directed by Defendant.

Doneth Cartwright

307.     Doneth Cartwright is a Jamaican citizen, residing in the Bahamas.

308.     Doneth Cartwright is a legal associate at Callenders.

309.     Doneth Cartwright has engaged in conduct in the United States on behalf of

Defendant in furtherance of Defendant's scheme against Plaintiff.

310.    Doneth Cartwright has been part of Defendant's scheme to solicit, through payments to witnesses, false statements against Plaintiff to be used to destroy and damage Plaintiff's business and property.

311.    Doneth Cartwright has used the private witness protection program to coerce witnesses to comply with Defendant's scheme to provide false statements about Plaintiff.

312.    Doneth Cartwright arranged for representatives of a prominent New York newspaper to meet with individuals who she knew would provide false information about Plaintiff.

313.    Doneth Cartwright arranged for representatives of a prominent New York newspaper to meet with individuals who she knew were compensated by Defendant to provide the reporter with false information about and against Plaintiff in furtherance of Defendant's scheme.

314.    Doneth Cartwright arranged for the Class Action Counsel to meet with women in the witness protection program and others who were not in the witness protection program, including women in the United States and in the Bahamas.

315.    Upon information and belief, Doneth Cartwright arranged for women to travel to New York to meet with the authorities to repeat false statements about Peter Nygård.

316.    Upon information and belief, Doneth Cartwright authorized, directed and carried out activities against Plaintiff and in furtherance of Defendant's scheme and for Defendant in arranging for the swearing of false witness statements, and the presentation of false statements to the United States authorities, including the Department of Homeland Security and the FBI.

317.    Upon information and belief, Doneth Cartwright carried out illegal and/or improper activities against Plaintiff in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to

damage and threaten to damage Plaintiff.

318.    The acts and actions of Doneth Cartwright against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Palladino & Sutherland

319.    Palladino & Sutherland is a private detective agency located in San Francisco, California.

320.    Palladino & Sutherland is licensed by the Bureau of Security and Investigative Services for the State of California.

321.    Palladino & Sutherland was compensated from or on behalf of Defendant to carry out certain activities against Plaintiff in furtherance of Defendant's scheme.

322.    Palladino & Sutherland was part of Defendant's scheme to arrange for false witness statements to be made about or against Plaintiff in an effort to destroy and damage Plaintiff's business and property.

323.    Upon information and belief, Palladino & Sutherland was part of Defendant's scheme to conduct a private witness protection program designed in part to coerce individuals to provide false sworn testimony about Plaintiff in an effort to destroy and damage Plaintiff, and in an effort to wrongly initiate legal proceedings against Peter Nygård.

324.    Upon information and belief, Palladino & Sutherland attempted to coerce Bianca McKinney, a United States Citizen, to provide false sworn statements against Peter Nygård, by among other things, instituting a false litigation against Plaintiff.

325.    Upon information and belief, Palladino & Sutherland carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged and

continue to damage Plaintiff.

326.   Upon information and belief, Palladino & Sutherland arranged for Stephen Feralio to join Defendant's witness protection program, knowing he would violate his duties to Plaintiff or businesses associated with Plaintiff and would assist in procuring people to make false statements about Plaintiff.

327.   The acts and actions of Palladino & Sutherland against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Jack Palladino

328.   Jack Palladino is a U.S. citizen residing in California.

329.   Jack Palladino is a licensed Private Investigator, licensed by the Bureau of Security and Investigative Services for the State of California.

330.   Upon information and belief, Jack Palladino and/or his company (Palladino & Sutherland) was paid by or on behalf of Defendant to carry out certain activities against Plaintiff and in furtherance of Defendant's scheme to damage and destroy Plaintiff's business and property.

331.   Upon information and belief, Jack Palladino was part of Defendant's scheme to arrange for false witness statements to be made about Plaintiff in an effort to destroy and damage Plaintiff's business and property.

332.   Upon information and belief, Jack Palladino carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff.

333.   The acts and/or actions of Jack Palladino against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

42

Sara Ness

334.    Sara Ness is a U.S. citizen.

335.    Sara Ness is and/or was an investigator at Palladino & Sutherland.

336.    Upon information and belief, Sara Ness worked on projects for Defendant as an investigator at or with Palladino & Sutherland in furtherance of Defendant's scheme against Plaintiff.

337.    Upon information and belief, Sara Ness was part of Defendant's scheme against Plaintiff to solicit false witness statements to be used to destroy and damage Plaintiff's business and property.

338.    Upon information and belief, Sara Ness contacted numerous former Nygård employees and acquaintances to try and influence them to make statements about Peter Nygård.

339.    Upon information and belief, in 2015, Sara Ness was hired by Defendant to track down a former model for Peter Nygård.

340.    Upon information and belief, Sara Ness pressured the former model into making false statements that she had been abused by Peter Nygård.

341.    Upon information and belief, the former model denied allegations made by Sara Ness that she had been abused by Peter Nygård.

342.    Upon information and belief, Sara Ness pressured the former model into making false statements that she had been involved in sex trafficking by Peter Nygård.

343.    Upon information and belief, the former model denied allegations made by Sara Ness that she had been involved in sex trafficking by Peter Nygård.

344.    Upon information and belief, Sara Ness in furtherance of Defendant's scheme against Plaintiff, coerced witnesses to provide false statements against and about Plaintiff to

43

destroy and damage Plaintiff.

345.    Upon information and belief, in 2015, Sara Ness was sent by Defendant to track down and harass Bianca McKinney.

346.    Upon information and belief, Sara Ness approached Bianca McKinney in her home and identified herself as an investigator with Palladino & Sutherland working on behalf of Defendant.

347.    Upon information and belief, Sara Ness told Bianca McKinney that her client, Defendant, wanted to put Peter Nygård in jail.

348.    Upon information and belief, Sara Ness showed Bianca McKinney a portion of a lawsuit filed by attorney Michael Artan, and pressured McKinney to say that Nygård was involved in sex trafficking and abusing women.

349.    Upon information and belief, Bianca McKinney denied the allegations that Sara Ness was pressuring her to make.

350.    Bianca McKinney, a California resident, claimed that Sara Ness threatened her to have Bianca McKinney assist in Defendant's scheme against Plaintiff designed to destroy and damage Plaintiff's business and property.

351.    On September 3, 2015, Sara Ness made defamatory and inflammatory comments to Darlyne Lucchesi regarding false allegations of rape and false imprisonment by Peter Nygård in an effort to coerce Darlyne Lucchesi to provide similar comments.

352.    Upon information and belief, Darlyne Lucchesi denied the allegations regarding Peter Nygård made by Sara Ness.

353.    Upon information and belief, Sara Ness carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf

of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

354. The acts and actions of Sara Ness against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

Allison Cain

355. Allison Cain is a U.S. citizen.

356. Upon information and belief, Allison Cain currently resides and/or works in Maryland.

357. Allison Cain was previously associated with the Palladino & Sutherland firm.

358. Allison Cain worked on projects for Defendant.

359. Allison Cain was part of the scheme to solicit false statements to be used to destroy and damage Plaintiff.

360. Allison Cain communicated with Jacky Jasper about the private and false information published by the diaryofahollywoodstreetking.com website to further the scheme to destroy and damage Plaintiff.

361. Upon information and belief, Allison Cain was part of the private witness protection program designed to coerce individuals to make false statements to help destroy and damage Plaintiff.

362. Upon information, Allison Cain carried out illegal and/or improper activities at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

363. The acts and/or actions of Allison Cain against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

D&R Agency, LLC

364.    The D&R Agency, LLC ("D&R") is an investigative agency based in Fort Lauderdale, Florida.

365.    D&R is licensed by the State of Florida.

366.    Upon information and belief, D&R was retained by a New York investigation firm for or on behalf of Defendant.

367.    Upon information and belief, D&R was paid by or on behalf of Defendant to carry out certain activities.

368.    The funds paid to D&R were directed and/or paid from New York.

369.    D&R engaged in activities to try to implicate Peter Nygård in a murder for hire scheme, which D&R, Fred Smith and others referred to as the "murder for hire plot", and other schemes designed to destroy and damage Plaintiff.

370.    D&R used funds provided by Defendant and/or Defendant's agents through an intricate improper financial scheme to pay Bobo and Toggi significant sums of money in an attempt to implicate Peter Nygård in a murder for hire scheme and encourage the making of false statements against Plaintiff.

371.    Defendant's agents created bank accounts in various countries to facilitate payments made to Bobo and Toggi.

372.    On or about February 5, 2015, expense money was furnished by Defendant's agents to Bobo and Toggi.

373.    Upon information and belief, as of May 2015, Bobo and Toggi were paid by or on behalf of Defendant's agents at least $250,000 for their services in manufacturing "evidence" regarding Peter Nygård.

374.    D&R was involved in the planning, developing and coordination of Bobo & Toggi's "murder for hire" scheme.

375.    D&R was involved in the surreptitious recording of Plaintiff Peter Nygård without his knowledge or consent, in an effort to manufacture evidence for the scheme.

376.    Upon information and belief, during a meeting with investigators John DiPaolo and Damian McLaughlin, Bobo and Toggi agreed to record Peter Nygård.

377.    In or about March 2015, John DiPaolo (along with Damian McLaughlin) provided Bobo and Toggi with a recording device to record future conversations with Peter Nygård.

378.    Upon information and belief, D&R engaged in other activities in furtherance of Defendant's scheme designed to destroy and/or damage Plaintiff's business and property.

379.    D&R participated in arranging for payments by or on behalf of Defendant totaling in excess of $1 million.

380.    D&R carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage, and threaten to damage Plaintiff.

381.    The acts and actions of D&R were directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant.

John DiPaolo

382.    John DiPaolo is a U.S. citizen.

383.    John DiPaolo is a resident of Florida.

384.    John DiPaolo was and/or is a member of D&R.

385.    John DiPaolo was or is President of D&R.

386.     Upon information and belief, John DiPaolo (as President of The D&R Investigative Services) was hired by Defendant to obtain information on Peter Nygård.

387.     Upon information and belief, John DiPaolo was paid by or on behalf of Defendant to carry out certain improper and/or illegal activities against Plaintiff in furtherance of Defendant's scheme.

388.     John DiPaolo was knowingly and actively engaged in the illegal and/or improper activities designed to destroy and damage Plaintiff's business and property.

389.     John DiPaolo carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

390.     The acts and/or actions of John DiPaolo were directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant or Defendant's agents.

Damian McLaughlin

391.     Damian McLaughlin is an investigator based in the U.K.

392.     Upon information and belief, Damian McLaughlin conspired with John DiPaolo and D&R Investigators in their efforts to harm Peter Nygård.

393.     Damian McLaughlin's actions directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant.

R. Scott Rivas

394.     R. Scott Rivas ("Scott Rivas") is a U.S. citizen.

395.     Scott Rivas is a resident of Florida.

396.     Scott Rivas is the CEO of The D&R Agency, LLC.

48

397.    Upon information and belief, Scott Rivas was paid by or on behalf of Defendant to carry out certain improper and/or illegal activities against Plaintiff in furtherance of Defendant's scheme.

398.    Scott Rivas was knowingly and actively engaged in the illegal and/or improper activities designed to destroy and damage Plaintiff's business and property.

399.    Upon information and belief, Scott Rivas carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

400.    The acts and/or actions of Scott Rivas were directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

James Lawson

401.    James Lawson is a U.S. citizen.

402.    James Lawson is a resident of Florida.

403.    James Lawson is the President of JDL & Associates Consulting Corp. ("JDL").

404.    James Lawson is a former FBI agent.

405.    James Lawson/JDL performed work for or on behalf of Defendant in furtherance of Defendant's scheme against Plaintiff.

406.    Upon information and belief, James Lawson/JDL was paid by or on behalf of Defendant to carry out certain illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme.

407.    Upon information and belief, in furtherance of Defendant's scheme against Plaintiff, James Lawson/JDL followed instructions from an entity in New York.

408.     Upon information and belief James Lawson/JDL was actively and knowingly engaged in the illegal and/or improper activities designed to destroy and damage Plaintiff's business and property.

409.     Upon information and belief James Lawson/JDL was knowingly and actively involved in developing, planning and carrying out Bobo and Toggi's murder for hire scheme.

410.     James Lawson/JDL was involved in the surreptitious recordings of Peter Nygård without Peter Nygård's knowledge or consent.

411.     Upon information and belief, through 2019 at least, James Lawson/JDL has harassed and/or coerced individuals who knew Peter Nygård, including former girlfriends, employees and acquaintances, to provide false statements against Plaintiff in an effort to damage Plaintiff's business and property.

412.     James Lawson/JDL carried out illegal and/or improper activities against Plaintiff at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

413.     The acts and/or actions of James Lawson/JDL were directed against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

Michael Pintard

414.     Michael Pintard co-conspired with Defendant's agents, Fred Smith and investigators, to harm Peter Nygård.

415.     Upon information and belief, Michael Pintard acted as a liaison between investigators and Bobo and Toggi. Michael Pintard helped to coordinate meetings and facilitated the exchange of information.

416.     Michael Pintard's actions directed against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

OTIA Investigations

417.     O'Keefe-Tatigian Investigations and Associates, Inc. is or was a Michigan-based private investigation business operated by Jack Tatigian, who was and/or is a principal of the business.

418.     Upon information and belief, O'Keefe-Tatigian Investigations and Associates, Inc. was retained to conduct illegal and/or improper activities in furtherance of Defendant's scheme and for or on behalf of Defendant against Plaintiff.

419.     O'Keefe-Tatigian Investigations and Associates, Inc. is also known as OT Investigations and Associates or OTIA.

420.     OTIA performed work by or on behalf of Defendant.

421.     OTIA performed some of that work in New York.

422.     OTIA was paid by or on behalf of Defendant or through Defendant's agents to perform or carry out certain illegal or improper activities directed against Plaintiff in furtherance of Defendant's scheme.

423.     OTIA threatened, coerced and/or harassed individuals in New York and throughout the United States in 2018 through 2020 in order to influence and gain cooperation with Defendant's scheme to destroy and damage Plaintiff through the procurement and dissemination of false statements about the conduct of Plaintiff Peter Nygård.

424.     Upon information and belief, OTIA accompanied women who came to New York to meet with federal authorities and the Class Action Counsel to ensure that they were following through with their commitment to Defendant to make false statements about Plaintiff.

425.     Upon information and belief, OTIA used investigators including Gary Marchetti and Mark Tobias to coerce women to participate in Defendant's scheme.

426.     OTIA carried out its illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

427.     The acts and/or actions of OTIA were made against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

Gary Marchetti

428.     Gary Marchetti is a U.S. citizen.

429.     Gary Marchetti is a resident of Michigan.

430.     Gary Marchetti is a retired Dearborn Police Department Detective Sergeant.

431.     Gary Marchetti is or was employed by or contracted by OTIA.

432.     Gary Marchetti performed work by or on behalf of Defendant.

433.     Gary Marchetti performed work in New York and elsewhere in the United States on behalf of Defendant.

434.     Gary Marchetti, on behalf of Defendant and in furtherance of Defendant's scheme aimed against Plaintiff, threatened, coerced and/or harassed individuals in New York and throughout the United States in 2018 through 2020 in order to further Defendant's scheme to destroy and damage Plaintiff through the procurement and dissemination of false statements about the conduct of Plaintiff.

435.     Gary Marchetti carried out the illegal and/or improper activities against Plaintiff

and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

436.    The acts and/or actions of Gary Marchetti were made against Plaintiff and in furtherance of Defendant's scheme and were authorized, directed, paid for and/or ratified by Defendant.

New York-based Law Firm

437.    A New York-based law firm was paid by or on behalf of Defendant or by Defendant's agents to participate in and orchestrate the activities of agents of Defendant in furtherance of Defendant's scheme against Plaintiff.

438.    The New York-based law firm participated in the activities designed to secure false statements from individuals about Peter Nygård in an effort to file false reports to initiate criminal and/or civil prosecution of Peter Nygård.

439.    The New York-based law firm communicated with members of the Callenders firm and other representatives/agents of Defendant in order to carry out Defendant's scheme to destroy and damage Plaintiff's business and property.

440.    Upon information and belief, the New York-based law firm was involved in the private witness protection program.

441.    Upon information and belief, the New York-based law firm carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

442.    The New York-based law firm's acts against Plaintiff and in furtherance of

53

Defendant's scheme were directed, authorized, paid for and/or ratified by Defendant and/or Defendant's agents.

Jeff Davis

443.   Upon information and belief, Jeff Davis is a U.S. citizen.

444.   Upon information and belief, Jeff Davis worked for or on behalf of Defendant.

445.   Upon information and belief, Jeff Davis was paid by or on behalf of Defendant to carry out certain activities against Plaintiff and in furtherance of Defendant's scheme.

446.   Upon information and belief, Jeff Davis carried out these activities at the direction of or on behalf of individuals located in New York.

447.   Jeff Davis was part of a scheme to coerce, pay and threaten individuals to provide false statements against or about Plaintiff to destroy and damage Plaintiff's business and property.

448.   Jeff Davis was part of Defendant's scheme to have the Department of Homeland Security investigate Peter Nygård, in order to destroy and damage Plaintiff's business and property.

449.   Upon information and belief, the Department of Homeland Security was presented with false documentation and false witness appearances by or at the direction of Jeff Davis with the expectation that Homeland Security would proceed with formal charges and eventual prosecution against Plaintiff Peter Nygård.

450.   Jeff Davis's acts caused damage to Plaintiff.

451.   Jeff Davis was part of a private witness protection program funded by and/or through Defendant and/or his agents in order to coerce individuals to cooperate with the scheme by providing false testimony and evidence against Peter Nygård.

452.   Jeff Davis carried out illegal and/or improper activities against Plaintiff at the

54

direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to damage and threaten to damage Plaintiff.

453.    Jeff Davis worked for a company called TekStratex, which ran Defendant's private witness protection program.

454.    According to The New York Times, Defendant and Zack Bacon paid TekStratex $6 million in connection with the private witness protection program before Zack Bacon fired Jeff Davis.

455.    The acts and/or actions of Jeff Davis against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or Defendant's agents.

Anthony Beach

456.    Anthony Beach is a U.S. citizen.

457.    Anthony Beach is a resident of Georgia.

458.    Anthony Beach is a former Police Officer for the City of Sandy Springs, Georgia, and a former Police Sergeant/Detective/Uniform Officer for the DeKalb County Government.

459.    Anthony Beach was retained or hired to perform services for or on behalf of Defendant against Plaintiff and in furtherance of Defendant's scheme.

460.    Anthony Beach was paid by or on behalf of Defendant to carry out certain illegal and/or improper activities against Plaintiff.

461.    Anthony Beach carried out these activities at the direction of or on behalf of individuals located in New York.

462.    Anthony Beach was one of several individuals who participated in, arranged and carried out Defendant's private witness protection program on behalf of Defendant.

1107729v.1

463.    Anthony Beach was part of a scheme to coerce, pay and threaten individuals to provide false statements about Plaintiff in an effort to destroy and damage Plaintiff's business and property.

464.    Anthony Beach was part of Defendant's scheme to provide false information to the Department of Homeland Security to launch an investigation into and about Peter Nygård in the hopes that formal charges would be brought against him and destroy Plaintiff's business and property.

465.    Anthony Beach worked with other "security guards" as yet to be identified who were all part of Defendant's scheme to coerce, pay and threaten individuals to provide false statements to destroy and damage Plaintiff's business and property.

466.    Anthony Beach carried out illegal and/or improper activities against Plaintiff and in furtherance of Defendant's scheme and at the direction of, under the supervision of, at the request of or on behalf of Defendant which have damaged, continue to cause damage and threaten to damage Plaintiff.

467.    The acts and/or actions of Anthony Beach and the as yet to be identified security guards against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Prominent New York Newspaper

468.    The prominent New York newspaper, The New York Times, is a New York corporation, incorporated on August 26, 1896.

469.    The New York Times's principal place of business is at 620 Eighth Avenue, New York, New York.

470.    The New York Times is a global media company.

56

471. For many years, The New York Times had been recognized as a high-quality news organization providing premium content and journalistic excellence.

472. The New York Times claims to have been awarded many industry and peer accolades, including at least 125 Pulitzer Prizes and citations, more than any other news organization.

473. The New York Times operates a newspaper that is distributed globally.

474. The New York Times operates websites, including for its newspaper, available internationally.

475. The New York Times produces a documentary TV series called "The Weekly," which airs Sunday evenings on FX and is available for streaming on Hulu the following day.

476. The Weekly is a newer venture for The New York Times, having first aired in June 2019.

477. Defendant and/or his agents contacted The New York Times and arranged to provide it with false information to publish a story in furtherance of Defendant's scheme and designed to destroy and damage Plaintiff's business and property.

478. The New York Times dispatched numerous reporters who claimed to have contacted over 250 people to interview people who knew Plaintiff Peter Nygård in order to publish an 'expose' story about Plaintiff Peter Nygård.

479. Upon information and belief, during these interviews, reporters tried to steer the individuals to provide information to fit a story The New York Times wanted to tell. As alleged below, The New York Times has published several stories about Plaintiff in 2020.

480. Upon information and belief, a New York Times reporter indicated that the paper's reporting is to try to "bring down" Plaintiff Peter Nygård.

57

Internationally Known Reporter for The New York Times

481.    The internationally known reporter, Kim Barker, is a U.S. citizen.

482.    Kim Barker has been the lead investigative reporter on a story about Peter Nygård given to The New York Times by agents for Defendant. As alleged below, The New York Times has published several stories about Plaintiff in 2020.

483.    Upon information and belief, Kim Barker, after being provided with information from Defendant and/or Defendant's agents, indicated that her intent is, as communicated to a third-party, to "bring down" Peter Nygård.

484.    Kim Barker has stated to a third-party that her goal with her investigation is to "bring down" Peter Nygård, the way the media brought down Harvey Weinstein.

485.    Kim Barker relied on fabricated and manufactured evidence in pursuing her story, despite being provided with information that the false statements were in fact false.

486.    Kim Barker relied on fabricated and manufactured evidence in pursuing her story, despite being provided with information that the scheme to damage Plaintiff using the media was planned by Defendant and/or his agents.

487.    While exposing some of the manufactured evidence against Peter Nygård, and exposing some of the conspiracy advanced by Defendant, The New York Times still published a series of stories about Peter Nygård relying on false statements, and advancing headlines designed to damage Plaintiff.

Canadian Bureau Chief for The New York Times

488.    The Canadian Bureau Chief, Catherine Porter, is a Canadian citizen.

489.    Catherine Porter is the Canada bureau chief for The New York Times, based in Toronto.

490.    Catherine Porter had been assisting Kim Barker in reporting a story on Peter Nygård at the behest of Defendant. As alleged below, The New York Times has published several stories about Plaintiff in 2020.

491.    Catherine Porter has relied on fabricated and manufactured evidence in pursuing The New York Times's story, despite being provided with information that the story was based on false statements.

492.    Catherine Porter has relied on fabricated and manufactured evidence in pursuing The New York Times's story, despite being provided with information that the scheme to damage Plaintiff using the media was planned by Defendant and/or his agents.

Canadian Broadcasting Company

493.    The Canadian Broadcasting Company ("CBC") is a Canadian federal Crown corporation that serves as the national public broadcaster for both radio and television.

494.    The CBC previously reported a story concerning Peter Nygård that contained untrue statements that were fabricated and manufactured in exchange for payments.

495.    Upon information and belief, CBC representatives involved in the reporting and broadcasting of the story were aware that the statements the story relied on were fabricated and manufactured in exchange for payments. The purpose of these fabricated statements were to cause harm to Peter Nygård.

496.    Timothy Sawa, on behalf of CBC, retained Jerry Forrester despite his suggestions that women would be paid to make statements about Peter Nygård.

497.    The CBC broadcast its Fifth Estate program about Peter Nygård on or about April 9, 2010, which included interviews of persons who made false statements about Plaintiff Peter Nygård forcing himself on a woman to have sexual activity without her consent. Prior to the

59

broadcast, that woman averred that such activities never took place and the statements made about her were untrue.

498.    The woman signed a notarized statement denying any sexual or inappropriate conduct on Plaintiff Peter Nygård's part.

499.    The CBC had previously worked with Defendant in damaging Plaintiff.

500.    Upon information and belief, the CBC or its individual employees are cooperating with The New York Times and Defendant in its and his efforts to damage Plaintiff.

501.    In 2020, the CBC has published stories about the recent activities that unfolded as part of Defendant's scheme, despite having uncovered knowledge that Defendant was paying the legal expenses of several of the women making claims against Plaintiff.

502.    In 2020, the CBC continues to publish one-sided stories in an effort to assist Defendant in his conspiracy to damage Plaintiff.

503.    Upon information and belief, the CBC's actions have been influenced by Defendant, his agents, and/or the false statements secured to damage Plaintiff.

Sistahsabused.com

504.    Sistahsabused.com is a domain name registered through GoDaddy, a U.S.-based registrar located in Arizona.

505.    Sistahsabused.com has hidden its registration information through Domains by Proxy, LLC, a privacy registration company.

506.    Domains by Proxy, LLC is located in Scottsdale, Arizona.

507.    The domain sistahsabused.com redirects to a Facebook page, @sistahsabused2.

508.    The @sistahsabused2 Facebook page was created on August 24, 2016.

509.    The @sistahsabused2 Facebook page is dedicated to the destruction of Plaintiff's

reputation.

510.    The @sistahsabused2 Facebook page is comprised of false statements designed to damage Plaintiff.

511.    The @sistahsabused2 Facebook page has engaged in the unauthorized use of Plaintiff's copyrights, images and trademarks.

512.    The @sistahsabused2 Facebook page has over 1000 "Follows."

513.    The @sistahsabused2 Facebook page seeks to damage Plaintiff's reputation.

514.    The @sistahsabused2 Facebook page seeks to interfere with, disrupt and damage Plaintiff's business relations.

515.    The @sistahsabused2 Facebook page has numerous false statements about Peter Nygård.

516.    The @sistahsabused2 Facebook page likened Peter Nygård to Jeffrey Epstein in an attempt to damage Plaintiff.

517.    The @sistahsabused2 Facebook page has published or re-published false stories about Plaintiff and individuals who worked for Plaintiff or businesses associated with Plaintiff, including Plaintiff's bodyguard, in an effort to damage Plaintiff.

518.    Upon information and belief, the @sistahsabused2 Facebook page was used by Defendant's agents to recruit women to participate in his scheme.

519.    Upon information and belief, Richette Ross used the @sistahsabused2 Facebook page to recruit women to participate in his scheme.

520.    In 2019, Richette Ross posted a phone number on the @sistahsabused2 Facebook page for people to contact her.

521.    Upon information and belief, the acts and actions of those behind or supporting the

@sistahsabused2 Facebook page against Plaintiff and in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant.

## JURISDICTION AND VENUE

522.     Louis Bacon and others persons associated with or employed by the enterprise, conducted and participated in the affairs of that enterprise through a pattern of racketeering activity, and entered an unlawful conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), thereby causing injury to business and property of Plaintiff.

523.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff brings claims under the laws of the United States, specifically, 18 U.S.C. §§ 1964(c) and (d), providing that any person injured in his business or property by reason of 18 U.S.C. § 1962 may sue therefor in any appropriate United States District Court. This Court has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. § 1367 because those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus form part of the same case or controversy under Article III of the United States Constitution.

524.     This action may be brought in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), because Defendant resides and transacts affairs in this district and a substantial part of the events giving rise to the claims herein occurred in this district.

525.     This judicial district is further appropriate insofar as the actions giving rise to the claims was directed, authorized and/or ratified in this judicial district in New York, a significant number of the witnesses are located in New York, the requested relief is sought to be enforced in the State of New York, and there is no better venue for this dispute to be litigated.

## ADDITIONAL FACTUAL ALLEGATIONS

526.     Several years ago, Louis Bacon, through his companies, foundations and associates, including professional investigators, began a pattern and practice of coercing and offering to pay individuals who currently or previously were allegedly connected with Plaintiff to provide knowingly false and fabricated statements against Plaintiff for the purpose of destroying Plaintiff's business and property.

527.     As early as 2000, at a dinner at his home, Louis Bacon is purported to have said that he wished Peter Nygård would: "fall off the end of the earth and disappear". At the same dinner, Defendant Robert F. Kennedy, Jr. and their compatriots were attempting to find a way to remove Peter Nygård from his home in Lyford Cay, and made it very clear they were attempting to discredit Peter Nygård in the eyes of the public.

528.     At a second dinner, also in 2000, which was attended by Robert F. Kennedy, Jr., Defendant's now-deceased property manager Dan Tuckfield showed off a room in Defendant's residence that was used as a central command to spy on Peter Nygård, his guests, and his property (Nygård Cay) adjacent to Louis Bacon's property at Lyford Cay.

529.     Desiring to rid the neighborhood of his neighbor, Defendant and/or his agents made an offer to Peter Nygård to buy Nygård Cay.

530.     Peter Nygård rejected the offer.

531.     Defendant and/or his agents told Peter Nygård that he would get the property one way or the other.

532.     In 2009, armed immigration officers raided Nygård Cay and interrogated Nygård's guests as to their legal status in the Bahamas. During that raid, an officer told Peter Nygård that he was disliked by his neighbor (Louis Bacon) and that the raid was illegitimate due to payoffs from

Defendant.

533.    Defendant's ire toward Peter Nygård took a negative turn and Defendant started blatantly engaging in acts designed to harm Peter Nygård and his guests.

534.    For example, on or about March 1, 2010, Patricia Landry observed Defendant's employees mounting speakers pointed towards Peter Nygård's property. These speakers were military grade speakers and they were positioned on Defendant's property to interfere with Peter Nygård's enjoyment of his property.

535.    Thereafter, Defendant proceeded to shape his enterprise and plan his racketeering activity designed to destroy and damage Plaintiff so he could rid himself of Peter Nygård at Lyford Cay.

536.    The racketeering activity described herein affects interstate or foreign commerce, and includes, among numerous other activities, paying and offering to pay individuals to harass Plaintiff, asserting untruthful statements about Plaintiff, influencing or intimidating other individuals in their dealings with Plaintiff or businesses associated with Plaintiff, including their business dealings with Plaintiff or businesses associated with Plaintiff, filing false reports about Plaintiff, making false statements and providing false information to the authorities to prompt criminal action and to support anticipated legal actions brought by Defendant and his agents or conduits and cohorts against Plaintiff (including paying and offering to pay witnesses in actions or proceedings upon agreement or understanding that the testimony of such witnesses will thereby be influenced, within the meaning of NY Penal Law § 215), and bribing a witness.

537.    Upon information and belief, the racketeering activity further includes paying and offering to pay individuals to harass Plaintiff, assert untruthful statements about Plaintiff, and providing false information to the authorities in connection with filing false reports about Plaintiff

within the meaning of NY Penal Law § 240.50, and within the meaning of 18 U.S.C. § 287.

538.    This illegal activity is part of a conspiracy to deprive Plaintiff of his property and damage his business. Additional illegal activities include harassing and threatening witnesses, manufacturing accusations to be asserted or filed against Plaintiff, and suborning perjury.

539.    Defendant Louis Bacon, through associates, including attorneys and professional investigators, has had a pattern and practice over many years of offering to pay witnesses with alleged connections to Plaintiff upon agreement or understanding that any testimony of such witnesses would be influenced.

540.    This pattern and practice has continued from at least 2010 up through the present.

541.    The activities identified herein were directed, authorized, paid for and/or ratified by Defendant from New York.

542.    Upon information and belief, in 2010, Defendant hired Los Angeles attorney Michael Artan ("Artan") to locate Bianca McKinney ("McKinney").

543.    Upon information and belief, Artan used private investigator Thomas Elfmont to locate and pressure her to cooperate in a manufactured litigation, unauthorized by McKinney, against Peter Nygård.

544.    Upon information and belief, Artan acted on behalf of Defendant.

545.    Artan and Defendant knowingly and willfully conspired and agreed among themselves to commit fraud on McKinney in furtherance of Defendant's plan to destroy Plaintiff.

546.    The purpose of this fraud was to damage the reputation of Peter Nygård and anything bearing his name.

547.    Upon information and belief, in or about October 2010, Artan, on behalf of himself and Defendant, directly and through their agent, private investigator Thomas Elfmont, falsely

represented to McKinney, among others, that Artan needed McKinney's help in connection with a lawsuit being filed on behalf of several purported female victims of Peter Nygård. Following his meeting with McKinney, Artan, acting on behalf of Defendant and himself, used some of the details of McKinney's trip to the Bahamas (such as the travel route and purpose of the trip) to manufacture a complaint against Peter Nygård naming McKinney as the plaintiff in the lawsuit.

548.    In or about March of 2016, Artan confessed to McKinney that he filed the complaint naming her as the plaintiff, admitted that there were no other female victims he was assisting, and that Artan had been working for Defendant to advance his vendetta against Peter Nygård.

549.    Artan's actions against Plaintiff and in furtherance of Defendant's scheme were directed, authorized, paid for and/or ratified by Defendant and/or Defendant's agents.

2010-2012 Payments for False Statements

550.    In the fall of 2008, Peter Nygård and his business associates learned that the CBC was working on the development of a negative story about him and his company.

551.    The subsequent CBC program called the "Fifth Estate" was first aired on April 9, 2010.

552.    During this period of time, Peter Nygård and Defendant had a dispute pertaining to the use of their Bahamian properties.

553.    Defendant engaged a Bahamian lawyer, Pericles Maillis, to attack Peter Nygård on various grounds, in an effort to force Peter Nygård to leave the Bahamas.

554.    Upon information and belief, Pericles Maillis met with Jerry Forrester and Alick Morrison to discuss and strategize a plan to bring Nygård's empire down.

555.    Upon information and belief, at said meeting, Pericles Maillis told Jerry Forrester that he wanted to find a young woman to say she was abused by Peter Nygård.

556.    Pericles Maillis stated to Vivian Whylly in September 2011 that he was seeking young women who would make statements that Peter Nygård drugged and abused them. Pericles Maillis advised that these young women would be taken care of, and told what to say.

557.    Numerous unfounded allegations of misconduct by Peter Nygård found their way into the public, some of which the CBC eventually reported.

558.    An investigation was conducted and revealed that the CBC used corrupt and discredited sources for the purpose of an exposé story.

559.    This included Defendant and/or his agents paying admitted dishonest investigators to "find" witnesses who became party to a conspiracy to defame Peter Nygård.

560.    Defendant facilitated with others in the development, production and airing of a CBC Fifth Estate program entitled "Larger than Life" which first aired on its main network on April 9, 2010 and on its website. This program broadcast inaccurate and false information about Plaintiff from witnesses who, at the direction and encouragement of Defendant with others, provided false statements. Stephen Davis, a private investigator based in New York and Defendant's head of security and investigations, played a pivotal role in this scheme.

561.    For the making of this program, Stephen Davis worked with, and was in regular contact with, Timothy Sawa, a CBC employee and producer and director of the Fifth Estate program about Plaintiff. During the CBC program, the CBC broadcast to the public unfounded and false allegations of misconduct by Peter Nygård.

562.    Upon further information and belief, Timothy Sawa contacted Sodo Bah at her home for the sole purpose of obtaining comments slandering Peter Nygård.

563.    On or about May 4, 2009, Sodo Bah sent an email to Timothy Sawa objecting to his request for negative comments about Peter Nygård. In this email, Sodo Bah accused Timothy

Sawa of deceit and trying to get her to lie.

564.    Upon further information and belief, Sodo Bah warned Timothy Sawa against using information from other former Nygård employees who she knew to be providing false information to the CBC.

565.    Upon further information and belief, on or about May 5, 2009, Sodo Bah forwarded the email to Timothy Sawa's boss, David Studer.

566.    Jerry Forrester, an investigator based in the United States who works or worked for Defendant Louis Bacon, also worked with Timothy Sawa on the CBC program. Jerry Forrester stated that he could recruit people to appear on the program and say anything disparaging about Peter Nygård provided they were paid. Even after these statements by Jerry Forrester, Timothy Sawa and the CBC continued to retain Jerry Forrester and broadcast statements procured by Jerry Forrester, when he was working for Defendant. The CBC paid Jerry Forrester $1,500 per day for his efforts. Jerry Forrester also paid two former property managers employed by Peter Nygård for services at Nygård Cay. These managers engaged in improper conduct and appeared in the CBC program to falsely assert that they assisted one of Plaintiff's associates to escape from Peter Nygård. The bribery procured by Defendant, through his surrogates, Stephen Davis, Jerry Forrester, and others, resulted in the Fifth Estate program suggesting that Peter Nygård was guilty of sexual misconduct in New York and at Nygård Cay.

567.    One of the individuals Jerry Forrester worked with, Mary Braithwaite, a senior administrator at Lyford Cay, stated that she wanted to make sure that Plaintiff could not sell another blouse anywhere in the world.

568.    Jerry Forrester suggested that women be paid to make false statements about the conduct of Peter Nygård.

569.   The CBC retained and paid Jerry Forrester despite knowing that this was his plan.

570.   Upon information and belief, Jerry Forrester offered to supply young women who would be willing to make up allegations if they were paid.

571.   Jerry Forrester involved Bradley Pratt who would control the process and pay the young women to make up allegations.

572.   On or about February 1, 2011, Bradley Pratt contacted Aisha Armbrister and proposed an exchange of cash for information on Peter Nygård.

573.   When Aisha Armbrister stated that she only had the highest regard for Peter Nygård, Princess Pratt asked Aisha Armbrister if she could find young women that would be prepared to make up bad stories about Peter Nygård, even if they were not true, in exchange for cash.

574.   During this conversation, Bradley Pratt proposed that Aisha Armbrister make up sexual stories about Peter Nygård and appear on the CBC Fifth Estate program.

575.   On or about September 15, 2010, Jerry Forrester and Bradley Pratt traveled to London to meet with a representative of Defendant, where they reiterated that they could find witnesses who would talk about Peter Nygård, provided the witnesses were paid.

576.   Pericles Maillis was recorded offering to pay $10,000 to a young woman to make a false allegation of serious sexual abuse.

577.   Others, including but not limited to Princess Pratt and Bradley Pratt, contacted individuals who had attended parties at Nygård Cay to obtain falsified damaging testimony about alleged criminal sexual misconduct. The women were offered $5,000 to $10,000 to lie and make up a "juicy" sex story about Peter Nygård.

578.   Other women, who had never been to Nygård Cay were similarly offered

compensation to make up stories about Peter Nygård.

579.    A criminal prosecution was filed in the Bahamas and statements from these witnesses were submitted to the court in 2012. Subsequently, a Bahamian civil lawsuit was launched against Louis Bacon and his co-conspirators.

580.    Witness A in that suit averred that on July 22, 2010, a man identifying himself as Bradley Pratt contacted her asking her to meet.

581.    On August 18, 2010, Bradley Pratt and Witness A met.

582.    Bradley Pratt told Witness A that he was authorized by Defendant to offer her $300 per hour to sit and talk with a Canadian television network for the production of a story on Peter Nygård.

583.    Bradley Pratt told Witness A that "the better [she made] up the stories, the more [she] will get paid."

584.    Bradley Pratt told Witness A that "he wanted stories about forceful sex, indecent assault and underage girls even if they are not true."

585.    Bradley Pratt asked if Witness A "could help him to find at least three (3) girls who had sex with Peter Nygård before and were prepared to make up stories that Peter Nygård had indecently assaulted them and to relate that on camera to the Canadian television network."

586.    Bradley Pratt told Witness A that if she was able to organize these girls, she would share in the money Louis Bacon would pay, and "the more false juicy stories you make up, the more money" he could pay her.

587.    Bradley Pratt later offered Witness A $10,000 to provide false intimate sexual details about Peter Nygård, intimating that the money was coming from Defendant.

588.    A copy of Witness A's signed statement was provided to The New York Times in

February 2019. The names of the witnesses are available, but pursuant to Bahamian rules were kept anonymous.

589.    Witness B averred that in February 2011, she "received a call from a Princess Bradley (a/k/a Princess Pratt) who [she] previously met at Nygård Cay. [Princess Bradley] asked [Witness B] to give information on Peter Nygård and Nygård Cay and said she would make sure [Witness B was] paid for [her] time."

590.    Princess Bradley asked Witness B "if [Witness B] could find girls that would be prepared to make up bad stories about [Peter Nygård] even if it was not true."

591.    Princess Bradley offered Witness B money for this task.

592.    Princess Bradley conceded to Witness B that the money was financed by "Mr. Nygård's neighbor" who "does not like Mr. Nygård who wants to drive him out of Nygård Cay." The neighbor being referred to was Defendant, Louis Bacon.

593.    Princess Bradley offered Witness B up to $10,000 for "made up and false criminal sex stories involving Mr. Nygård." She said, "Just make them up even if they are not true."

594.    Princess Bradley offered Witness B even more money if she would go on camera with the CBC and "there was another $10,000 in it for [her] and anybody [she] could recruit."'

595.    Princess Bradley ended the offer with a threatening warning that she should keep the conversation confidential because "these are very dangerous people who would hurt you badly if you got them into trouble."

596.    This signed statement was provided to The New York Times in February 2019.

597.    Other similar statements were procured and they were also provided to The New York Times in February 2019.

598.    The CBC also used statements from individuals about others that were clearly false.

71

599. The CBC used statements from Allan and Michelle May, who upon information and belief were improperly influenced, claiming that a woman from the Dominican Republic had been mistreated as an underage girl by Peter Nygård. However, the subject of the statements had denied the allegations that were made.

600. The CBC nevertheless broadcast the statements to, upon information and belief, damage Plaintiff.

601. The acts of the CBC were supported by actions taken by or on behalf of and paid for and/or ratified by Defendant.

602. Defendant's conduct and the conspiracy developed during the 2008-2012 time frame is being repeated now.

2014 Media Publication

603. Upon information and belief, on or about January 25, 2014, Samantha Storr and Philincia Cleare, former friends of Peter Nygård, demanded $500,000 from Peter Nygård in an extortion scheme at the behest of, or in conjunction with, the efforts of Defendant. Samantha Storr and Philincia Cleare communicated their extortion scheme through email using their personal email addresses and sent to Peter Nygård's email account, in which they stated they would destroy six alleged videos upon the payment of $500,000. Upon information and belief, the women threatened to provide them to Defendant or others if the demands were not met.

604. Upon information and belief, this scam was just a cover story and the women were already working with Defendant's agent.

605. Upon Plaintiff's refusal to comply with the extortion demands, stories about alleged private videos and correspondence were leaked to a gossip website "Diary of a Hollywood Street King" operated by Jacky Jasper. Articles citing the materials in the extortion scheme were

published on the website on various dates in February through May, 2014. The articles reference documents and media stolen from Peter Nygård, and detail Peter Nygård engaging in deviant sexual acts and verbal abuse of employees for the purposes of harming Plaintiff's reputation and damaging his business.

606.    The articles were removed from the Diary of a Hollywood Street King website only after a lawsuit was filed against Jacky Jasper, for which a judgment was obtained on March 8, 2016. These articles caused damage to Plaintiff's reputation which continues today.

Efforts to Arrange for False Testimony to Be Used in Media, False Reports and Claims

607.    On January 14, 2015, Louis Bacon filed an action against Peter Nygård, Nygård International Partnership and Nygård Inc. in the Supreme Court of New York, New York County, Bacon v. Nygård, et al., No. 150400/2015 ("the NY Case").

608.    In preparation for filing suit, Defendant and/or his agents and representatives procured false statements to assist in the filing of that claim.

609.    Defendant and/or his agents induced Stephen Feralio to breach his contract and duties to Plaintiff or businesses associated with Plaintiff by revealing confidential information and providing information designed to assist Defendant as a plaintiff in the NY Case and otherwise.

610.    Stephen Feralio is being paid and provided housing while the NY Case is pending through an agreement entered into between Stephen Feralio and Defendant through his companies, Belvedere and Wilson Mesa. In addition, Defendant agreed to indemnify Stephen Feralio if he were sued by Plaintiff or businesses associated with Plaintiff.

611.    On November 21, 2011, Stephen Feralio entered into an independent contractor agreement with Plaintiff or businesses associated with Plaintiff and accepted a position as a creative director, to take video and document Peter Nygård's travel and effectively be his

documentarian. Less than two months later, Stephen Feralio told Plaintiff he was leaving his position due to a difference in work expectations. On February 15, 2013, Stephen Feralio entered into another agreement with Plaintiff or businesses associated with Plaintiff to act in the same role he had left previously. The effective date of the agreement was September 10, 2012.

612.    Stephen Feralio also signed an intellectual property agreement on August 13, 2013.

613.    On or about March 24, 2014, Stephen Feralio reached out to the offices of Louis Bacon to inform Defendant that he was in possession of video footage of Peter Nygård that might be of interest to Defendant. Stephen Feralio used a pseudonym, "Mark Beauchamp," purportedly in order to maintain anonymity while in conversation with Zack Bacon, working at the behest of Defendant, regarding the video footage.

614.    Upon information and belief, this interaction had been pre-planned and Stephen Feralio had already been working with Defendant's agents in violation of his contractual agreements.

615.    After Defendant's private investigator, Jack Palladino, and Defendant's attorneys at the New York law firm determined to proceed, Stephen Feralio entered into the agreement with Belvedere and Wilson Mesa on behalf of Defendant.

616.    Stephen Feralio was induced by Defendant and/or his agents to violate his agreements with Plaintiff or businesses associated with Plaintiff in exchange for a monetary payment and obligations that upon information and belief continue today.

617.    Stephen Feralio has since worked with Defendant to recruit others to help damage Plaintiff. Stephen Feralio provided confidential information to Defendant, including names and contact information for investigators to harass others and to coerce information for use in potential accusations and claims to be asserted against Plaintiff.

618.     Stephen Feralio contacted an individual and indicated that he could get him a similar deal from Defendant for this individual if he would cooperate.

619.     Upon information and belief, Stephen Feralio is in the private witness protection program authorized, directed and paid for by Defendant.

620.     Upon information and belief, Stephen Feralio's activities, designed to damage Plaintiff, were authorized, directed, paid for and/or ratified by Defendant.

Toggi, Bobo, Clement Chea

621.     On February 12, 2015, and again on February 19, 2015, on behalf of Defendant Louis Bacon, John J. DiPaolo, a former FBI investigator, through his firm, The D&R Agency, LLC, along with his associate James Lawson, a former FBI Senior Special Agent, met with Toggi and Bobo in Nassau, the Bahamas.

622.     Bobo recorded the February 19, 2015 meeting on a concealed phone.

623.     During the February 19, 2015 meeting, John DiPaolo said he was on the telephone with lawyers with the New York law firm. John DiPaolo or James Lawson said the following to Bobo and Toggi:

(a)     "Well, obviously, I think, this, there is a progression of cooperation payments. I don't know if they are willing to pay three million dollars up front. This is our first conversation. I think what they intended to do is, to give a portion of money in good faith to you today for the information that you come to the table with."

(b)     "Like I said, Fred is our person that is the conduit with, for the money."

(c)     "So for the totality of all of your cooperation, however long it takes, including your testimony at some point, plus everything that you are giving us, plus the continued cooperation, and meeting with Nygård, and, him coming into your car, and recording him, and so on, and so

75

forth, you put a value of that on the totality of it of five million?"

(d)      "They are going to call the main attorney, that is handling that, and call us back. These are the people we have been directly dealing with, it is a law firm, which is up in New York. And, they have been retained by Mr. Bacon to represent him on this, and other matters. He is the one that eventually hired us out of Florida to do the investigative aspect of Nygård here."

(e)      "The attorneys are calling, the people we deal with out there are not top partners of the law firm. We are dealing with people who are delegated to deal with this. So, now, they are talking to the partners, direct contact with Mr. Bacon negotiating."

(f)      "So, the information, what they want to, they wanted to use this information just to show what type of person Nygård is, and, you know, it is not just they are looking at the whole thing, Nygård has businesses all over the place. He has made businesses up in New York. So extent of the investigation is not solely you guys here in the Bahamas. It is a complete investigation that goes elsewhere. You guys are a portion of it. You are a big portion of it. So, anything that we can show, that he is doing down here, is going to be part of the whole package."

(g)      "We called New York, the attorneys, to share with them what possibly we could start with today, what could eventually could lead to. Share with them what they expect today eventually, as far as compensation. So, they are currently right now discussing that. See if we can come to terms with them, if so, we will move forward. So, hopefully that will happen. That is where we are at."

(h)      "Well, they are very interested, they think the number was a little high, but, they said it is it is doable. They are very willing to pay very large sums of money for your cooperation. But this will be a continual going back and forth with them being satisfied that you have the correct information that they want, with you being assured that we have got the money that you want for

now, so I guess what they asked for our next step is, you say you got text messages are very damaging. What are those text messages. They want to know, do you have text messages, where Nygård talks about criminal behavior?"

(i)      "They want to know what it is that we are, that they are paying for. They are willing to pay, they just want us to verify that it is what they want… So, somehow, we got to come to an agreement how I can relay that information to them that it is what it is… And, then we will continue this dialogue, and pay you large sums of money…"

(j)      "They said they will pay you, they will, they told me they will pay you large sums. I told them you (sic) your figures, they said it is a little high, but where (sic) willing to pay… they said their position, they are very excited about your cooperation. They will pay you large sums of money. And we are in a position to give that to you."

(k)      "All I can say these guys have deep pockets, they have lots of money."

(l)      "We want a continual cooperation with you. We want you to continue to meet with Nygård. And, continue to give us valuable information. This is just the beginning."

(m)      "I am just waiting to see how much money we can give you guys up front. Like I say this is not coming out of my pocket. They want some confidence that what they are buying is valuable. I have no doubt what you guys have is valuable to them. They have to see, touch, smell it. So they know. And they are telling me look, we are willing to pay them an incredible amount of money, but we have to understand that what we are getting is a good product. That we are not sitting here thinking that we have this great information, which, you may think it is great information, but, it maybe, but it is not necessarily what they need or want..."

(n)      "The reason why this stuff is going back and forth and up and down the chain is it is going all the way up to Mr. Bacon and back. We are talking to partners of the law firm, who is

77

talking to [inaudible]."

(o)      "Again, I said this is going through these guys up to the top…"

(p)      "I guess we are at this point, where, any business relationship, people up in the New York have to feel warm and fuzzy, that they have information that they are willing to buy. And, they are willing to pay exorbitant amounts of money, they have to have something in front of them to show that they have criminal behavior on the part of Nygård, evidence that they have with their buy. They are willing to buy it. They are going to spend incredible amount of money to do it, we understand that."

(q)      ". . . we have to show these attorneys that you have something to offer them as valuable evidence, in their case. And, they said, when you show them that, they will pay you the money. And, that is where they are at."

624.      During the February 19, 2015 meeting, Bobo or Toggi said:

(a)      "Come to court to testify? I will come to court to testify."

(b)      "Today, and for whatever go on, We looking for five million, . . . , but for today straight up looking for three million for the evidence we give. Because we know we have the strong evidence. We show we have the strong evidence. Because I am going to testify Toggi going to testify."

(c)      "Statement and everything 500 thousand. And do the affidavit right now. I could do it right now."

(d)      "I sell for hundred thousand dollars for an affidavit. Honestly, and truly. We don't want to affiliate with Nygård, but we could call Nygård, and get hundred thousand dollars now, $50,000 right now. Call him right now. I will show you right now, in front of you guys."

625.     Bobo and Toggi claimed to have information about Peter Nygård which would be harmful to Peter Nygård.

626.     Upon information and belief, on February 19, 2015, Toggi provided a signed statement, made in Nassau, the Bahamas, witnessed by James Lawson, with the participation of John DiPaolo, and other employees of D&R, for which John DiPaolo paid Toggi $50,000. This payment was made through channels from and authorized by Defendant Louis Bacon in the United States.

627.     The February 19, 2015 statement contained false and influenced statements regarding Plaintiff, and was taken to be used for potential claims by Defendant Louis Bacon against Plaintiff and for submission of a false report to the authorities. The statements included the purported fact that Peter Nygård sent out a hit list (i.e., a list of individuals to be murdered) that included Defendant.

628.     Defendant and Bobo and Toggi knew that Peter Nygård never authorized a murder for hire plot and had specifically refuted Bobo and Toggi's efforts to entrap him into doing so.

629.     In an attempt to advance this scheme, the D & R Investigative Agency made arrangements in New York, Florida and the Bahamas to capture Peter Nygård trying to enlist Bobo and Toggi in a murder for hire plot, so that this could be used in potential accusations and claims against Peter Nygård and for the false report to the authorities.

630.     On May 6, 2015, Damian McLaughlin called Defendant's agent advising him of Peter Nygård's travel itinerary, demonstrating Defendant's agents were tracking Peter Nygård and that this was a coordinated plan.

631.     On May 14, 2015, Damian McLaughlin and James Lawson communicated regarding payments to Bobo with the money to be facilitated through Fred Smith.

632.    Upon information and belief, in October 2015, while in the Cayman Islands, John DiPaolo offered a substantial amount of money to another potential witness, Clement Chea, in exchange for false and influenced information regarding Plaintiff. This activity was authorized, directed and/or ratified authorized by Defendant and/or his agents.

633.    On January 24, 2016, in Miami Springs, Florida, in the presence of John DiPaolo and two of his associates, Toggi gave several "sworn statements," stenographically reported by Prestige Reporting Service, Inc., Fort Lauderdale, Florida.

634.    On February 4, 2016, in Santo Domingo, Dominican Republic, in the presence of John DiPaolo and two of his associates, Toggi gave several "sworn statements," stenographically reported by Prestige Reporting Service.

635.    On February 4, 2016, in Santo Domingo, Dominican Republic, in the presence of John DiPaolo and three of his associates, Bobo gave several "sworn statements," stenographically reported by Prestige Reporting Service.

636.    These statements, which contained falsehoods, were designed to support a future claim against Peter Nygård.

637.    On March 8, 2016, the Florida-based investigator, John DiPaolo, executed an affidavit in the Bahamas to be used in an anticipated claim against Peter Nygård. The January 24, 2016 and the February 4, 2016 statements were exhibits to John DiPaolo's affidavit.

638.    On or about March 9, 2016, Louis Bacon and three other plaintiffs filed a lawsuit in the Bahamas Supreme Court against Peter Nygård and his lawyer, Keod Smith. Smith, Bacon, et al. v. Nygård and Smith, Case No. 2016/CLE/gen/00329 ("the Bahamas Case").

639.    John DiPaolo's March 8, 2016 affidavit, with the false statements of Bobo and Toggi, was used in the Bahamas Case and it acknowledges that payments were made to Bobo and

Toggi, and that a schedule of payments could be prepared.

640.    The "sworn statements" by Bobo, Toggi and John DiPaolo contain materially false assertions purchased with Defendant's sums of money, including that Peter Nygård prepared a hit list to murder persons, and paid Bobo and Toggi to burn a shop and an automobile.

641.    The payments made to Bobo and Toggi by Defendant and/or his agents far exceed compensating the witnesses for expenses and out-of-pocket losses.

Philincia Cleare False Statements

642.    Philincia Cleare tried to extort Peter Nygård.

643.    In or about January of 2014, Philincia Cleare extorted Peter Nygård for $500,000 in exchange for deletion of alleged incriminating video footage of Peter Nygård.

644.    Upon information and belief, Defendant and/or his agents tried to use Philincia Cleare to entrap and extort Peter Nygård.

645.    Upon information and belief, Philincia Cleare was coerced by Defendant's agents to travel to the United States in 2016.

646.    Upon information and belief, Philincia Cleare was told by Defendant's agents that Peter Nygård was trying to hurt her and that she needed protection.

647.    Upon information and belief, Defendant's agents lied to Philincia Cleare to convince her to act against the interests of Plaintiff.

648.    Upon information and belief, Philincia Cleare was placed into the private "witness protection program" created by Defendant and his agents.

649.    Upon information and belief, Philincia Cleare was told that Defendant would pay to have her educated and to arrange for a permanent visa for her to remain in the United States.

650.    Upon information and belief, Philincia Cleare was offered room and board and a

monthly stipend to assist Defendant in his scheme against Plaintiff.

651.    Upon information and belief, Defendant's agents arranged for Philincia Cleare to have a place to live, free of charge.

652.    Upon information and belief, Defendant's agents placed Philincia Cleare in hotel rooms and apartments, often moving her around.

653.    Upon information and belief, Defendant placed Philincia Cleare in Colorado where she now resides with her costs being paid for by Defendant and/or his agents.

654.    Upon information and belief, Defendant supplied security guards who ensured that Philincia Cleare remained in Defendant's private witness protection program.

655.    Upon information and belief, Defendant's retained security guards coerced Philincia Cleare to work against the interests of Plaintiff by lying to her about Peter Nygård, by paying her money and by threatening and intimidating her.

656.    Upon information and belief, Philincia Cleare has been in the U.S. longer than permitted under a tourist visa, and she is now an illegal alien.

657.    Upon information and belief, Philincia Cleare is being harbored in the United States by Defendant and/or his agents in violation of 8 U.S.C. § 1324.

658.    Upon information and belief, Philincia Cleare was forced by Defendant and/or his agents to sign false statements against Peter Nygård in order to stay in Defendant's private witness protection program.

659.    Upon information and belief, Philincia Cleare was paid by Defendant and/or his agents to provide false statements against Peter Nygård.

660.    Upon information and belief, Defendant intended to and has used Philincia Cleare's false statements to damage Plaintiff.

661.    Upon information and belief, Defendant introduced Philincia Cleare to the Class Action Counsel for the purpose of filing a false claim against Plaintiff.

662.    Upon information and belief, Defendant and/or his agents used Philincia Cleare to file a false report about Peter Nygård.

663.    Upon information and belief, the false statements made by Philincia Cleare were made with the knowledge and intent to harm Plaintiff.

664.    Upon information and belief, Defendant introduced Philincia Cleare to the federal authorities for the purpose of filing a false claim against Plaintiff.

665.    In 2018, Philincia Cleare disavowed statements she had made against Peter Nygård.

666.    On or about March 1, 2018, Zack Bacon spoke with Philincia Cleare and other women in Defendant's private witness protection program revealing Defendant's plan to "allow the free press to destroy [Plaintiff] the way they did with Cosby, Moore, Winestine (sic)."

667.    On March 3, 2018, Philincia Cleare apologized to Peter Nygård for the actions she took.

668.    On that same day, Philincia Cleare revealed to Peter Nygård that Defendant was planning a "civil action" against him which would use the false statements.

669.    On March 16, 2018, Philincia Cleare admitted that Defendant wanted her "to make up stories about [Peter Nygård] with younger girls."

670.    Philincia Cleare admitted that Defendant had her meet with "the Jamaican Consulate Office in Miami" in February 2018, to have her "sign this paperwork filled with lies about [Peter Nygård] and girls younger 14-17 years."

671.    Upon information and belief, Philincia Cleare did not meet with the Jamaican Consulate, but rather with Jeff Davis and Doneth Cartwright, agents for Defendant.

672.    Upon information and belief, another false statement was prepared with the assistance of Jeff Davis and Doneth Cartwright.

673.    Upon information and belief, Philincia Cleare was threatened with the cut off of her money if she did not sign the false statement.

674.    In February 2019, emails confirming Philincia Cleare's admissions were provided to The New York Times.

675.    Upon information and belief, a reporter for The New York Times, likely Kim Barker, met with Philincia Cleare after receiving the emails and interviewed her for the story it was preparing. The New York Times has published several stories about Plaintiff in 2020.

676.    Philincia Cleare had previously admitted being offered money by Defendant's agents to make up false stories about Peter Nygård.

677.    Upon information and belief, Philincia Cleare's false statements were used to influence media outlets to publish false information about Plaintiff, to file false reports about Plaintiff and to plan for future claims to be filed against Plaintiff.

678.    Philincia Cleare's acts and actions against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Tazhmoye Cummings False Statements

679.    Defendant and/or his agents secured the false statements of Tazhmoye Cummings to use in potential claims against Plaintiff, for use in filing false reports with the authorities and for use in providing such statements to the media, including The New York Times, all designed to destroy and damage Plaintiff.

680.    Upon information and belief, Defendant also tried to use Tazhmoye Cummings to entrap Peter Nygård and extort him.

681.    Tazhmoye Cummings did extort Peter Nygård.

682.    In or about November of 2013, Tazhmoye Cummings extorted Peter Nygård for $5,000. Tazhmoye Cummings threatened to expose alleged incriminating video footage of Peter Nygård to a Bahamian politician that Defendant was affiliated with unless Peter Nygård paid her $5,000.

683.    Upon information and belief, Peter Nygård refused to comply with Tazhmoye Cummings' threats of extortion.

684.    Upon information and belief, Tazhmoye Cummings, in or about November of 2013, again extorted Peter Nygård for $5,000. Tazhmoye Cummings threatened to expose the same alleged incriminating video footage of Peter Nygård to Defendant's lawyer.

685.    Tazhmoye Cummings also recorded a video statement in two parts.

Part 1 provides in relevant part:

> "It's April 8th 2016. I Tazhmoye Cummings, is definitely willing to sign an affidavit, stating I will not press any criminal charges against Nygård, in the Bahamas, or California or anywhere else in the states …. As long as I am satisfied with my settlement, I'm willing to swear to never press any criminal charges. Under one condition. The condition is that no more time is wasted in this matter because the other side [presumably Louis Bacon] has been waiting patiently for me to commit to my statement which in... (Undecipherable voice coaching statement) I will be left with no choice but to sign a statement with them, and commit to a statement, if I am left waiting in vain by this current side. So as long as the offer is something that I am pleased with, I would be willing to sign a sworn affidavit."

686.    Part 2 of the video statement provides:

> "Also, just to confirm, I haven't signed any affidavit or made any affidavits with the other side as it stands at this moment. Or signed any commitments with the other side as it stands. They're waiting patiently for me to, but I haven't as yet. I'm still making up my mind. Which in I have decided to go with this side if this side is serious about my wishes"

687.    In about February 2016, Tazhmoye Cummings made a handwritten statement in which she wrote:

> "Last July, I was contacted by Louis Bacons lawyer "Allison Cain" offering me a weekend

trip to Miami at the Four Seasons hotel and compensation for any job opportunities I would of missed while being out of the country."

688.    The statement includes Tazhmoye Cummings' admission that she sold a story to

the Diary of a Hollywood Street King website "as a plot to get back at" Peter Nygård.

689.    The statement continues:

"She [Allison Cain] then inquired about me telling my story to a team of lawyers… I then told her that in order for me to go in depth …I would need compensation and very good compensation… She then told me that paying for information is illegal so she wouldn't be able to do that but I could be compensated in other ways so I should think about it. The conversation simmered down and she then asked how much lost wages did I encounter for taking the time to be here. I told her she would need to reimburse me $3,000 for my weekend being out of the country. On the final night we had dinner, she gave me $2,000 cash and assured me that she would transfer the remainder of the funds through "money gram" which she did.

690.    The statement continues:

"She informed me that they were ready to go all the way and I would be fully compensated and taken care of and given my own security detail. All I would have to do was agree to fly to California on February 3rd. She told me that she would be my comfort person and whatever I needed she would be there. She had people wanting to speak to me about . . . about a case they were building... She then gave me the option to completely move to California if I found it to my liking she would make it possibly [sic] for me to get residency, an apartment and a monthly allowance which she said would be a good enough amount to go shopping and completely cover all my expenses, along with a fee that was supposed to be discussed for my time there."

691.    Tazhmoye Cummings extorted Peter Nygård for several hundred thousand dollars

and claimed that she had "another offer [from Defendant and/or his agents] for living expenses,

whatever [her] heart desires basically, an awesome job opportunity that [she] would love in the

US, everything that [she] would need in the US to be comfortable basically."

692.    Tazhmoye Cummings threatened to work with Defendant to damage Plaintiff,

including through the use of false statements unless Plaintiff paid her $800,000.

693.    Peter Nygård refused to comply with the extortionist threats and Tazhmoye

Cummings has been working with Defendant and his agents. Upon information and belief, her

cooperation with Defendant and his agents commenced before the extortionist acts.

694.    Tazhmoye Cummings thereafter made false statements to assist Defendant in his conspiracy against Plaintiff.

695.    Tazhmoye Cummings made such false statements, willfully and knowingly.

696.    Upon information and belief, Tazhmoye Cummings has since made false statements, including to a reporter for The New York Times, all designed to be used in a media story designed to disparage and damage Plaintiff, to be used with a claim against Plaintiff, and to be used to make false reports to the authorities.

697.    Upon information and belief, Tazhmoye Cummings has been paid to make further false allegations against Peter Nygård.

698.    Upon information and belief, Tazhmoye Cummings is resident in the United States, residing in Texas, on an expired visa and is part of Defendant's private witness protection program.

699.    Upon information and belief, Tazhmoye Cummings has had and may still have a security detail paid for by Defendant so that no one could interfere with her plan to assist Defendant in destroying Plaintiff.

700.    Upon information and belief, Tazhmoye Cummings has been or is being harbored as an illegal alien in the United States solely for Defendant's use to support false claims against Peter Nygård.

701.    Upon information and belief, Defendant and/or his agents are harboring Tazhmoye Cummings as an illegal alien in violation of 8 U.S.C. 1324.

702.    Upon information and belief, Tazhmoye Cummings has been or is being paid a monthly stipend of several thousands of dollars to stay in the United States illegally to assist in Defendant's scheme to damage and destroy Plaintiff.

703.    Upon information and belief, Tazhmoye Cummings had or is also having her lodging paid for on a monthly basis.

704.    Upon information and belief, Tazhmoye Cummings had or has a security detail being directly or indirectly paid for by Defendant.

705.    Upon information and belief, Tazhmoye Cummings has been interviewed by a reporter for The New York Times, likely Kim Barker, for use in its newspaper story and for use in its television program. Statements made by Tazhmoye Cummings contain falsehoods designed to destroy and damage Plaintiff. The New York Times has published several stories about Plaintiff in 2020.

706.    Upon information and belief, Defendant's agents sought to introduce Tazhmoye Cummings to the Class Action Counsel and the government authorities for the purpose of providing false statements and make false claims to damage Plaintiff.

707.    Tazhmoye Cummings has committed acts and actions against Plaintiff in furtherance of Defendant's scheme that were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Samantha Storr

708.    In 2014, Samantha Storr tried to extort Peter Nygård for $500,000 along with Philincia Cleare and Robynn Toni Smith.

709.    Samantha Storr indicated that she would work with Defendant against Plaintiff if the extortion money was not paid.

710.    Upon information and belief, Samantha Storr had already been working with Defendant and/or his agents at the time the extortionist threats were made.

711.    Plaintiff refused to pay extortion money.

712.    Upon information and belief, Samantha Storr was coerced by Defendant's agents to travel to the United States in or about 2016.

713.    Upon information and belief, Samantha Storr was told by Defendant's agents that Peter Nygård was trying to hurt her and that she needed protection.

714.    Upon information and belief, Defendant's agents lied to Samantha Storr to convince her to act against the interests of Plaintiff.

715.    Upon information and belief, Samantha Storr was placed into Defendant's private witness protection program and is residing in Texas.

716.    Upon information and belief, Samantha Storr was told that Defendant would pay to arrange for a permanent visa for her to remain in the United States.

717.    Upon information and belief, Samantha Storr was offered room and board and a monthly stipend to assist Defendant in his scheme.

718.    Upon information and belief, Defendant's agents arranged for Samantha Storr to have a place to live, free of charge.

719.    Upon information and belief, Defendant's agents placed Samantha Storr in hotel rooms and apartments, often moving her around.

720.    Upon information and belief, Defendant placed Samantha Storr in Texas where she now resides with the costs being paid for by Defendant and/or his agents.

721.    Upon information and belief, Defendant supplied security guards who ensured that Samantha Storr remained in Defendant's private witness protection program.

722.    Upon information and belief, Defendant's retained security guards coerced Samantha Storr to work against the interests of Plaintiff by lying to her about Peter Nygård, by paying her money and by threatening her.

723.     Upon information and belief, Samantha Storr has been in the U.S. longer than permitted under a tourist visa, and she is now an illegal alien.

724.     Upon information and belief, Samantha Storr is being harbored in the United States by Defendant and/or his agents in violation of 8 U.S.C. § 1324.

725.     Upon information and belief, Samantha Storr was forced by Defendant and/or his agents to sign false statements against Peter Nygård in order to stay in the witness protection program.

726.     Upon information and belief, Samantha Storr was paid by Defendant and/or his agents to provide false statements against Peter Nygård.

727.     Upon information and belief, Defendant intended to and has used Samantha Storr's false statements to damage Plaintiff.

728.     Upon information and belief, Defendant and/or his agents used Samantha Storr to file a false report about Peter Nygård.

729.     Upon information and belief, the false statements made by Samantha Storr were made with the knowledge and intent to harm Plaintiff.

730.     Samantha Storr has met and been interviewed by a reporter for The New York Times, likely Kim Barker.

731.     Upon information and belief, Samantha Storr has repeated false statements to The New York Times that are damaging to Plaintiff.

732.     The acts and actions of Samantha Storr against Plaintiff in furtherance of Defendant's scheme were authorized, directed, paid for and/or ratified by Defendant and/or his agents.

Other People in the Private Witness Protection Program

733.    There are other witnesses in the private witness protection program located in the United States who Defendant and/or his agents are paying or have paid to make false statements about Peter Nygård.

734.    There are other individuals who Defendant's agents have coerced, threatened, and/or paid to provide Defendant and/or his agents with false statements to be used against Plaintiff.

735.    Upon information and belief, these other as yet to be identified individuals have repeated certain of these false statements to The New York Times to damage Plaintiff.

736.    Upon information and belief, these as yet to be identified individuals have issued false statements to be used to file false reports and/or file false claims against Plaintiff, including in the United States.

Richette Ross

737.    Defendant and/or his agents or representatives tried to have others swear false statements with the promise of money or based on threats, and tampered with witnesses who were positioned against Defendant.

738.    Upon information and belief, Richette Ross was paid $500 a week by Fred Smith to work on a potential lawsuit against Peter Nygård regarding alleged workplace abuses.

739.    On June 28, 2016, Richette Ross, a former employee [approximately 2009-2014] of Peter Nygård, swore an affidavit submitted in support of Peter Nygård in an action by Defendant Louis Bacon and other individuals involved in or connected to the enterprise alleged herein.

740.    The affidavit addressed a recorded conversation between Richette Ross and Toggi that occurred on April 4, 2016. During this conversation, Toggi admitted to Richette Ross that he

91

worked for Defendant.

741.    A second recorded conversation occurred on June 13, 2016 in which Toggi asked Richette Ross for information about women who were around Peter Nygård. Toggi indicated that he "needs two girls" and noted that Defendant is paying him to get information on Peter Nygård. In this conversation, Toggi acknowledged that Defendant made multiple payments to him amounting to close to $6 million, and the first time he met Defendant's agents they gave him $50,000. Toggi told Richette Ross she too could make money if she told Defendant's agents what they wanted to hear.

742.    In a late-August 2016 encounter, Toggi accosted Richette Ross, put his hand around her neck, and said he wanted to meet with her to offer her money to walk away from her June 28, 2016 affidavit. Toggi told Richette Ross that she should make herself scarce and accept money to walk away from the affidavit. Toggi confirmed to Richette Ross that he was paid by Louis Bacon from the beginning of the saga between Peter Nygård and Louis Bacon. Toggi told Richette Ross that his job with Louis Bacon was to set up Peter Nygård by finding women who would say that they had sexual relations with Peter Nygård and that he had treated them like slaves.

743.    On September 21, 2016, Bobo told Richette Ross that the men with and for whom he was working really wanted to pay her to walk away from the June 28, 2016 affidavit submitted in support of Peter Nygård.

744.    Toggi bragged to Richette Ross about how he and Bobo, along with persons whom he said were former FBI agents from the United States, set up Peter Nygård by having him recorded during private conversations when Toggi and Bobo unsuccessfully tried to get Peter Nygård to endorse killing people.

745.    Upon information and belief, following the filing of the initial Complaint in this

case, where Richette Ross' name was revealed, she was visited by an agent for Defendant who threatened her and coerced her to refrain from cooperating with Plaintiff.

746.     Richette Ross eventually became an operative for Defendant, and her actions were paid for, coerced, authorized and ratified by Defendant and/or his agents.

Litira Fox

747.     Upon information and belief, Litira Fox was paid by Fred Smith and/or his agents and/or the agents of Defendant. Upon information and belief, Fred Smith, Defendant and/or their agents paid Litira Fox in furtherance of the conspiracy against Peter Nygård.

748.     Upon information and belief, Litira Fox provided investigators and lawyers working for Defendant with additional witnesses for their case against Peter Nygård. Upon information and belief, Litira Fox paid said witnesses each $200 per visit.

749.     Upon information and belief, Litira Fox was paid $2,000 a month for her actions.

750.     Upon information and belief, Litira Fox was paid to provide investigators and lawyers working for Defendant with women who would make statements about Peter Nygård, regardless of their truth or falsity.

751.     Litira Fox's actions were paid for, coerced, authorized and ratified by Defendant and/or his agents.

Deidre Miller

752.     Upon information and belief, in 2018, Deidre Miller was invited to Baha Mar by Litira Fox. Deidre Miller was invited to Baha Mar to meet with investigators.

753.     Upon information and belief, the investigators were working for, and acting on behalf of Defendant.

754.     Upon information and belief, after meeting with said investigators, Deidre Miller

claimed to have dated Peter Nygård for years. Deidre Miller told The New York Times that she had witnessed Peter Nygård entertaining two teen-aged women in his bedroom, one of whom had been in a school uniform. Deidre Miller's claims would have been clearly false to someone who did any due diligence.

755.     Upon information and belief, after making said statement to The New York Times, Deidre Miller (along with Litira Fox) received a substantial gift, expensive jewelry from Cartier, from investigators on behalf of Defendant.

Improper Activity in 2015-2016

756.     In or about 2016, investigators working for Defendant started to harass Plaintiff's employees, friends and acquaintances.

757.     These investigators harassed numerous people in an effort to disrupt Plaintiff's business relations and damage Plaintiff.

758.     For example, in the summer of 2016, Danielle Gaines was approached by two men who she described as harassing and threatening.

759.     In September 2015, Darlyne Lucchesi was approached by a woman from San Francisco (believed to be Sara Ness) claiming to have been hired by Zack Bacon and Louis Bacon, and that she was working for them for four years. Darlyne Lucchesi was shown documents which had been claimed to have come from Plaintiff.

760.     Sara Ness repeated false allegations to Darlyne Lucchesi claiming that a woman was being held against her will by Plaintiff, forced to engage in sexual acts and was raped. Sara Ness further claimed that this was part of a pattern of events considered to be "Satanical Rituals."

761.     When Darlyne Lucchesi protested and denied that any such acts took place, Sara Ness heightened her claims of falsehoods, including allegations of rape, mental illness, and

94

sexually transmitted diseases, among others while making racial slurs to Darlyne Lucchesi.

762.     Sara Ness then indicated to Darlyne Lucchesi that her client, Louis Bacon, was concerned that Peter Nygård may be dangerous and violent.

763.     Sara Ness was trying, through false statements, to coerce Darlyne Lucchesi to assist Defendant in potential claims against Plaintiff.

764.     On or about March 13, 2015, Sara Ness contacted Maribel Rodriguez inquiring about Plaintiff Peter Nygård.

765.     Maribel Rodriguez understood from her conversations with Sara Ness that Sara Ness worked for Defendant and wanted her to lie about the conduct of Plaintiff Peter Nygård.

766.     Sara Ness confirmed to Maribel Rodriguez that she worked for an investigation firm called Palladino & Sutherland and they were hired by Louis Bacon and his New York law firm to investigate Plaintiff Peter Nygård.

767.     Sara Ness informed Maribel Rodriguez that they had already talked to many people about their experiences with Plaintiff Peter Nygård and that "most people did not have a good experience."

768.     Sara Ness offered to visit Maribel Rodriguez in Santiago to hear about her experiences. In the alternative, Sara Ness offered to "fly [Maribel Rodriguez] anywhere [she would] like (such as Miami), take care of all the expenses, compensate [her] for [her] time if [she missed] work."

769.     Unprompted, Sara Ness wrote to Maribel Rodriguez offering "If you are concerned about retribution (by Nygård) you should know that [her] client, Louis Bacon, would do anything in his power to ensure her safety."

770.     Upon information and belief, Sara Ness was trying to intimidate Maribel

95

Rodriguez by intimating that Peter Nygård was trying to hurt her, when there was no reason, proof or allegation that he was.

771.    When Maribel Rodriguez asked what she would get in exchange for her interview, Sara Ness indicated that was "an understandable question" and promised to consult with her group.

772.    Maribel Rodriguez understood that Defendant Louis Bacon's agents were trying to get her to lie about experiences with Plaintiff Peter Nygård, and they were willing to pay for such information.

773.    In 2015, Defendant retained a New York-based investigative firm, Ergo, who dispatched Matt Moneyhon and Kate Crumrine to investigate Peter Nygård in connection with a claim or potential claim by Louis Bacon and/or others against Peter Nygård. Despite being advised that individuals had non-disclosure agreements, these investigators induced employees to breach these agreements to further Defendant's efforts to damage Plaintiff.

774.    In or about March of 2015, Defendant's agents met with the FBI in an effort to convince them to open up an investigation of Peter Nygård based on the fabricated evidence they obtained.

775.    In 2016, Defendant and/or his agents met with the FBI to attempt to initiate a criminal action against Peter Nygård.

776.    Upon information and belief, the FBI did not find any merit to the claim in 2016 and did not pursue it.

777.    In 2016, Defendant and/or his agents contacted the Department of Homeland Security to attempt to initiate a criminal investigation.

778.    Upon information and belief, the Department of Homeland Security did not find any merit to the claim in 2016 and abandoned its investigation at that time.

779.     Upon information and belief, Defendant and/or his agents provided the authorities with false information, including through in-person interviews and through the mail.

780.     As a result of the initiation of these investigations, Plaintiff's employees, friends, and business associates were contacted and were asked questions about Plaintiff, which harmed them.

Improper Activity in 2018-2019

781.     Upon information and belief, in the fall of 2018, while Peter Nygård's property in the Bahamas was under the custody of Fred Smith, Defendant's attorney and agent, through an Order issued by a Bahamian court in a separate matter, the property was burglarized. Upon information and belief, certain documentation including a contact list of Peter Nygård's was taken. Soon thereafter, investigators directly or indirectly hired by Defendant, including James Lawson/JDL, "Dutch Holland" and OTIA, began contacting persons on the contact list looking for information about alleged criminal misconduct by Peter Nygård. Persons contacted include residents of at least New York, New Jersey, Georgia, and California. Among the people contacted from the list was Imani Iddeen. Imani Iddeen lived in California and had been approached at her apartment door by investigators who bypassed security in her building.

782.     Imani Iddeen signed an affidavit on December 22, 2018 confirming that she was contacted by investigators known to be under the employ of Defendant who were looking to speak with her about Plaintiff. Despite her pleas to leave her alone, Imani Iddeen was harassed by these investigators several times thereafter, up through February 2019.

783.     Danielle Gaines was another person contacted in California by Defendant's investigators. Danielle Gaines signed an affidavit on December 13, 2018 to confirm that she too was contacted by investigators known to be under the employ of Defendant and she too was

97

harassed.

784.    SueLyn Medeiros was also approached in California by investigators who pressured her to cooperate with their investigation. She too was harassed and signed an affidavit to that effect.

785.    Other women in the United States were approached on numerous occasions and harassed about their relationships with Peter Nygård. Some women were told that a big media story was about to break and if they had any chance of being kept out of the story, they had to work with Defendant's investigators.

786.    Some of these women were further told that if they did not cooperate, they risked being named as a victim, a witness or an accomplice.

787.    Some of these women felt threatened and were concerned about Defendant's agents' tactics.

788.    The investigators did not stop with just former employees and friends. Current employees were contacted and told of stories about to be released through the media about Plaintiff.

789.    The harassment and disclosure of false statements by Defendant's agents/investigators to Plaintiff's friends, acquaintances and employees continued even after they were asked to cease and desist.

790.    Upon information and belief, the actions of the investigators were directed, authorized, paid for and/or ratified by Defendant.

The Pending Media Assault

791.    No later than February 2019, reporters with The New York Times started contacting people from a list that upon information and belief was provided to them by or on behalf

of Defendant.

792.     The reporters from The New York Times made statements to various individuals about conduct being alleged against Peter Nygård. They repeated the false statements made to them by individuals working in concert with Defendant in order to get others to similarly make statements, false or otherwise, designed to damage Plaintiff.

793.     The reporters from The New York Times claim to have interviewed in excess of 250 people.

794.     Upon information and belief, the reporters had been invited to the Bahamas by Fred Smith.

795.     Upon information and belief, the reporters had been hosted in the Bahamas by Fred Smith.

796.     Upon information and belief, Fred Smith provided the reporters with access to witnesses who were influenced by or on behalf of Defendant to provide false information for the newspaper's story.

797.     Upon information and belief, Fred Smith provided the reporters with documents to be used in reporting the story.

798.     One of the items Fred Smith provided included a manuscript described by the author as a fairy tale.

799.     Kim Barker contacted the ghost writer to learn more information about the source of the manuscript, since the author of the manuscript had been killed.

800.     In inquiring about the reasons for the investigation, Kim Barker told the individual that she was trying to "bring down" Peter Nygård.

801.     Upon information and belief, Kim Barker claimed that the media would bring

down Peter Nygård the way it had done with Bill Cosby and Harvey Weinstein.

802.   Kim Barker tried to coerce the ghost writer's involvement by claiming Peter Nygård was responsible for the death of the author, and suggesting that ghost writer seek vengeance.

803.   Kim Barker's statement about bringing down Peter Nygård was also heard by a friend of the ghost writer.

<u>The More Than Ten Year Conspiracy to Damage Plaintiff Continues</u>

804.   Upon information and belief, Defendant is a billionaire.

805.   Defendant has indicated and/or demonstrated that he will spend millions of dollars just to destroy Plaintiff.

806.   Defendant has utilized illegal and improper methods to destroy and damage Plaintiff.

807.   Defendant and/or his agents and surrogates have made false statements about Plaintiff, and have solicited, coerced and paid for false statements to be used to damage Plaintiff, to be used to file false reports with authorities about Plaintiff, and to be used for claims and potential claims against Plaintiff.

808.   These statements and the dissemination of the information about them was designed to damage Plaintiff and interfere with his business relations.

809.   Defendant has assembled dozens of individuals and entities to assist him in this assault, spreading money around to accomplish his intended desire to destroy Plaintiff.

810.   Based upon the practice of Defendant paying and otherwise conferring benefits on witnesses for false and influenced testimony, the statement of John DiPaolo that Louis Bacon is willing to pay "exorbitant" and "incredible" amounts of money, and the agency of James

Lawson/JDL for this purpose, Plaintiff is entitled to injunctive relief to prevent further harm to his business and property.

811.    Taken together, more than a dozen "statements" have been obtained by participants in the enterprise acting on behalf of Defendant, given by purported witnesses to be used against Plaintiff in various litigations, both pending and anticipated, and more particularly, to be used in abusing process by filing false reports, and by conspiring with media outlets to publicize the false statements.

812.    In addition, upon information and belief, Defendant arranged for civil actions to be filed against Plaintiff using false statements, coerced and paid for testimony, to be bolstered by media publications, because he was unable to convince the FBI and the Department of Homeland Security to prosecute Peter Nygård based on false information.

813.    The false statements had no legitimate purpose. The statements are to capture false information, regardless of truth, and used to damage Plaintiff in his business and property. The statements constitute influenced testimony within the meaning of NY Penal Law § 215.00, bribing a witness, and other similar state laws.

814.    Defendant and other individuals and entities, knowingly and with malice, acting with or on behalf of Defendant, or participants in the enterprise acting on behalf of Defendant, established, provided content for, or encouraged purported witnesses to provide false statements, including content for the sistahsabused.com domain. Functioning through Facebook, this publicly available website contains disparaging content about Plaintiff. This content includes falsified accusations against Plaintiff, including encouraging actual or prospective consumers to not purchase Plaintiff's fashion products and to dissuade a major department store from continuing its business relationship with Plaintiff or businesses associated with Plaintiff by ceasing to carry

101

Plaintiff's or businesses associated with Plaintiff's fashion products. These accusations have no legitimate purpose and are designed to injure Plaintiff in his business relationships and property.

815.    The efforts to dissuade a major department store from continuing its business relationship finally came to fruition, which further caused the lender for businesses associated with Plaintiff to call its loan and thrust Nygård International Partnership and Nygård Inc. and seven other entities into receivership. Peter Nygård is the indirect beneficial owner of Nygård International Partnership and has been damaged personally by and because of the damage caused to Nygård International Partnership. In addition, Nygård International Partnership had a business relationship with Nygård Inc., such that damage to Nygård Inc. could impact Nygård International Partnership, and thereby damage Plaintiff Peter Nygård. Moreover, insofar as Peter Nygård was closely associated with Nygård International Partnership, damage to Nygård International Partnership resulted in damage to Peter Nygård, his reputation and good will.

Improper Activity in 2020

816.    The immediate and irreparable harm of Defendant's misconduct manifested itself in 2020. Defendant's efforts, as alleged above, included improperly influencing and providing false information to The New York Times, which published negative stories about Plaintiff in 2020 to ruin Plaintiff.

817.    Defendant's scheme also included influencing the filing of scandalous lawsuits against Plaintiff in 2020, including lawsuits in New York and California.

818.    Defendant has also conducted, supported and orchestrated media attacks (both mainstream and social media) against Plaintiff in 2020 in connection with these lawsuits.

819.    Upon information and belief, Defendant has also planned, arranged for, financially supported and orchestrated the filing of lawsuits against Plaintiff based on false statements.

820.     Upon information and belief, Defendant's orchestrated lawsuits and media attacks influenced raids on properties associated with Plaintiff in New York and California in 2020 by the FBI and local law enforcement.

821.     Defendant's actions against Plaintiff utilize fabricated and manufactured evidence, and accusations and allegations conceived through payments, threats, coercion and intimidation by Defendant and/or his agents.

822.     Through the use of U.S. and foreign investigators and guards, Defendant has created a fake witness protection program to coerce witnesses and persons that represent these witnesses to cooperate in the scheme. Defendant has used a series of corporate manipulations in connection with this scheme, including the improper use of not-for-profit entities, to funnel tens of millions of dollars to fund the illicit activities.

823.     Through Defendant's witness protection program, Defendant influenced the filing of a lawsuit on January 24, 2020 by a Jane Doe plaintiff against Peter Nygård in the Superior Court of the State of California, County of Los Angeles, Case No. 20STCV03216. Consistent with Defendant's witness protection program, the allegations in that lawsuit include sexual battery of a minor and other related claims.

824.     Through Defendant's witness protection program, Defendant influenced the filing of a putative class action lawsuit on February 13, 2020 by ten Jane Does plaintiffs against Peter Nygård, Nygård Inc., Nygård International Partnership, and Nygård Holdings Limited, in the United States District Court for the Southern District of New York, Case No. 20-01288. Consistent with Defendant's witness protection program, the allegations in that lawsuit include the Trafficking Victim Protection Act.

825.     Because of Defendant's conduct, including Defendant's witness protection

program, on February 25, 2020, "[f]ederal agents" "raided the California and New York offices of Canadian fashion mogul Peter J. Nygard, who was recently sued by 10 women accusing him and his companies of rape and sex trafficking…. Hours after the raids, Nygard 'made the decision to step down as chairman of the Nygard Companies and will divest his ownership interest,' his spokesperson said in a statement." *See* https://www.law360.com/articles/1247279/feds-raid-fashion-mogul-peter-Nygard-s-ny-calif-offices. "The announcement came after a major client, Dillard's department stores, said it would no longer carry Mr. Nygard's fashion line." *See* https://www.nytimes.com/2020/02/25/us/peter-Nygard-international-fbi-raid.html.

826.    The Dillard's statement provided: "In light of the serious allegations concerning Peter Nygard, which are in direct opposition to our core values, Dillard's has refused current deliveries, canceled all existing orders and suspended all future purchases from Nygard." *See https://www.cbc.ca/news/canada/manitoba/dillard-s-Nygard-clothing-cancelled-orders-1.5476574*.

827.    In another example, a media report stated that a "clothing store in Kentville is pulling some of its most popular lines to make a point," and its owners "have decided to stop selling brands owned by Canadian fashion icon Peter Nygard after a class-action lawsuit was filed Feb. 13 on behalf of 10 women alleging that Nygard sexually assaulted them." "This includes: Tan Jay, Alia, Nygard & Nygard Slims," and "While these brands have been popular at Phinneys and often best-sellers, in good conscience, we cannot support Mr. Nygard's brands." *See* https://www.capebretonpost.com/news/provincial/kentville-clothing-store-pulls-some-popular-brands-amid-disturbing-allegations-against-fashion-mogul-peter-Nygard-414169/.

828.    Media reports regarding these recent lawsuits against Plaintiff further evidence that Defendant's conduct, including through the witness protection program, and the enticement to

make false claims, have precipitated and prompted these lawsuits and resulting media reports, the government investigations and raids, and the resulting damages to Plaintiff.

829.    On February 10, 2020, the CBC claimed that Defendant Louis Bacon had been paying the fees of four of the women who brought the Southern District of New York action against Plaintiff. The CBC later published the same information only to issue a "clarification," disclosing that a lawyer for four of the plaintiffs bringing the new Southern District of New York lawsuit stated that the lawyer's "legal bills are being paid for by a not-for-profit organization called Sanctuary, set up to support women who are victims of sexual assault. One of its donors is Louis Bacon." *See* https://www.cbc.ca/amp/1.5465180. This further evidences Defendant's improper use of not-for-profits to wage his misconduct campaign against Plaintiff. Other media have reported that "American investor and hedge fund manager Louis Bacon has partially funded the US class action lawsuit against Mr Nygard." *See* http://www.tribune242.com/news/2020/apr/23/nygard-ordeal-never-left-me-accusers-account-how-v/.

830.    On the evening of Saturday, February 22, 2020, The New York Times released its Sunday, February 23, 2020 edition, wherein The New York Times ran a front-page article about the recent lawsuits. The New York Times published this article after its reporters spent at least one year interviewing Defendant's agents' hand-picked witnesses. While the majority of the article, including the headline, was significantly damaging to Plaintiff, The New York Times did report on certain irregularities and issues it found during its reporting relating to Defendant. The article included numerous references to Defendant and his associates, and further evidence the misconduct of Defendant, including through his witness protection program. *See* https://www.nytimes.com/2020/02/22/world/americas/peter-Nygard-louis-bacon.html.

831.    Relevant excerpts from that New York Times article include:

a. Lawyers and investigators funded in part by Mr. Bacon claim that Mr. Nygard raped teenage girls in the Bahamas.

b. Investigators and lawyers tied to Mr. Bacon offered Nygard associates generous incentives to build an abuse case against the Canadian — Cartier jewelry, a regular salary or a year's rent in a gated community, according to documents and interviews. Smaller payments filtered down to some accusers, which could be used to undermine their credibility in any court case or investigation.

c. Reporters also spoke with five other women, who said Mr. Nygard sexually assaulted them … **two later recanted, saying they had been promised money and coached to fabricate their stories**.

d. Mr. Bacon, who founded New York-based Moore Capital Management … [and h]is associates have spent two years finding women to bring claims against Mr. Nygard.

e. Others cast aspersions on Mr. Bacon, claiming he had paid Nygard employees to dig up dirt and had objected to black Bahamians visiting Lyford Cay.

832.    The New York Times story continued under the subtitle "Clash of the Titans," with these excerpts:

a. Mr. Bacon was a rare adversary. His wealth was valued at more than double Mr. Nygard's. He helped form a nonprofit called Save the Bays to target environmental abuses, starting with Nygard Cay. Fred Smith, a prominent human-rights lawyer, came on board.

b. Mr. Bacon and his older brother, Zack, hired a small army of lawyers and private investigators, including veterans of the F.B.I. and Scotland Yard. They persuaded some of Mr. Nygard's allies to provide evidence for a defamation lawsuit, filed in 2015. They launched their own lawsuits. And they paid well.

c. Mr. Bullard and Mr. Davilma, working with the Bacon investigators, hatched a plan to videotape Mr. Nygard. The private eyes acted like secret agents, using encrypted phones and dropping cash for the two men in a box behind a post office. Eventually, the Bacons paid the two about $1.5 million, mostly for secretly recording five meetings with Mr. Nygard.

833.    The New York Times story continued, under the subtitle "The Hunt," with these excerpts:

a. In late 2015, they [Louis and Zack Bacon] hired TekStratex, a new Texas security firm, to push American law enforcement officials to investigate him [Peter Nygard] for sex trafficking. The firm's leader, Jeff Davis, told Zack Bacon that he'd worked for the C.I.A. for 10 years — including in something called "the ghost program," Mr. Bacon recalled.

b. The F.B.I. looked into Mr. Nygard twice, but only briefly. In April 2016, the Department of Homeland Security dug in. To help the inquiry, the Bacons moved five witnesses — two former Bahamian employees of Mr. Nygard and three former girlfriends — to the United States and covered their living expenses. Mr. Davis told them that Mr. Nygard had "put out hits on them," several recalled in interviews. Burly bodyguards drove them to different houses and hotels, swerving through traffic and changing cars, saying they were being followed.

c. He soon focused on a lawsuit, hoping to draw on the #MeToo movement and "the most aggressive lawyers in the world," Zack Bacon said in a recording provided to The Times.

d. By last summer, Mr. Smith and the private investigators had introduced about 15 Bahamian women to American lawyers at the DiCello Levitt Gutzler firm. They were planning to bring a lawsuit in New York.

834.    The New York Times continued its report, under the subtitle "A Gift From Our Boss," with these excerpts:

a. For years, Mr. Nygard had insisted that Louis Bacon paid people to lie about him. The hedge fund founder maintained that wasn't true. But his [Louis Bacon's] team created vulnerabilities, giving money and gifts to witnesses and accusers in the Bahamas, The Times found.

b. The Bahamian lawyers and investigators were not paid by the Bacons directly. Instead, they were paid by a nonprofit Mr. Smith created, called Sanctuary, to support sexual assault victims; both he [Fred Smith] and Mr. Bacon donated generously to that. "They are handing the defendant arguments," said Jeanne Christensen, a New York lawyer focusing on sexual harassment.

c. The private investigators and Mr. Smith compensated two witnesses who found alleged victims: Litira Fox, a former girlfriend of Mr. Nygard's who said she recruited for him, and Richette Ross, a former massage therapist at Nygard Cay who said she did the same.

d. Ms. Ross did well. After she told Mr. Smith that unknown assailants had shot up her former home, killed her family dog and broke into her car in different incidents, Mr. Smith moved her into a gated community, paying $5,000 a month.

107

e.  Mr. Smith also gave Ms. Ross $500 a week to work on another potential lawsuit against Mr. Nygard, this one for workplace abuses. Accusers received smaller payments. Ms. Fox, who earned $2,000 a month, said she passed some of that to the women she brought to meetings with lawyers and investigators — often $200 for a visit. Mr. Smith acknowledged giving about $1,000 collectively to four or five alleged victims, but said that was for their time and expenses.

f.  There were more substantial gifts. Deidre Miller said Ms. Fox invited her to the Baha Mar luxury resort in August 2018 to meet with investigators. She was a valuable witness — she would later tell The Times she had dated Mr. Nygard for years and had seen two teenagers in his bed, one in her school uniform. Afterward, Ms. Miller said, the investigators took her and Ms. Fox to the resort's Cartier store. There, she said, the men bought each woman a matching 18-carat gold bracelet and necklace for $9,350. Ms. Miller provided a photo of the receipt, though the man whose name was on it denied making the purchase. "He was like, 'It's a gift from our boss,'" Ms. Miller recalled. "They said they were working for Louis Bacon."

835.  The New York Times further reported, under the subtitle "The Lie," with these excerpts:

a.  For more than a year, Marvinique Smith and her sister, Marrinique, were central to the developing lawsuit. They told their stories repeatedly to lawyers, investigators and the Bahamian police. Marvinique said she was invited to a pamper party in 2010, when she was 15. There, she said, Mr. Nygard talked to her about modeling and had sex with her. Her sister recounted a horrific tale: Mr. Nygard had raped her as cartoons played on TV. She said she was 10.

b.  **But in October, the sisters told a very different story to Times reporters: They had never been assaulted by Mr. Nygard. They had never even met him. They claimed Ms. Ross had paid them to make everything up. Marvinique Smith said Ms. Ross suggested she might collect as much as a half-million dollars in a settlement, and then could give Ms. Ross a cut.**

c.  She coached them on Mr. Nygard's pickup lines, bedroom layout and sexual proclivities, the sisters said. Meanwhile, she gave them cash — $150 here, $350 there — for every meeting, they said. Ms. Smith said she confessed to lying because Ms. Ross, who was dating her boyfriend's father, stopped paying her. She and her sister felt guilty and scared. "I couldn't do it anymore," Ms. Smith said, adding, "There might be girls that it actually happened to, but it didn't happen to me and my sister."

d.  Ms. Ross had undisclosed connections with other women she brought to the lawyers. Two were relatives. Two were related to a close friend. All were included as plaintiffs in the lawsuit. She had also sent a note to a former Nygard employee,

asking to talk about the case. "It will pay very handsomely," she wrote.

836.    The scheme reported by The New York Times is eerily similar to the plan Defendant and his agents attempted years ago – find women willing to make false statements about Peter Nygård and sex in exchange for money, then take these women to the press to publicize the false stories in an effort to destroy Peter Nygård and his business, and then try to engage the authorities to prosecute him criminally. An Affidavit of Leo Paul Thurston, filed with the Bahamian Supreme Court, incorporates several exhibits, including witness statements. These statements, made by witnesses for use in the Bahamian courts years ago detail the efforts by Defendant's agents to perpetrate a conspiracy and scheme similar to the scheme alleged herein.

837.    Defendant's conduct, including through the witness protection program, and the recruitment of women who agreed to lie for money, and resulting loss to Plaintiff resulted in the appointment of a receiver for Nygård International Partnership and Nygård Inc.

838.    A    March    20,    2020    media    report,    available    at http://www.tribune242.com/news/2020/mar/20/receiver-takes-over-Nygard-firms/,    included these excerpts:

   a. Peter Nygard's global fashion empire has been plunged into financial crisis after court-appointed receivers this week took over its affairs following recent sex trafficking allegations against the tycoon.

   b. The claims against the Lyford Cay resident, which he has vehemently denied, were cited by the Nygard Group's lenders as a key factor behind their decision to successfully petition the courts for the appointment of a receiver over business interests he has spent decades building.

   c. Two US-based financiers, White Oak Commercial Finance and Second Avenue Capital Partners, are alleging in court papers that Mr. Nygard's fashion empire breached the conditions of a $40m loan agreement by failing to promptly disclose the lawsuit where ten girls made allegations of rape and sexual assault against him.

d.   This was swiftly followed by the Federal Bureau of Investigation (FBI) and New York Police Department raid on Nygard Group's New York and California offices, which resulted in its largest customer, Dillard's, dropping the Canadian's empire as a supplier.

e.   White Oak and Second Avenue alleged that this represented a further default under the loan agreement, for which $25.87m is allegedly outstanding and owing, due to Dillard's accounting for 67 percent - more than two-thirds - of Nygard Group's third party wholesale group.

f.   Richter Advisory Group, which was appointed as the Nygard Group's receiver by the Canadian courts on Wednesday, has moved swiftly to seek Chapter 15 recognition from the southern New York bankruptcy court so it can protect its assets from legal actions by creditors said to be owed a combined $60.551m.

g.   In the midst of the foregoing, the lenders learned that Peter Nygard and several of the [Nygard Group's US companies] had been sued in a class action lawsuit in the US District Court for the Southern District of New York.

h.   The class action lawsuit alleges, among other things, that Mr Nygard raped and sexually assaulted multiple children and women, and that the [US companies] knowingly aided and abetted him in a decades-long sex-trafficking scheme.

i.   Then came the FBI and New York police raid, and the loss of the Dillard's account, where it "had refused current deliveries, cancelled all existing orders and suspended all future purchases from the Nygard Group". Mr Nygard announced he would step down from his fashion empire, and sell it, the very same day.

j.   However, the fact that Mr Nygard and his fashion brand are virtually one and the same is likely to complicate any sale. The two are indivisible, and court documents obtained by Tribune Business reveal that the Nygard Group had sought protection from White Oak/South Avenue and their other creditors under the Canadian Bankruptcy and Insolvency Act.

k.   The well-known Bahamas resident, who has been locked in a decade-long feud with his Lyford Cay neighbour, Louis Bacon, had even managed to hold off the lenders' receivership bid in several Canadian court hearings.

l.   "The Nygard Group employs approximately 1,450 people worldwide, of whom approximately 100 are located in the US. The Nygard Group operates 167 retail stores in Canada and two retail stores in the US, and upon information and belief, supplied other retailers such as Dillard's and Costco Wholesale Canada until recently."

839.   On March 23, 2020, Robert L. Dean, the Executive Vice President and Managing

Director of White Oak Commercial Finance LLC, submitted a Declaration to the U.S. Bankruptcy

110

Court further explaining the ramifications of the filing of the Jane Does litigation in the Southern District of New York (which was financed by Defendant or one of his proxies), the federal raids on the Nygård premises, and the decision by Dillard's to terminate its relationship with Nygård, including the cancellation and rejection of current orders. These events, all resulting from the orchestrated events designed by, funded by or arranged by Defendant or his agents, caused damage to Plaintiff.

840.    Upon information and belief, Defendant and/or his companies utilized the services of Citco to funnel money into the Bahamas, in part to fund his activities to damage Plaintiff.

841.    In April 2013, the Bahamas Tribune reported that Defendant was then moving his business away from Citco in the Bahamas. The report provided that Citco staff had been reduced from 65 to 12 and that Defendant blamed Plaintiff Peter Nygård as the reason he had to move his money away from Citco in the Bahamas. However, upon information and belief, in late 2015, Defendant's businesses were still working with Citco in the Bahamas despite falsely claiming that it left the Bahamas. Upon information and belief, the publication of the loss of 53 jobs blamed on Plaintiff was designed to damage Plaintiff.

842.    The lawsuits, media storm, FBI raids and associated activities that Defendant's conduct prompted resulted in further harm to Plaintiff through the April 10, 2020 publication of a tabloid book titled "Predator King: Peter Nygard's Dark Life of Rape, Drugs, and Blackmail," which repeatedly disparages Plaintiff, relying on the paid for, fabricated and manufactured claims. The tabloid book regurgitates the allegations raised in these lawsuits and related media reports. For example, the tabloid book describes the "Jane Doe" Southern District of New York lawsuit as a "disturbing and explosive bombshell." Consistent with the efforts harvested through Defendant's witness protection program, the tabloid book reads that "[a]s with Harvey Weinstein and Bill

Cosby before him, the case of Peter Nygard is a he said / she said, she said, she said, she said, she said. Reporters know that where there's smoke, there's often fire. The more women, across continents and decades, who share the same story, the more likely it is that it's true."

843.     This book published statements that flowed from the conspiracy alleged herein, and specifically followed the playbook that the recording The New York Times attributed to Zack Bacon, that is to discredit and destroy Peter Nygård the way that the media did with Harvey Weinstein and Bill Cosby.

844.     Subsequent to the filing of the putative class action in February 2020, counsel for the Jane Does, DiCello Levitt Gutzler LLC, commenced a public campaign seeking to entice other women to join the litigation against Plaintiff. The public notices republish the false statements secured by Defendant's agents.

845.     The public notices solicited additional women to join in the lawsuit. Within hours after the filing, DiCello Levitt Gutzler LLC were promoting the fact that dozens of women had come forward.

846.     On April 20, 2020, the Jane Doe plaintiffs in the putative class action filed in the Southern District of New York filed an amended complaint, adding additional allegations that have further perpetuated Defendant's planned scheme alleged herein. The amended complaint added 36 unidentified plaintiffs. Upon information and belief, women who came forward were fabricating claims to be included in the amended complaint.

## COUNT I - VIOLATIONS OF 18 U.S.C. § 1962(C)

847.     Plaintiff incorporates by reference ¶¶ 1 - 846 above as if fully set forth at length herein.

848.     18 U.S.C. § 1964(c) provides a private right of action to any person whose business

or property is injured by reason of a violation of the activities prohibited by 18 U.S.C. § 1962.

849.     Defendant has: (1) violated 18 U.S.C. § 1962; (2) Plaintiff has sustained injury to business or property; and (3) the injury was caused by the violation of § 1962.

850.     Defendant and those acting in concert with him committed (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

851.     Under 18 U.S.C. § 1961(4), an "enterprise" is any "group of individuals associated in fact although not a legal entity," for a common purpose of engaging in a course of conduct, proved by evidence of an ongoing organization, formal or informal, whereby the various associates function as a continuing unit. A collection of RICO "persons" may, together, make up a RICO enterprise, where persons conducted or participated in the enterprise's affairs, not just their own affairs.

852.     Defendant directed, authorized, paid for and/or ratified the conduct alleged to have been done by others in this Amended Complaint.

853.     Defendant acted in concert with those identified in this Amended Complaint.

854.     Under 18 U.S.C. § 1961(1)(A), "racketeering activity" means any act or threat involving bribery chargeable under state law and punishable by imprisonment for more than one year. This includes state statutes throughout the United States addressing witness bribing. This includes New York Penal Law § 215.00, bribing a witness:

> "A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will thereby be influenced…."

This also includes Colorado Revised Statute, CO Rev Stat § 18-8-703 (2016) for bribing a witness:

> "A person commits bribing a witness or victim if he or she offers, confers, or agrees

to confer any benefit upon a witness, or a victim, or a person he or she believes is to be called to testify as a witness or victim in any official proceeding, or upon a member of the witness' family, a member of the victim's family, a person in close relationship to the witness or victim, or a person residing in the same household as the witness or victim with intent to: (a) Influence the witness or victim to testify falsely or unlawfully withhold any testimony."

Furthermore, Colorado Revised Statute, CO Rev Stat § 18-8-707 describes witness or victim tampering as:

"A person commits tampering with a witness or victim if he intentionally attempts without bribery or threats to induce a witness or victim or a person he believes is to be called to testify as a witness or victim in any official proceeding or who may be called to testify as a witness to or victim of any crime to: (a)  Testify falsely or unlawfully withhold any testimony."

In addition, this includes Texas Penal Code § 36.05:

"A person commits an offense if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding: (1)  to testify falsely."

Moreover, this includes California Penal Code § 137:

"Every person who attempts by force or threat of force or by the use of fraud to induce any person to give false testimony or withhold true testimony or to give false material information pertaining to a crime to, or withhold true material information pertaining to a crime from, a law enforcement official is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."

855.    Defendant has and continues to violate state law addressing witness bribing, including New York Penal Law, Colorado Revised Statutes, Texas Penal Code and California Penal Code by bribing witnesses for false statements and by paying, threatening and coercing witnesses to provide false statements, and to perform the other illegal and improper conduct identified herein. Insofar as there are numerous other women who have advanced false statements against Peter Nygård, there may be other similar state statutes which were violated and will be

identified at or before trial.

856.     Under 18 U.S.C. § 1961(1)(B), "racketeering activity" means any act indictable under Title 18 of the US Code, including § 1956, "relating to laundering of monetary instruments."

857.     Upon information and belief, Defendant has violated this Act by, inter alia, making payments through various entities, incorporating not-for-profit entities to further his personal agendas despite the prohibition of using those entities for that purpose, and upon information and belief by taking tax deductions when such actions are not charitable.

858.     Defendant and others acting in concert with him have violated 18 U.S.C. § 1351 by engaging in fraud in foreign labor contracting, and committed the violation more than two times within the past ten years.

859.     Defendant and others acting in concert with him, knowingly and with intent to defraud, recruited, solicited or hired persons outside the United States for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

860.     Defendant's solicitation, recruitment, hiring and intent to defraud foreign persons included false promises of education, immigration and monetary compensation.

861.     At least two of the witnesses Defendant solicited and paid have recently recanted and conceded that they never even met Peter Nygård.

862.     Defendant's witness protection program encompassed fraud in foreign labor contracting, through the utilization of false or fraudulent pretenses, representations or promises, involving persons outside of the United States, such as Bahamians, for employment in the United States, including through allowing witness visas to expire, limiting or terminating payments or financial support to witnesses, and the use of threats communicated to witnesses, to procure

statements against Plaintiff, including false statements to disparage or damage Plaintiff in his business or property. This includes Defendant and/or his agents harboring Philincia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, and their inclusion in the witness protection program.

863.    Defendant and others acting in concert with him have violated 18 U.S.C. § 201(b) and committed the violation more than two times within the past ten years.

864.    Defendant and others acting in concert with him have violated 18 U.S.C. § 201(b)(3) by directly or indirectly, corruptly giving, offering, or promising financial compensation, including through the witness protection program, of value to the witnesses, or offering or promising the witnesses financial compensation, including through the witness protection program, with the intent to influence the witnesses' testimony under oath or affirmation before a court, the FBI, or the Department of Homeland Security, or officer authorized by United States law to hear evidence or take testimony, through testimony against Plaintiff, including false statements to disparage or damage Plaintiff in his business or property, or with the intent to influence the witnesses to absent themselves therefrom.

865.    Others acting in concert with Defendant have violated 18 U.S.C. § 201(b)(4) by directly or indirectly, corruptly demanding, seeking, receiving, accepting, or agreeing to receive or accept financial compensation, including through the witness protection program, in return for being influenced in testimony under oath or affirmation as witnesses upon any such trial, hearing, or other proceeding, including statements against Plaintiff, including false statements to disparage or damage Plaintiff in his business or property, or in return for absenting themselves therefrom.

866.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1341 through frauds and swindles and committed the violation more than two times within the past ten

116

years.

867.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1341 by having devised or intending to devise a scheme or artifice to defraud, including through the witness protection program and the procuring of false statements to disparage or damage Plaintiff in his business or property, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, including through the witness protection program and the procuring of false statements to coerce and extort Peter Nygård to provide his property in the Bahamas to Defendant, and upon information and belief, for the purpose of executing and/or in furtherance of the scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, matter, including statements to disparage or damage Plaintiff, correspondence or financial compensation, to be sent or delivered by the Postal Service, or deposited or caused to be deposited matter, including statements to disparage or damage Plaintiff, correspondence or financial compensation, to be sent or delivered by any private or commercial interstate carrier, or took or received therefrom the foregoing matter, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, the foregoing matter, including upon information and belief the mailing of a hard drive by an agent of Defendant, which contained false statements against Plaintiff, to Homeland Security.

868.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343 through fraud and committed the violation more than two times within the past ten years.

869.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343 by, having devised or intending to devise a scheme or artifice to defraud, including through the acts mentioned herein, including the witness protection program and the procuring of false

statements to defame, disparage, destroy and/or damage Plaintiff in his reputation, business or property, to cause Plaintiff financial harm and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

870.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343 by, having devised or intending to devise a scheme or artifice to defraud, including through the acts mentioned herein, including the witness protection program and the procuring of false statements to defame, disparage, destroy and/or damage Plaintiff in his reputation, business or property and to destroy the value in Plaintiff's property in the Bahamas, in order to coerce and extort Peter Nygård to provide his property in the Bahamas to Defendant.

871.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343, for the purpose of executing and/or in furtherance of the scheme or artifice, by transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds, including the transmission of false statements, the domestic and international transmission of millions of dollars to not-for-profit entities and others to fund the illicit activities, including the witness protection program and payments to others who agreed to provide false statements and fake evidence to support Defendant's plan; the participation in the CBC's broadcasting and publication of false statements about Plaintiff; and the participation in The New York Times' and other media outlets' (including traditional media, social media and book publishers) publication of false statements.

872.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343, for the purpose of executing and/or in furtherance of the scheme or artifice, by transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds, including the transmission of false

statements, the domestic and international transmission of millions of dollars to not-for-profit entities and others to fund the illicit activities, including the witness protection program and payments to others who agreed to use the Internet to recruit participants in the witness protection program, and to procure false statements against Plaintiff, including Richette Ross using the Internet site Sistahsabused.com and posting her phone number for people to contact her to procure false statements against Plaintiff.

873.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1343, for the purpose of executing and/or in furtherance of the scheme or artifice, by transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds, including actions by Defendant and/or his agents, including Zack Bacon, Sarah Ness, Allison Cain, Doneth Cartwright and others, by using email, text messages and telephone calls to communicate with individuals as part of the witness protection program and the procuring of false statements against Plaintiff, including communications with individuals identified herein, and the sending of materials related to Defendant's scheme.

874.    The actions taken by Defendant, his agents and others acting in concert with them, included, among others, phone calls and other communications by Doneth Cartwright to contact women to provide false statements to The New York Times and the federal authorities against Plaintiff, as well as to the Class Action Counsel in an effort to support the filing of a fraudulent claim against Plaintiff; phone calls and/or email or other communications by Fred Smith to participants in the enterprise regarding various aspects of the plan; March 28, 2015, April 16, 2015 and May 3, 2015 phone calls between John DiPaolo and/or James Lawson and Bobo and/or Toggi and/or others in furtherance of Defendant's scheme and efforts to set up Plaintiff; text messages

119

on May 6, 2015 between James Lawson, with Damian McLaughlin, and D&R regarding a plan, as part of Defendant's scheme, to give Bobo and Toggi a vehicle possessing audio/video equipment to set up and secretly record Plaintiff; May 11, 2015 text messages between Bobo and James Lawson regarding Defendant's scheme; Defendant and/or his agents using wire payments to send payments to Bobo and Toggi; phone calls, text messages from TekStratex employees and contractors to the participants in the witness protection program to coerce them into continuing with the scheme; phone calls to various women by investigators including, Sara Ness, Allison Cain, Gary Marchetti, James Lawson, and others to coerce women to participate in the scheme at the risk of being publicly damaged through the media; a March 1, 2018 phone call between Defendant's brother and agent Zack Bacon and women in the witness protection program, including Philincia Cleare, detailing Defendant's scheme and that Defendant and Zack Bacon wanted to facilitate the media destroying Plaintiff the way the media destroyed Bill Cosby and Harvey Weinstein, followed by a civil action that would push Plaintiff's alleged sexual activities into the media, further destroying Plaintiff; and by using Western Union and bank wires to send payments to individuals (including payments to Philincia Cleare and others) involved in the witness protection program to procure false statements against Plaintiff, influence false statements made to the media, the Class Action Counsel and governmental agents, among others.

875.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1465 through the production and transportation of obscene matters for distribution and committed the violation more than two times within the past ten years.

876.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1465 by knowingly producing with the intent to transport, distribute, or transmit in interstate or foreign commerce, or knowingly transporting or traveling in, or using a facility or means of, interstate

or foreign commerce or an interactive computer service in or affecting such commerce, for the purpose of sale or distribution of any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, including through the procurement of false statements against Plaintiff, and the acts and actions of Jacky Jasper against Plaintiff, which were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted or ratified by Defendant and his agents.

877.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1512 through tampering with a witness, victim, or an informant and committed the violation more than two times within the past ten years.

878.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1512(a)(2) by using physical force or the threat of physical force, or attempting to do so, against witnesses to procure false statements, including through the witness protection program, with the intent to influence, delay, or prevent the testimony of the witnesses in official proceedings, including before courts, the FBI, and the Department of Homeland Security, or caused or induced the witnesses to withhold testimony, or withhold a record, document, or other object, from an official proceeding, and, upon information and belief, in the case of Stephen Feralio, to evade legal process summoning him to appear as a witness, or to produce a record, document, or other object, in an official proceeding in the United States, or to be absent from an official proceeding to which he had been summoned by legal process.

879.    Defendant has also coerced certain witnesses to testify, sending guards and investigators to ensure that they continue to perpetrate their false claims before the federal authorities.

880.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1513 through retaliating against a witness, victim, or an informant and committed the violation more than two times within the past ten years.

881.    Defendant and others acting in concert with him have retaliated against witnesses who opted not to continue with the false statements they were paid or coerced to provide, including cutting off their financial sustenance and arranging for an arrest of a witness by a co-conspirator's friend to ensure she remains in line.

882.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1513 by knowingly engaging in the witness protection program or retailing against witnesses against Defendant or those acting in concert with Defendant and threatening the bodily injury of these witnesses or threatening to damage or damaging the tangible property of these witnesses, with the intent to retaliate against the witnesses for the attendance of the witnesses at an official proceeding, or any testimony given or any record, document, or other object produced by the witnesses in an official proceeding, including court proceedings and FBI and Department of Homeland Security investigations.

883.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1581 through engaging in peonage and committed the violation more than two times within the past ten years.

884.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1581 by holding witnesses in the witness protection program to a condition of peonage, coercing witnesses with expired visas, coerced financial obligations including housing and living expenses, for which employment through the provision of false statements against Plaintiff is required for the satisfaction or ongoing provision of these financial obligations. This includes Defendant and/or

122

his agents harboring Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, and their inclusion in the witness protection program.

885.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1589 through engaging in forced labor and committed the violation more than two times within the past ten years.

886.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1589 by knowingly providing or obtaining the labor or services of witnesses to procure false statements against Plaintiff, including through the witness protection program, by means of force, threats of force, physical restraint, or threats of physical restraint to the witnesses, including through expired visas or restricted or precluded movement through the witness protection program, or by means of serious harm or threats of serious harm to those witnesses, or by means of the abuse or threatened abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of any scheme, plan, or pattern intended to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Plaintiff, that person or another person would suffer serious harm or physical restraint. Defendant and those acting in concert with him have knowingly benefitted, financially or by receiving of items of value, from participating in a venture that has engaged in the providing or obtaining of labor or services by the above means, knowingly or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by these means.

887.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1590 through trafficking in peonage, involuntary servitude and forced labor and committed the violation more than two times within the past ten years.

888.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1590

by knowingly recruiting, harboring, transporting, providing, or obtaining witnesses to procure false statements, for labor or services in violation of peonage, involuntary servitude and forced labor law, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiff and to obtain commercial advantage or private financial gain to the detriment of Plaintiff.

889.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1592 through interstate and foreign travel or transportation in aid of racketeering enterprises and committed the violation more than two times within the past ten years.

890.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1592 by traveling in interstate or foreign commerce or using the mail or facilities in interstate or foreign commerce, with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, including extortion or bribery to procure false statements, the witness protection program, and the domestic and international transmission of millions of dollars to not-for-profit entities to fund the illicit activities, and thereafter performed or attempted to perform the procurement of false statements, including through the witness protection program.

891.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 through the laundering of monetary instruments and committed the violation more than two times within the past ten years. This includes, among others, utilizing not-for-profit entities to funnel

payments to individuals to make false statements.

892.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 by, knowing that property involved in a financial transaction represents the proceeds of unlawful activity, conducted or attempted to conduct such a financial transaction which in fact involved the proceeds of the unlawful activity with the intent to promote the carrying on of the unlawful activity, including through payments improperly funneled through not-for-profit entities to be used and used for the witness protection program and the procurement of false statements against Plaintiff.

893.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1596 with the intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986, or knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under state or federal law, including making payments through various entities, incorporating not-for-profit entities to further Defendant's personal agendas despite the prohibition of using those entities for that purpose, including through payments improperly funneled through not-for-profit entities to be used and used for the witness protection program and the procurement of false statements against Plaintiff, and upon information and belief by taking tax deductions when such actions are not charitable.

894.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1957 through engaging in monetary transactions in property derived from the unlawful activity that violated 18 U.S.C. § 1596 and committed the violation more than two times within the past ten years.

895.    Defendant and others acting in concert with him have violated 18 U.S.C. § 1957

125

by knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000, derived from the unlawful activity that violated 18 U.S.C. § 1596, the offense took place in the United States and outside the United States but Defendant is a United States person, including through the deposit, withdrawal, or transfer, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution, including making payments through various entities, incorporating not-for-profit entities to further Defendant's personal agendas despite the prohibition of using those entities for that purpose, including through payments improperly funneled through not-for-profit entities to be used for the witness protection program and the procurement of false statements against Plaintiff, and upon information and belief by taking tax deductions when such actions are not charitable.

896.    Defendant and others acting in concert with him have violated 18 U.S.C. § 2314 through transporting in interstate or foreign commerce stolen goods exceeding $5,000 in value and committed the violation more than two times within the past ten years.

897.    Defendant and others acting in concert with him have violated 18 U.S.C. § 2314 by transporting, transmitting, or transferring in interstate or foreign commerce goods or merchandise, exceeding $5,000 in value, knowing the goods or merchandise was stolen, converted or taken by fraud; including the transporting, transmitting or transferring of the videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant, and his provision of videos stolen, converted or fraudulently taken from Peter Nygård to provide to Defendant or those in concert with Defendant, videos and other materials sent by or to Jacky Jasper and posted online, against Plaintiff, which were in furtherance of Defendant's scheme and were authorized, directed, initiated, prompted or ratified by Defendant, and documents stolen or procured by fraud from Peter Nygård that others working in concert with Defendant obtained, including documents submitted

126

to the Department of Homeland Security.

898.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324 by bringing in and harboring aliens and committed the violation more than two times within the past ten years.

899.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324 by knowingly or in reckless disregard of the fact that aliens have come to, entered, or remain in the United States in violation of law, concealing, harboring, or shielding from detection, or attempting to conceal, harbor, or shield from detection, the aliens in any place, including any building or any means of transportation, by encouraging or inducing aliens to come to, enter, or reside in the United States, knowingly or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; engaging in a conspiracy to commit the preceding acts, and aiding or abetting the commission of the preceding acts, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiff and to obtain commercial advantage or private financial gain to the detriment of Plaintiff.

900.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324a by unlawfully employing aliens and committed the violation more than two times within the past ten years.

901.     Defendant and others acting in concert with him have violated 8 U.S.C. § 1324a by hiring for employment in the United States aliens knowing the aliens are unauthorized with

respect to such employment, or continuing to employ aliens in the United States knowing the aliens are or have become unauthorized with respect to such employment, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiff and to obtain commercial advantage or private financial gain to the detriment of Plaintiff.

902.    Defendant and others acting in concert with him have engaged in commercial bribery under New York law and committed the violation more than two times within the past ten years.

903.    Defendant and others acting in concert have engaged in commercial bribery under New York law by conferring, or offering or agreeing to confer, a benefit upon an employee or agent or fiduciary of Plaintiff or businesses associated with Plaintiff without the consent of Plaintiff or businesses associated with Plaintiff, with the intent to influence his conduct in relation to the affairs of Plaintiff or businesses associated with Plaintiff, and the value of the benefit conferred or offered or agreed to be conferred exceeded $1,000 and caused economic harm to Plaintiff of over $250, including, upon information and belief, conferring, or offering or agreeing to confer, over $1,000 to Stephen Feralio, who worked for Peter Nygård, without the consent of Peter Nygård, to influence Stephen Feralio's conduct in relation to Peter Nygård's affairs, and caused more than $250 in harm to Peter Nygård, including the transporting, transmitting or transferring of the videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant, and his provision of videos stolen, converted or fraudulently taken from Peter Nygård

128

to provide to Defendant or those in concert with Defendant, and including upon information and belief, James Lawson/JDL's and others acting in concert with Defendant's coercion of Peter Nygård's employees to provide false statements against Plaintiff, including through the witness protection program, and including Jerry Forrester paying two property managers who were employed by Peter Nygård to engage in improper conduct and appear in the CBC program to falsely assert that they assisted one of Plaintiff's associates to escape from Peter Nygård, and the bribery procured by Defendant, through his surrogates, Stephen Davis, Jerry Forrester, and others, resulted in the Fifth Estate program suggesting that Peter Nygård was guilty of sexual misconduct in New York and at Nygård Cay.

904.    Defendant and others acting in concert with him have engaged in coercion/extortion under New York law and committed the violation more than two times within the past ten years.

905.    Defendant and others acting in concert have engaged in coercion/extortion under New York law by compelling or inducing persons to engage in conduct which the persons have a legal right to abstain from engaging in, or to abstain from engaging in conduct in which they have a legal right to engage, by means of instilling in them a fear that, if the demand is not complied with, Defendant or those acting in concert with him will engage in other conduct constituting a crime or perform any other act which would not in itself materially benefit the persons but is calculated to harm Plaintiff materially with respect to his business, reputation or personal relationships, and committed the crime by instilling in the victim a fear that he or she will cause physical injury to a person or cause damage to property, or compelling or inducing the persons to commit or attempt to commit a felony, including through the witness protection program, by means of force, threats of force, physical restraint, or threats of physical restraint to the witnesses,

including through expired visas or restricted or precluded movement through the witness protection program, or by means of serious harm or threats of serious harm to those witnesses, or by means of the abuse or threatened abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of any scheme, plan, or pattern intended to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Plaintiff, that person or another person would suffer serious harm or physical restraint, including through the submission of false statements to the FBI and the Department of Homeland Security.

906.     Under 18 U.S.C. § 1961(5), a "pattern of racketeering activity" means "at least two acts of racketeering activity" within a ten-year period.

907.     As set forth herein, the pattern of racketeering activity undertaken by Defendant throughout the last ten years far exceeds two acts.

RICO Enterprise

908.     The "enterprise" here is the association in fact of numerous individuals and entities, including, but not limited to, Louis Bacon, Zack Bacon, Ann Colley, Robert F. Kennedy, Jr./Waterkeepers/Save the Bays, Fred Smith/Callenders, Doneth Cartwright, Jeff Davis/TekStratex, Livingston Bullard, Wisler Davilma, John DiPaolo, James Lawson/JDL, OTIA, Richette Ross, Litira Fox and others who have banded together to obtain false and influenced statements and affidavits for the purpose of damaging Plaintiff in his business and property in the United States.

909.     On or about February 19, 2015, Livingston Bullard and John DiPaolo referred to the association in fact as a "team."

Racketeering Activity

910.    The "racketeering activity" here under 18 U.S.C. § 1961(1)(A) includes the acts set forth in this Amended Complaint, including but not limited to the violations alleged above under this Count I, and violations of NY Penal Law § 215.00 (and other state laws as referenced herein), in which when Defendant and his associates, as set forth herein, conferred, or offered or agreed to confer, including through the witness protection program, benefits upon witnesses or persons about to be called as witnesses, in pending and anticipated litigation, in reports filed with the authorities, in false information being distributed on line and in working with The New York Times and its companion television program, upon agreements or understandings that the testimony of such witnesses will thereby be influenced.

911.    NY Penal Law § 215.00 is a class D felony under New York law. "Felony" means an offense for which a sentence to a term of imprisonment in excess of one year may be imposed. Other states pertinent hereto, as identified herein and which may be identified once the Jane Does in the putative class action are identified, have similar statutes for which a term of imprisonment in excess of one year may be imposed.

912.    In addition, the racketeering activity includes violating the statutes listed above in this Count I, such as 8 U.S.C. § 1324, through the bringing in and harboring of certain aliens, including through the witness protection program, the inclusion of aliens in the witness protection program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and/or his agents harboring Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others in the United States, done for the purpose of procuring false statements against Plaintiff and to obtain commercial advantage or private financial gain to the

detriment of Plaintiff.

913.    The "racketeering activity" here under 18 U.S.C. § 1961(1)(B) includes violations of 18 U.S.C. § 1956, laundering of monetary instruments.

914.    Pursuant to 18 U.S.C. § 1956(a)(2)(A), whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, is subject to a fine, or imprisonment, or both. Upon information and belief, this includes the transfer of money from entities and individuals including Defendant's agents including MCM, MCF, Waterkeepers, Save the Bays, Callenders and/or others via wire transfers from funds which emanated from New York and elsewhere.

915.    Pursuant to 18 U.S.C. § 1956(c)(7)(B)(vi), "specified unlawful activity" means "an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States."

916.    The "specified unlawful activity" here includes the allegations set forth above, including the bribery of witnesses alleged herein.

917.    Bribing witnesses would subject violators to prosecution in the United States or extradition under the United Nations Convention Against Transnational Organized Crime ("Convention"), given that such conduct contravenes numerous sections of the Bahamas Penal Code carrying potential deprivations of liberty of at least four years. For example: Convention Articles 2, 5, 16, 23; Bahamas Penal Code Chapter 84, Title xxviii, §§ 346 (Extortion), 423 (Perjury), 424 (Perjury); Bahamas Justice Protection (Amendment) Act, 2014, Chapter 64A

(Obstruction of Justice); Bahamas Penal Code (Amendment) Act, 2014 (Organized Crime).

918.     The transfers of money by Defendant Louis Bacon and his associates from a place within the United States, directly or indirectly, to Livingston Bullard, Wisler Davilma, Richette Ross, their agents or proxies, outside the United States, for the purpose of bribing them, were violations of the money laundering statute, 18 U.S.C. § 1956, and thereby racketeering activity under 18 U.S.C. § 1961(1)(B).

919.     The predicate acts include multiple payments each to Livingston Bullard and Wisler Davilma, amongst others including Richette Ross and Litira Fox. Upon information and belief, the total requested amount of the payments was approximately $5,000,000 or more.

920.     The predicate acts also include multiple payments to others including Philincia Cleare, Tazhmoye Cummins, Samantha Storr, Fred Smith/Callenders and investigators, lawyers, security guards, not-for-profit organizations, and others.

921.     The source of the payments is Defendant or entities controlled by him inside the United States.

922.     Defendant, directly or indirectly, hired associates to obtain the false and influenced statements against Plaintiff alleged herein. Defendant also worked with individuals in New York and elsewhere to file false reports, disseminate false information and plant a false story with The New York Times.

923.     The pattern of activity is offering to pay, agreeing to pay, and paying witnesses, as well as influencing witnesses, including witnesses in the U.S. and the Bahamas to provide false and influenced statements, in connection with testimony, prospective testimony, false reports to the U.S. authorities, online defamation and the damaging and destruction of reputation by attempting to and planting a false story in The New York Times, which also has a television

program seen around the world, and whose publication is picked up and republished or cited to by publications around the world.

Injury to Business or Property

924.     As a direct result of the racketeering activity alleged herein, as well as the conduct of other participants in the RICO enterprise, Plaintiff has been injured in his business and property including:

(1)     Plaintiff and businesses associated with Plaintiff have spent significant amounts of money in the United States to defend legal proceedings and criminal investigations prosecuted against Plaintiff through the use of the false and influenced statements alleged herein.

(2)     Plaintiff and businesses associated with Plaintiff have spent money for public relations fees in the United States to combat damages resulting from the use of false and influenced statements in the media and on social media in the United States.

(3)     Plaintiff and businesses associated with Plaintiff lost a long-existing line of credit to be used in the United States (among other places). In late 2015, a banking institution with which businesses associated with Plaintiff had a relationship of nearly 20 years, the Bank of Nova Scotia, renewed the substantial credit facility. On March 14, 2016 (after the disclosure of false statements), that banking institution sent an email message regarding the "serious allegations" in the Bahamas Case and attached an article from the internet (which was available in the United States) discussing several of the statements. Plaintiff and/or businesses associated with Plaintiff directed that banking institution to a press release issued in the United States that was intended to combat the false and influenced statements in the Bahamas Case and on the internet. Nevertheless, about two months later, that banking institution terminated its relationship with Plaintiff and the businesses associated with Plaintiff. The businesses associated with Plaintiff used money from that

134

institution's credit line in the United States.

(4)    The businesses associated with Plaintiff subsequently had lost a credit line with the Bank of Montreal in late 2019 and had to secure a new line of credit to sustain operations. On January 3, 2020, Nygård Inc. secured a new line of credit, guaranteed by Nygård International Partnership, with White Oak Commercial Finance and Second Avenue Capital Partners LLC. Following the filing of the putative class action in the Southern District of New York, the FBI raids in California and New York, the publication of The New York Times article, and the announcement of Dillard's that it was terminating its relationship with Plaintiff and the businesses associated with Plaintiff, the lenders determined there was a default under their credit agreement and ultimately sought and obtained the appointment of a receiver for Nygård International Partnership, Nygård Inc., and seven other debtor entities and effectively wrested control of Canadian debtor entities from Plaintiff, and took control over U.S. debtor entities that were important business partners.

(5)    Plaintiff and the businesses associated with Plaintiff lost a long-standing client and expansion of business with Canadian retailers into the United States, harming Plaintiff and Plaintiff's businesses.

(6)    Dillard's, the largest client of Plaintiff and the businesses associated with Plaintiff, announced in February 2020 that "[i]n light of the serious allegations concerning Peter Nygård, which are in direct opposition to our core values, Dillard's has refused current deliveries, canceled all existing orders and suspended all future purchases from Nygård."

(7)    Another media report revealed that a "clothing store in Kentville is pulling some of its most popular lines to make a point," and its owners "have decided to stop selling brands owned by Canadian fashion icon Peter Nygård after a class-action lawsuit was filed Feb. 13 on

behalf of 10 women alleging that Nygård sexually assaulted them."

(8)     Plaintiff and the businesses associated with Plaintiff lost business, their good will and reputation in the United States and elsewhere. Peter Nygård and the businesses and brands bearing his name are closely identified in the public mind, similar to other fashion houses. The false and influenced statements about Peter Nygård have damaged Plaintiff, Plaintiff's businesses and his business partners, which further damage Plaintiff and Plaintiff's business through loss of good will, irreparable harm to their reputation, and lost business and money.

925.    To date, the damages suffered by Plaintiff total tens of millions, potentially hundreds of millions of dollars, or more.

926.    Such expenditures and financial losses are neither speculative nor intangible. As the RICO enterprise continues to operate in the manner alleged herein into the future, Plaintiff will continue to suffer damages as alleged.

927.    The New York Times and other publications and media outlets published the false statements, and the damage to Plaintiff's business, good will and reputation has been catastrophic.

928.    Because Defendant promoted and directed the filing of civil actions against Plaintiff, the damage to Plaintiff's business, good will and reputation has been catastrophic.

929.    As media reports advised, "[f]ederal agents" "raided the California and New York offices of Canadian fashion mogul Peter J. Nygård, who was recently sued by 10 women accusing him and his companies of rape and sex trafficking…. Hours after the raids, Nygård 'made the decision to step down as chairman of the Nygård Companies and will divest his ownership interest,' his spokesperson said in a statement."

930.    Media reports further stated that "Peter Nygård's global fashion empire has been plunged into financial crisis after court-appointed receivers this week took over its affairs

following recent sex trafficking allegations against the tycoon."

931.    If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiff.

## COUNT II - VIOLATIONS OF 18 U.S.C. § 1962(D)

932.    Plaintiff incorporates by reference ¶¶ 1 - 931 above as if fully set forth at length herein.

933.    Defendant Louis Bacon entered an agreement with other participants in the RICO enterprise, including John DiPaolo, D&R Investigation, James Lawson/JDL, Wisler Davilma, Livingston Bullard, Fred Smith, Philincia Cleare, Tazhmoye Cummings, Samantha Storr, Richette Ross and others mentioned herein to violate § 1962(c) by obtaining, through unlawful means, false and influenced statements and affidavits to be used against Plaintiff to injure him in his business and property.

934.    In accordance with the agreements described herein, Defendant obtained, through unlawful means, the false and influenced statements alleged herein.

935.    As a direct result of the conspiracy among Defendant and the other participants in the RICO enterprise, Plaintiff has been injured in his business and property as described herein.

936.    If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiff.

## COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

937.    Plaintiff incorporates by reference ¶¶ 1 - 936 above as if fully set forth at length herein.

938.    Plaintiff and businesses associated with Plaintiff are engaged in the fashion business and, until the ramifications of Defendant's misconduct in 2020, have, or at least had, existing and prospective business relationships with consumers that do or may purchase their fashion brands and major department stores carry, or may carry, Plaintiff's and businesses

137

associated with Plaintiff's fashion brands.

939.     Defendant and others acting with him or on his behalf interfered with Plaintiff's business relationships and the business relationships involving businesses associated with Plaintiff, including the opportunities to sell their fashion brands.

940.     Defendant and these other individuals, knowingly and with malice, established, provided content for, or encouraged purported witnesses to provide false statements, including content for the sistahsabused.com domain. The website contains disparaging content about Plaintiff. This content includes falsified accusations against Plaintiff, including encouraging actual or prospective consumers to not purchase Plaintiff's fashion products or the fashion products of the businesses associated with Plaintiff, and dissuading a department store customer from continuing its business relationship with them by ceasing to carry their fashion products. This includes the dropping of Plaintiff's fashion line, and the fashion line of businesses associated with Plaintiff, by Dillard's, the largest client of Plaintiff's, and the businesses associated with Plaintiff.

941.     Defendant and these other individuals, knowingly and with malice, established, provided content for, or encouraged purported witnesses to provide false statements, including content for The New York Times. Based upon statements made by the reporters to numerous witnesses interviewed to date and the stated goal of trying to bring down Peter Nygård, the news stories unleashed against Plaintiff contained disparaging content about Plaintiff. This content includes falsified accusations against Plaintiff.

942.     These accusations have no legitimate purpose and are designed to injure Plaintiff in his business relationships with consumers and entities that sell his, and his associated businesses', fashion brands.

943.     Defendant intentionally sought to frustrate the benefits that Plaintiff, and the

businesses associated with Plaintiff, reasonably expected through the sale of their fashion brands to consumers and retailers that carry their brands. Plaintiff had a reasonable expectation that Plaintiff and the businesses associated with Plaintiff and these consumers and retailers would have entered into business and contractual relationships, with economic benefits to Plaintiff and businesses associated with Plaintiff. Defendant wrongfully and intentionally prevented these relationships from developing. As a result, Plaintiff and businesses associated with Plaintiff will not be able to enjoy the benefit of their bargain in selling their fashion brands to current and prospective future consumers and retailers that carry their brands.

944. Plaintiff has been wrongfully prevented from expanding or continuing his business relationships with consumers or entities that carry or may carry his fashion brands as a result of Defendant's wrongful conduct, and the businesses associated with him were wrongfully prevented from expanding or continuing their business relationships with consumers or entities that carry or may carry their fashion brands, as a result of Defendant's wrongful conduct. For example, Plaintiff and businesses associated with Plaintiff lost a long-standing client and expansion of business with Canadian retailers into the United States, harming Plaintiff and Plaintiff's businesses, including business located in New York. This includes Dillard's dropping the fashion line of Plaintiff and the businesses associated with Plaintiff. Dillard's was their largest client. In addition, this resulted in the loss of a long-existing line of credit to be used in the United States, as well as the loss of the most recent line of credit, plunging five companies indirectly owned by Plaintiff into receivership, along with four companies that impacted Plaintiff's business.

945. As a proximate cause of the wrongful conduct, Plaintiff's prospective and existing business relationships have been tortiously harmed, and Plaintiff has been significantly and irreparably injured in an amount to be determined at trial. Plaintiff has suffered quantifiable

reputational and financial damages though the diminishment of ongoing and prospective customer and business relationships.

946.     As a result of Defendant's willful and wanton conduct, which was in reckless disregard for Plaintiff's rights, and which showed a high degree of moral turpitude, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

947.     If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiff.

## COUNT IV – AIDING AND ABETTING THE FILING OF A FALSE REPORT

948.     Plaintiff incorporates by reference ¶¶ 1 – 947 above as if fully set forth at length herein.

949.     Defendant has, through bribery and intimidation of witnesses, intentionally caused and substantially assisted these individuals to make false police reports and false reports to other law enforcement and governmental entities in the United States about Plaintiff.

950.     Defendant Louis Bacon intended these false reports to implicate Plaintiff for unlawful conduct he did not commit, or as personal revenge against Plaintiff. Defendant knowingly aided and abetted (including through bribery, threats and coercion) the procurement and dissemination of these false reports.

951.     The filing of the false reports violates 18 U.S.C. § 287, NY Penal Law § 240.50, as well as similar state laws in other states including California, Colorado and Texas (and other states that will become evident when the Jane Does in the putative class action are identified).

952.     The filing of the false reports in violation of the law, and the aiding and abetting of these filings, has, as a direct and natural result, caused damage to Plaintiff.

## COUNT V – FILING OF A FALSE REPORT

953.     Plaintiff incorporates by reference ¶¶ 1 - 952 above as if fully set forth at length

herein.

954.     Defendant has, through bribery and intimidation of witnesses, intentionally caused the filing of false police reports and false reports to other law enforcement and governmental entities in the United States about Plaintiff.

955.     Defendant intended these false reports to implicate Plaintiff for unlawful conduct he did not commit, or as personal revenge against Plaintiff.

956.     The filing of the false reports violates 18 U.S.C. § 287, NY Penal Law § 240.50, and similar state laws in states including California, Colorado and Texas (and other states that will become evident when the Jane Does in the putative class action are identified).

957.     The filing of the false reports in violation of the law has caused damage to Plaintiff.

958.     The filing of the false reports was also an abuse of process.

## COUNT VI – TRAFFICKING AND HARBORING CERTAIN ALIENS TO FURTHER A FRAUDULENT ACT

959.     Plaintiff incorporates by reference ¶¶ 1 - 958 above as if fully set forth at length herein.

960.     Defendant and/or his agents have brought aliens to the United States with promises of education, money and permanent visas provided they further his fraudulent and illegal conspiracy against Plaintiff.

961.     Defendant and/or his agents have transported, moved, harbored, shielded from detection and provided the means for aliens, including Philincia Cleare, Tazhmoye Cummings, Samantha Storr and/or others, in violation of 8 U.S.C. § 1324.

962.     Defendant and/or his agents committed these acts to coerce the individual aliens to cooperate in his conspiracy to destroy and damage Plaintiff.

963.     As a result of Defendant's acts, Plaintiff has been damaged, including as set forth

herein.

964.     If Defendant's conduct is not enjoined, it will cause irreparable harm to Plaintiff.

## COUNT VII – ABUSE OF PROCESS

965.     Plaintiff incorporates by reference ¶¶ 1 – 964 above as if fully set forth at length herein.

966.     Defendant caused legal process to be issued against Plaintiff in the lawsuits alleged herein that were filed against Plaintiff.

967.     Defendant intended to harm Plaintiff without justification or excuse.

968.     Defendant used legal process in an improper manner to obtain a collateral objective against Plaintiff. Defendant misused legal process in the lawsuits alleged herein that were filed against Plaintiff to obtain and utilize the false statements against Plaintiff alleged herein, precipitate the coercion of witnesses and obtaining of additional false statements against Plaintiff alleged herein, to coerce and cause financial institutions not to do business with Plaintiff and businesses associated with Plaintiff as alleged herein, to influence consumers and businesses to not do business with Plaintiff and businesses associated with Plaintiff and to refrain from and cease doing business with Plaintiff and businesses associated with Plaintiff. This included influencing Dillard's, Plaintiff's largest client, as well as others to stop carrying the fashion brands of Plaintiff and the businesses associated with Plaintiff, as alleged herein. Defendant further used legal process in an improper manner to extort Peter Nygård to turn over his property in the Bahamas to Defendant, as alleged herein.

969.     Defendant's purpose of this process was to achieve an end that was not legally obtainable, with an ulterior motive and with malice, as alleged herein. Defendant acted with a conscious disregard for the rights of Plaintiff because his ulterior purpose in misusing legal process

was: (1) harassing and damaging Plaintiff through the utilization and obtaining of false statements against Plaintiff to damage Plaintiff's business, good will and reputation; (2) harassing and damaging Plaintiff through coercing and causing financial institutions not to do business with Plaintiff and businesses associated with Plaintiff; (3) harassing and damaging Plaintiff through influencing consumers and businesses to not do business with Plaintiff and the businesses associated with Plaintiff, and to refrain from and cease carrying and selling the fashion brands associated with Plaintiff and businesses associated with Plaintiff; and (4) harassing and extorting Peter Nygård to turn over his property in the Bahamas to Defendant.

970.   Defendant's conduct was a substantial factor in causing Plaintiff's damages, and the depravity of Defendant's conduct fulfills the requirements for an award of exemplary damages.

WHEREFORE, Plaintiff Peter Nygård demands judgment in his favor and against Defendant Louis M. Bacon, as follows:

(1)     Awarding actual damages as will be determined at trial;

(2)     Awarding treble damages, attorney fees, interest and other relief provided by statute;

(3)     Preliminarily and permanently enjoining Defendant Louis Bacon and those acting in concert with him from paying or conferring benefits upon, or threatening individuals to make false statements to be used against Plaintiff in legal proceedings, anticipated legal proceedings, reports to authorities, and the dissemination of defamatory statements on line, in print publications, on television and any other media;

(4)     Awarding punitive damages; and,

(5)     Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of any

and all issues in this action so triable as of right.

Dated: White Plains, New York      **WILSON, ELSER, MOSKOWITZ,**
      July 27, 2020                    **EDELMAN & DICKER LLP**

                                    /s/ David M. Ross

                                David M. Ross, Esq., *admitted pro hac vice*
                                1500 K Street, N.W., Suite 330
                                Washington, DC 20005
                                Tel: (202) 626-7660
                                Fax: (202) 626-3606
                                david.ross@wilsonelser.com

                                Cynthia S. Butera, Esq.
                                Rebecca R. Gelozin, Esq.
                                1133 Westchester Avenue
                                White Plains, NY 10604
                                Tel: (914) 872-7000
                                Fax: (914) 323-7001
                                cynthia.butera@wilsonelser.com
                                rebecca.gelozin@wilsonelser.com

                                ***Counsel for Plaintiff Peter Nygård***