# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER J. NYGÅRD,<br><br>          Plaintiff,<br><br>          v.<br><br>LOUIS M. BACON, JOHN DOES 1-100 AND DOE CORPS. 1-30,<br><br>          Defendants. | **Civil Action No.<br>1:2019-cv-01559-LGS-KNF** |

## SECOND AMENDED COMPLAINT

Plaintiff PETER J. NYGÅRD ("Nygård"), complaining of Defendants, LOUIS M. BACON ("Louis Bacon" or "Defendant"), JOHN DOES 1-100 and DOE CORPS. 1-30 alleges:

## INTRODUCTION

1.      This is an action alleging fraud, civil conspiracy to commit fraud, abuse of process, and racketeering, arising from a scheme orchestrated by Defendant, in concert with others, that was designed and implemented with the sole purpose of damaging Nygård.

2.      Over two decades ago, Defendant and his agents made an offer to Nygård to buy Nygård's property, Nygård Cay, where Defendant owned the adjacent property. When Nygård rejected the offer, Defendant and his agents told Nygård that Defendant would get the property one way or another. Thereafter, Defendant proceeded to shape his enterprises and plan his racketeering activity designed to destroy and damage Nygård so he could rid himself of Nygård at Nygård Cay. Specifically, Defendant engaged in a scheme to manufacture and fabricate evidence of sexual misconduct by Plaintiff through payments, coercion, threats and promises made to individuals so that they would create false stories about Plaintiff, provide false information to the

1

media and social media, use false information to threaten and prosecute civil actions against Plaintiff, and provide false information to authorities who would prosecute Plaintiff and have him incarcerated. These efforts by Defendant were designed to destroy Plaintiff's business reputation, his property and resources, his opportunities to pursue his chosen profession, his opportunities to pursue other business interests, and ultimately his liberty.

3.     Defendant's scheme has come to fruition, with Plaintiff's personal and business reputation ruined, his financial interests ruined, his assets depleted, his liberty removed with his continued incarceration, and as first threatened, his removal from his property at Nygård Cay.

4.     For more than a decade, Defendant and his co-conspirators operated a complex network of cooperative enterprises that share the common goal of systematically damaging Nygård, and stripping him of his liberties.

5.     The racketeering activity described herein affects interstate or foreign commerce, and includes, among numerous other activities, paying and offering to pay individuals to harass and extort Nygård, assert untruthful statements about Nygård, influence or intimidate other individuals in their dealings with Nygård, including their business dealings with Nygård, filing false reports about Nygård, making false statements and providing false information to the authorities to prompt civil and criminal action, including within the meaning of NY Penal Law §240.50 and 18 U.S.C. § 287, and to support anticipated legal actions brought by Louis Bacon and his agents or conduits and cohorts against Nygård, including paying and offering to pay witnesses in actions or proceedings upon agreement or understanding that the testimony of such witnesses will thereby be influenced, including within the meaning of NY Penal Law § 215, bribing a witness, and other bribery statutes.

258651167v.1

## PARTIES

### Plaintiff

6.      Nygård is a Canadian citizen, owns the Nygård Cay property in the Bahamas, and owned property in, and had business interests in, the United States.

7.      For decades, and as recently as 2020, Nygård conducted business at various locations around the world, including the United States and in New York, promoting the design, manufacture, distribution, and sale of women's clothing and accessories. Until 2020, Nygård's face, likeness, name, and signature adorned the branding of a Nygård fashion line, and brands operated under the name "Nygård." One of the stores selling such merchandise branded "Nygård," was located at 1431 Broadway, New York, NY 10018.

8.      As a direct result of the acts alleged herein by Defendant and the associated enterprises set forth below, since December 2020, Nygård, has been incarcerated and he remains detained at the Headingly Correctional Centre near Winnipeg, Manitoba, Canada, awaiting extradition to New York federal authorities in the United States, and specifically in New York.

### Defendants

9.      Louis Bacon is a resident of New York State, with residences and businesses in New York City and Long Island.

10.      Louis Bacon is the Chairman and Chief Executive Officer of Moore Capital Management ("MCM"), a private Investment firm headquartered at 11 Times Square, New York, NY 10036. MCM has additional offices in London and Hong Kong. Louis Bacon is Chairman of the Boards of Belvedere Property Management LLC ("Belvedere"), a property management firm with headquarters in New York, and Wilson Mesa Ranch Holdings, LLC ("Wilson Mesa"), a land holding company affiliated with Belvedere. Louis Bacon is the Founder and Chairman of the Board

3

of the Moore Charitable Foundation, Inc. ("MCF"), a New York-based not-for-profit located at 11 Times Square, New York, New York 10036. Louis Bacon is a founding member and a director of Save the Bays, an organization in the Bahamas that relied and/or relies on funding and support from Waterkeeper Alliance, Inc., a New York not-for-profit corporation that has received Louis Bacon-directed funds, and which used its funds primarily to advance the destruction of Nygård. Louis Bacon is the founder and benefactor of Our Sanctuary, a Bahamian charity that has used its funds primarily for the advancement of the false claims and false statements made against Nygård.

11.     Until sometime in 2013, Louis Bacon was the primary client of Citco Fund Services in the Bahamas, a financial institution through which certain of Louis Bacon's money likely flowed to fund activities referenced herein.

12.     John Does 1-100 are those individuals (male and female) who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the individuals mentioned below.

13.     Doe Corps. 1-30 are those entities who actively and knowingly participated in the actions complained of herein and may upon further discovery and investigation include some of the entities mentioned below.

<u>Enterprises</u>

14.     Section 1962(c) makes it "unlawful for any person employed by or associated with any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …." 18 U.S.C. § 1962(c).

15.     As set forth herein, Louis Bacon willfully and knowingly committed and conspired

to commit racketeering activities through a pattern involving a network of separate yet cooperative enterprises and/or associations in fact (hereinafter collectively "the Network"), which impacted interstate and foreign commerce.

16.     Together, the Network cooperatively and collaboratively devised and carried out acts to accomplish their common goal of damaging Nygård's image, business and property, in his personal and professional capacities (hereinafter referred to as the "Network's Common Goal").

17.     The initial RICO enterprise, the Enterprise to Remove Nygård from Lyford Cay and Destroy Nygård ("Lyford Cay Enterprise"), managed by Louis Bacon, included co-conspirators Robert F. Kennedy Jr., Frederick Smith ("Fred Smith"), Bradley Pratt, Princess Pratt, Mary Braithwaite, Jerry Forrester, Zack Bacon, and Pericles Maillis. The persons involved in the Lyford Cay Enterprise intended to accomplish their goal of removing Nygård from his property in Lyford Cay by procuring false witness statements regarding sexual misconduct designed to damage Nygård's public image and business relationships, deprive him of funds and deprive him of liberty. When the Lyford Cay Enterprise initially failed to exile Nygård from his property, Louis Bacon established subsequent enterprises to accomplish the goal of forcing Nygård to leave Nygård Cay and the Network's Common Goal.

18.     The Enterprise of Charitable Organizations ("Non-Profit Enterprise") involves the collaborative and cooperative efforts of many of the controlling members of various charitable organizations, founded by, funded by, or controlled by Louis Bacon. The charitable organizations and their controlling members involved in the Non-Profit Enterprise includes organizations and individuals listed in paragraphs 10 and 17 above. Louis Bacon maintained control over this Enterprise in large part through his financial support which was directed for the sole purpose of using such funds to achieve the Network's Common Goal.

5

19.     The Murder for Hire Enterprise was managed and funded by Louis Bacon, including the retention of Wisler Davilma ("Bobo"), Livingston Bullard ("Toggi"), D&R Agency LLC ("D&R"), Fred Smith, John DiPaolo, Damian McLaughlin, Michael Pintard, James Lawson, and JDL & Associates Consulting Corp., who acted as agents for this Enterprise. The Murder for Hire Enterprise set out to accomplish the Network's Common Goal by paying known criminals millions of dollars to set up Nygård, using illegal recording devices and other methods of entrapment, to put him in legal jeopardy and destroy his public image and business relationships.

20.     The Enterprise to Harbor Illegal Alien Witnesses in Private Protection Program Enterprise ("Witness Protection Enterprise") involved individuals who worked for Louis Bacon, including investigators and lawyers, who acted as agents for this Enterprise, including Zack Bacon, Belvedere, Wilson Mesa, Doneth Cartwright, Lisa Haba, Jeff Davis, TekStratex, Anthony Beach, Palladino & Sutherland, and Allison Cain. Louis Bacon and his co-conspirators of this Enterprise arranged for the transportation of illegal alien witnesses to the United States, including Philincia Cleare, Tazhmoye Cummings, Samantha Storr, and Jestan Sands, with promises of immigration papers, education, housing, and money. Louis Bacon, along with his co-conspirators of this Enterprise, also arranged for the transportation of United States residents, including Stephen Feralio, across state lines, with promises of compensation, to carrying out racketeering activities in furtherance of the Network's Common Goal. Together, the agents intended to exploit witnesses through coercion, extortion, bribes, and compensation in order to disseminate false information about Nygård, to make false claims to the federal authorities and in civil litigation, and to interact with the media for the purpose of achieving the Network's Common Goal.

21.     The Enterprise to Tamper with Witnesses and to Procure False Witness Statements ("Witness Tampering Enterprise") for over a decade through this year, involved individuals and

entities that stood to gain by the success of the Network's Common Goal, and the continued incarceration of Nygård. The persons involved in this Enterprise, includes Fred Smith, Palladino & Sutherland, Jack Palladino, Sara Ness, Allison Cain, O'Keefe-Tatigian Investigations and Associates, Inc., TekStratex, Greg Gutzler, Lisa Haba, Shannon Moroney, and Pamela Erickson. These persons, as agents of this Enterprise in furtherance of the Network's Common Goal, used methods that include bribery, extortion, coercion, threats, and deception with the intention of obtaining and publishing false statements about Nygård through interfering with, threatening, coercing, manipulating and paying witnesses, including Jestan Sands, Richette Ross, Litira Fox, Bianca McKinney, Stephen Feralio, Darlyne Lucchesi, Tazhmoye Cummings, Jacky Jasper, Philincia Cleare, Gary Marchetti, Mark Tobias, Ana Garcea, Ken Grondin, Biehare Agonafer and numerous Jane Does and John Does who are suing Nygård, in addition to others. As a result of the efforts of the Witness Tampering Enterprise, false claims were filed, Nygård became the target of a relentless media assault premised on the false information, and this ultimately led to Nygård's resignation from and the loss of Nygård's businesses, the civil proceedings, and the criminal investigation and prosecution of him, which has resulted in Nygård's ongoing incarceration and loss of liberty.

22.     The Enterprise to File False Claims ("False Claims Enterprise") is tied closely to, cooperative with, and was (in-part) dependent upon the efforts and acts by the Witness Tampering Enterprise. This Enterprise involved individuals and entities who worked for Louis Bacon, including agents, investigators, and lawyers, including Michael Artan, Thomas Elfmont, Palladino & Sutherland, TekStratex, DiCello Levitt Gutzler, Greg Gutzler, The Haba Law Firm, Lisa Haba, Shannon Moroney and others. As early as 2010, and continuing today, this Enterprise has been responsible for the threats and filing of numerous lawsuits containing false allegations, and

7

associated media interactions, including Bianca McKinney, Tazhmoye Cummings, Philincia Cleare, Richette Ross, April Telek, and plaintiffs in Jane Doe and John Doe lawsuits filed in New York and California, which relied on the false statements procured by the agents and efforts of the Witness Tampering Enterprise. As a result of the collaborative efforts of the False Claims Enterprise, lawsuits were filed in foreign and domestic jurisdictions, including federal and state courts in California, Florida, and New York. The filing of these false claims added momentum to the ongoing media assault against Nygård, and succeeded in accomplishing the Lyford Cay Enterprise's initial goal of exiling Nygård from the Bahamas and from his property at Nygård Cay, and overall the Network's Common Goal, which ultimately led to the destruction of Nygård's image and business relationships and resulted in Nygård's incarceration.

23.     The Enterprise to Damage Nygård through Media Campaign ("Media Enterprise"), managed by Louis Bacon, as early as 2008, through the present, has involved a collaborative, cooperative, and deliberate effort by journalists, major media outlets, various news sources, broadcast and streaming programs, and social media to destroy Nygård's reputation and livelihood and to further the Network's Common Goal. Louis Bacon and his co-conspirators acting as agents on behalf of this Enterprise, including the Canadian Broadcasting Corporation ("CBC"), Stephen Davis, Timothy Sawa, Stephen Feralio, Jacky Jasper, Philincia Cleare, Tazhmoye Cummings, Palladino & Sutherland, SistahsAbused.com, The New York Times, Zack Bacon, Fred Smith, Doneth Cartwright, James Lawson, Kim Barker and Catherine Porter, used proxies to make false statements in the media, as well as used additional methods of threats, coercion, intimidation, manipulation and bribery in furtherance of the Network's Common Goal.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1332; there is a complete diversity of citizenship in that the citizenship of Plaintiff is diverse from the citizenship of Defendant, and the matter in controversy exceeds $75,000.

25.     This Court has personal jurisdiction over Defendant as Louis Bacon is a citizen of the United States and is a resident of the State of New York.

26.     Louis Bacon and other persons associated with or employed by the enterprises described herein conducted and participated in the affairs of that enterprise through a pattern of racketeering, and entered an unlawful conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 (a), (b), (c), and (d), thereby causing injury to Nygård.

27.     Pursuant to 28 U.S.C. § 1331, this Court also has subject matter jurisdiction over this action, as Nygård's claims arise under the laws of the United States and present a federal question to be decided in any appropriate United States District Court. Specifically, 18 U.S.C. §§ 1964(c) and (d) provide that any person injured in his business or property by reason of 18 U.S.C. § 1962 may sue therefor in any appropriate United States District Court.

28.     This Court can and should exercise supplemental jurisdiction over Nygård's state law claims for relief, pursuant to 28 U.S.C. § 1367, as these claims are substantially related to the federal claims (RICO), in that they arise from a common nucleus of operative facts, giving rise to the same case or controversy under Article III of the United States Constitution.

29.     This action may be brought in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), because Defendant resides and transacts affairs in this District, and a substantial part of the events giving rise to the claims herein occurred within the jurisdiction of this District.

30.     This judicial district is further the appropriate venue and forum for this action to be

brought insofar as the acts giving rise to the claims were: (1) directed, authorized or ratified in this judicial district in New York; (2) a significant number of witnesses are located in New York; (3) the requested relief is sought to be enforced in the State of New York; (4) the damages were directed to, at least in part, result in New York; and, (5) there is no better venue for this dispute to be litigated.

## ADDITIONAL FACTS

31.     Plaintiff brings this action because Defendant violated the RICO statute, 18 U.S.C. § 1962, injuring Nygård's business and property, and these injuries were caused by the violation of § 1962. Further, § 1962(c) makes it unlawful for Defendant or any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt. 18 U.S.C. § 1962(c).

## I.     VIOLATION OF 18 U.S.C. § 1962

### A.   Violations of 18 U.S.C. §§ 1341, 1343: Issues Relating to Mail and Wire Fraud

32.     Defendant and agents within one or several of the associated enterprises within the Network (hereinafter "Defendant and Network Agents") violated 18 U.S.C. § 1341 by frauds and swindles committed through violations more than twice in the past ten years. Defendant and Network Agents violated § 1341 through Defendant's efforts procuring witnesses and their false statements to disparage and damage Nygård in his business or property, and to coerce and extort Nygård to provide his property in the Bahamas to Defendant. This involved, in furtherance of the Network's Common Goal, mailing or sending or receiving by an interstate carrier statements to disparage or damage Nygård, or associated correspondence or financial compensation. This included the mailing of a hard drive by an agent of Defendant and Network Agents, which

contained false statements against Nygård, to federal agencies, including Homeland Security, the FBI and the United States Attorney's Office in New York, and by Defendant's agent, Fred Smith, mailing materials to The New York Times, as well as the provision of false information to other media, for the purpose of convincing the media outlet to publish false information about Plaintiff.

33.    Defendant and Network Agents violated 18 U.S.C. § 1343 by fraud and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1343 to execute and in furtherance of the Network's Common Goal, by transmitted by wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds, including:

> a.    The transmission of false statements and millions of dollars to not-for-profit entities and others to fund the illicit activities, including efforts procuring witnesses and their false statements and fake evidence to support Defendant's plan and the Network's Common Goal; the participation in the media broadcasting and publication of false statements about Nygård, including with the CBC and The New York Times, social media, and book publishers;
>
> b.    The transmission of false statements and millions of dollars to not-for-profit entities and others to fund the illicit activities, including efforts procuring witnesses and their false statements and payments to others who agreed to use the Internet to recruit participants to serve as such witnesses and to procure false statements against Nygård, including Richette Ross using the Internet site Sistahsabused.com and posting her phone number for people to contact her to procure false statements against Nygård;
>
> c.    By communicating with Defendant's agents through email communications with

11

promises of payments for such false statements and for filing false claims and by wiring money using Western Union or other money transfer companies for women to remain in Defendant's witness program and to have resources to assist in making false claims to the authorities;

d.  Actions taken by Defendant and Network Agents, including Zack Bacon, Sarah Ness, Allison Cain, and Doneth Cartwright, by using email, text messages and telephone calls to communicate with individuals as part of Defendant's witness program and the procuring of false statements against Nygård, including communications with individuals identified herein, and the sending of materials related to Defendant's plan and the Network's Common Goal.

34.  The actions taken by Defendant and Network Agents included phone calls and other communications by Doneth Cartwright to contact women to provide false statements to The New York Times and the federal authorities against Nygård, as well as to attorneys in an effort to support the filing of fraudulent civil claims against Nygård; phone calls and email or other communications by Fred Smith to participants in the enterprise regarding various aspects of the plan; March 28, 2015, April 16, 2015 and May 3, 2015 phone calls between John DiPaolo or James Lawson and Bobo or Toggi or others in furtherance of the Network's Common Goal and efforts to set up Plaintiff; text messages on May 6, 2015 between James Lawson, with Damian McLaughlin, and D&R regarding a plan, as part of Defendant's plan and the Network's Common Goal, to give Bobo and Toggi a vehicle possessing audio/video equipment to set up and secretly record Nygård; May 11, 2015 text messages between Bobo and James Lawson regarding Defendant's plan and the Network's Common Goal; Defendant and Network Agents using wire payments to send payments to Bobo and Toggi; phone calls, text messages from TekStratex employees and contractors in the United States to the participants in Defendant's witness program in the United States to coerce and manipulate them into continuing

12

with the scheme; phone calls to various women by investigators including Sara Ness, Allison Cain, Gary Marchetti, James Lawson, and others to coerce women to participate in the scheme at the risk of being publicly damaged through the media, and/or to offer financial remuneration for assisting in the Network's Common Goal; a March 1, 2018 phone call between Defendant's brother and agent Zack Bacon and women in Defendant's witness program, including Philincia Cleare, detailing Defendant's plan and the Network's Common Goal and that Defendant and Zack Bacon wanted to facilitate the media destroying Nygård the way the media destroyed Bill Cosby and Harvey Weinstein, followed by a civil action that would push Nygård's alleged sexual activities into the media, further destroying Nygård; and by using Western Union and bank wires to send payments to individuals (including payments to Philincia Cleare and others) involved in the witness program to procure false statements against Nygård, influence false statements made to the media, attorneys and governmental agents.

      B.   <u>Violations of 18 U.S.C. § 1465: Issues Relating to the Production and Transportation of Obscene Matters for Sale or Distribution</u>

35.    Defendant and Network Agents violated 18 U.S.C. § 1465 by the production and transportation of obscene matters for distribution and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1465, through their knowing actions, including through the procurement of false statements against Nygård, and the acts and actions of Defendant's agents, including Tazhmoye Cummings, Philincia Cleare and Jacky Jasper against Nygård, by perpetuating false claims about sexual indiscretions and physical attributes of Plaintiff, which were in furtherance of the Network's Common Goal, and were authorized, directed, initiated, prompted, funded, or ratified by Defendant and Network Agents.

      C.   <u>Violations of 18 U.S.C. §§ 1512, 1513: Issues Relating to Tampering with, or Retaliating Against, a Witness, Victim, or an Informant</u>

36.    Defendant and Network Agents violated 18 U.S.C. § 1512 by tampering with a witness, victim, or an informant and committed the violation more than twice in the past ten years.

37.     Defendant and Network Agents violated 18 U.S.C. § 1512(a)(2) by using, threatening or attempting physical force against witnesses to procure false statements, including through Defendant's witness program, with the intent to influence, delay, or prevent the testimony of the witnesses, or their provision of an object, in official proceedings, including before the courts, the FBI, the United States Attorney's Office, and the Department of Homeland Security, and in the case of Stephen Feralio, to evade legal process regarding an official proceeding in the United States. Defendant and Network Agents also coerced certain witnesses to testify, sending guards and investigators, including Gary Marchetti and Mark Tobias of the O'Keefe Tatigian Investigative Agency, to ensure that they continue to perpetrate their false claims before federal authorities.

38.     Defendant and Network Agents violated 18 U.S.C. § 1513 by retaliating against a witness, victim, or an informant and committed the violation more than twice in the past ten years. Defendant and Network Agents retaliated against witnesses who opted not to continue providing or supporting the false statements that they were paid or coerced to provide, including cutting off their financial sustenance and arranging for an arrest of a witness, Philincia Cleare, by a co-conspirator's friend to ensure she remained committed to Defendant's plan. Defendant and Network Agents violated § 1513 by knowingly engaging in the witness program or retaliating against witnesses against Defendant and Network Agents and threatening the bodily injury of these witnesses or threatening to or damaging the tangible property of these witnesses, with the intent to retaliate against the witnesses for the attendance of the witnesses at an official proceeding, or any testimony given or any record, document, or other object produced by the witnesses in an official proceeding, including court proceedings and FBI, United States Attorney's Office and Department of Homeland Security investigations.

14

D. <u>Violations of 18 U.S.C. § 1581: Issues Relating to Peonage; Obstructing Enforcement</u>

39.     Defendant and Network Agents violated 18 U.S.C. § 1581 by engaging in peonage and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1581 by holding witnesses in Defendant's witness program to a condition of peonage, coercing witnesses with expired visas, coerced financial obligations including housing and living expenses, for which employment through the provision of false statements against Nygård was required for the satisfaction or ongoing provision of these financial obligations. This includes Defendant and Network Agents harboring Philincia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, and their inclusion in Defendant's witness program.

E. <u>Violations of 18 U.S.C. § 1589: Issues Relating to Forced Labor</u>

40.     Defendant and Network Agents violated 18 U.S.C. § 1589 by engaging in forced labor and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1589 by knowingly providing or obtaining the labor or services of witnesses to procure false statements against Nygård, including through Defendant's witness program, by means or threats of force or physical restraint to the witnesses or their friends. This included through expired visas or restricted or precluded movement through Defendant's witness on program, or by means or threats of serious harm to those witnesses, or by means or threats of the abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of a plan to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Nygård, that person or another person would suffer serious harm or physical restraint. Defendant and Network Agents knowingly benefitted, financially or by receiving items of value, from participating in a venture that has engaged in the providing or obtaining of labor or services by the above means, knowingly or in

15

reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by these means.

> F. <u>Violations of 18 U.S.C. §§ 1590, 1592,: Issues Relating to Trafficking, and Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor</u>

41.     Defendant and Network Agents violated 18 U.S.C. § 1590 by knowingly obtaining witnesses to procure false statements, for labor or services in violation of peonage, involuntary servitude and forced labor law, including through Defendant's witness program, the inclusion of aliens in Defendant's witness program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and Network Agents harboring Philincia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, for the purpose of procuring false statements against Nygård and to obtain commercial advantage or private financial gain to the detriment of Nygård.

42.     Defendant and Network Agents violated 18 U.S.C. § 1952 by interstate and foreign transportation in aid of racketeering enterprises and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1952 by traveling in interstate or foreign commerce or using the mail or facilities in interstate or foreign commerce, with the intent to facilitate the carrying on of unlawful activity, including extortion or bribery to procure false statements, Defendant's witness program, and the domestic and international transmission of millions of dollars to not-for-profit entities, including to Waterkeeper Alliance, Inc., Save The Bays, and Sanctuary, to fund the illicit activities, and thereafter attempted to or performed the procurement of false statements, including through Defendant's witness protection program and the illicit solicitations performed by Richette Ross and others.

G. Violations of 18 U.S.C. §§ 1596, 1957: Issues Relating to Additional Jurisdiction in Certain Trafficking Offenses; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

43. Defendant and Network Agents violated 18 U.S.C. § 1596 by the laundering of monetary instruments and committed the violation more than twice in the past ten years. This includes utilizing not-for-profit entities to funnel payments to individuals to make false statements. Defendant and Network Agents violated § 1596 by knowing that property involved in a financial transaction represents the proceeds of unlawful activity, attempted to or conducted such a transaction which involved the proceeds of the unlawful activity with the intent to promote the carrying on of the unlawful activity including through payments improperly funneled through not-for-profit entities for use for Defendant's witness program and the procurement of false statements against Nygård.

44. Defendant and Network Agents violated 18 U.S.C. § 1957 by engaging in monetary transactions in property derived from the unlawful activity that violated 18 U.S.C. § 1596 and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1957 by knowingly attempting to or engaging in a monetary transaction in criminally derived property of value greater than $10,000, derived from the unlawful activity that violated 18 U.S.C. § 1596, the offense took place in and outside the United States, but Defendant is a United States person, including through the deposit, withdrawal, or transfer, in or affecting interstate commerce, of a monetary instrument by, through, or to a financial institution, including making payments through various entities, incorporating not-for-profit entities, to further Defendant's plan and the Network's Common Goal despite the prohibition of using those entities for that purpose, including through payments improperly funneled through not-for-profit entities to be used for Defendant's witness program and the procurement of false statements against Nygård. These

17

include payments made directly to witnesses and payments made to recruiters such as Richette Ross, who convinced women and girls to make false statements against Plaintiff, including providing instructions as to what to say and providing information about Plaintiff to make such statements more believable.

H.  Violations of 18 U.S.C. § 2314: Issues Relating to the Transportation of Stolen Goods, Securities, Moneys, Fraudulent State Tax Stamps, or Articles used in Counterfeiting

45.     Defendant and Network Agents violated 18 U.S.C. § 2314 by transporting in interstate or foreign commerce stolen goods exceeding $5,000 in value and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 2314 by transmitting in interstate or foreign commerce such goods or merchandise, knowing the goods or merchandise were stolen, converted or taken by fraud; including the transmitting of videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant, and his provision of videos stolen, converted or fraudulently taken from Nygård to provide to Defendant and Network Agents, videos and other materials sent by or to Jacky Jasper and posted online, against Nygård, which were in furtherance of the Network's Common Goal, and were authorized by Defendant and Network Agents, and documents stolen or procured by fraud from Nygård that Defendant and Network Agents obtained, including documents submitted to the Department of Homeland Security. Moreover, videos wrongfully withheld by Stephen Feralio were provided to the CBC and other media outlets, including the producers of the Discovery Plus documentary published about Plaintiff.

I.  Violations of 8 U.S.C. § 1324: Issues Relating to Bringing in and Harboring Certain Aliens

46.     Defendant and Network Agents violated 8 U.S.C. § 1324 by knowingly or in reckless disregard of aliens coming to the United States in violation of law, attempting to or

shielding from detection the aliens, by inducing aliens to come to the United States, knowingly or in reckless disregard of the fact that such coming to violates the law; engaging in a conspiracy to commit and aiding or abetting the commission of the preceding acts, including through Defendant's witness program, the inclusion of aliens in the witness program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and Network Agents harboring Philincia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, done for the purpose of procuring false statements against Nygård and to obtain commercial advantage or private financial gain to the detriment of Nygård. These statements underlie the media stories, the civil litigation and the criminal prosecution taken against Plaintiff.

47.     Defendant and Network Agents violated 8 U.S.C. § 1324a by unlawfully employing aliens and committed the violation more than twice in the past ten years. Defendant and Network Agents violated § 1324a by hiring or continuing to employ in the United States aliens knowing the aliens are unauthorized for that employment, including through Defendant's witness program, the inclusion of aliens in the witness program despite knowledge or reckless disregard for the expiration of the aliens' visas to legally remain in the United States, preventing governmental authorities from detecting their presence, including Defendant and Network Agents harboring Philincia Cleare, Tazhmoye Cummings, and Samantha Storr in the United States, for the purpose of procuring false statements against Nygård and to obtain commercial advantage or private financial gain to the detriment of Nygård. Some of these women were transported to New York at Defendant's behest to complete the Network's Common Goal.

J.   <u>Issues Relating to Commercial Bribery and Coercion/Extortion (Under New York Law)</u>

48.     Defendant and Network Agents engaged in commercial bribery under New York

law and committed the violation more than twice in the past ten years. Defendant and Network Agents engaged in commercial bribery under New York law by agreeing to or conferring a benefit upon an employee or agent or fiduciary of Nygård, with the intent to influence his conduct in relation to the affairs of Nygård, and the value of the benefit agreed to or conferred exceeded $1,000 and caused economic harm to Nygård over $250, including offering to or conferring over $1,000 to Stephen Feralio, who worked for Nygård, without the consent of Nygård, to influence Stephen Feralio's conduct in relation to Nygård's affairs, and caused more than $250 in harm to Nygård, including the transmitting of the videos stolen, converted or taken by fraud by Stephen Feralio, working with Defendant or as an agent of the Network, and his provision of videos stolen, converted or fraudulently taken from Nygård to provide to Defendant and Network Agents, and including James Lawson and JDL & Associates Consulting Corp.'s coercion of Nygård's employees to provide false statements against Nygård, including through Defendant's witness program, and including Jerry Forrester paying two property managers who were employed by Nygård to engage in improper conduct and appear in a CBC program to falsely assert that they assisted a Nygård associate to escape from Nygård, and the bribery procured by Defendant and Network Agents, including Stephen Davis and Jerry Forrester, resulted in the CBC's Fifth Estate Program suggesting that Nygård was guilty of sexual misconduct in New York and at Nygård Cay. Stephen Feralio further provided videos for use by the CBC and for use in the Discovery Plus program designed to damage Plaintiff.

49.     Defendant and Network Agents engaged in coercion/extortion under New York law and committed the violation more than twice in the past ten years. Defendant and Network Agents engaged in coercion/extortion under New York law by compelling or inducing persons to abstain from or engage in conduct which the persons legally can abstain from or engage in, through

instilling in them a fear that, if the demand is not complied with, Defendant and Network Agents will engage in other conduct constituting a crime or perform any other act which would not in itself materially benefit the persons but is calculated to harm Nygård materially with respect to his business, reputation or relationships, and committed the crime by instilling in the victim a fear that he or she will cause physical injury to a person or cause damage to property, or compelling or inducing the persons to commit a felony, including through Defendant's witness program, by means or threats of force or physical restraint to the witnesses, including through expired visas or restricted or precluded movement through the witness program, or by means of threats of or serious harm to those witnesses, or by threats of or abuse of law or legal process to those witnesses, including through the use of expired visas; or by means of a plan to cause the witnesses to believe that, if the witnesses did not perform such labor or services, through the provision of false statements against Nygård, that person or another person would suffer serious harm or physical restraint, including through the submission of false statements to the FBI and the Department of Homeland Security. Further, Defendant's agents made clear to Philincia Cleare, by arranging her arrest in Georgia, that unless she cooperated with the scheme, she could be arrested and deported back to the Bahamas.

## II.    INJURY TO NYGÅRD

50.    The immediate and irreparable harm of Defendant and Network Agents' misconduct, through his funding, instructing, directing, and orchestrating of the collaborative and cooperative efforts of the Network, in violation of 18 U.S.C. § 1962, has directly and indirectly caused injury and damage to Nygård.

51.    Defendant and Network Agents' actions caused:

a.    Nygård losing business contracts and loans, including anticipated deals with Dillard's in connection with a new company he formed in the United States, as

21

well as deals with certain other entities;

b. Loss of real property, including Nygård Cay which was seized pursuant to false statements made by Defendant's agents;

c. Devaluation of Nygård's intellectual property rights, including the devaluation of Plaintiff's name, image, signature and likeness that had previously been licensed for use in the United States and Worldwide, which no longer has any positive value;

d. Damage to the personal property of Nygård, including damage to the property right of goodwill associated with his famous name, damage via Nygård's property right in lost business opportunities, damage to Nygård's professional reputation, and damage to Nygård's property right to pursue his chosen profession, including personal appearance fees, design fees, marketing fees, and fees earned through the use of his name, likeness, image and signature, and lost business opportunities through newly established entities he was forming with Dillard's and other entities;

e. Damage via the incurrence of professional reputation, public relations, legal and other fees in the United States and elsewhere, including payment to public relations specialists, social media contractors, investigators and lawyers to remediate the damage due to the actions of Defendant, including and concerning the damage due from Jacky Jasper's columns, Defendant's targeted social media and mainstream media attacks, Defendant's initiated investigation by the FBI, U.S. Attorney's Office, Department of Homeland Security, the New York Times and other media outlets; and

f. Loss of liberty through the arrest and continued incarceration of Nygård.

A. Lost Business Contracts and Loans

52.    On February 25, 2020, as a result of the efforts of Defendant and Network Agents, including actions taken by or on behalf of the Witness Protection Enterprise, "[f]ederal agents" "raided the California and New York offices of [Nygård], who was recently sued by 10 women accusing him … of rape and sex trafficking ….Hours after the raids, Nygård 'made the decision to step down as chairman of the Nygård Companies and [] divest his ownership interest'."[1] This announcement "came after a major client, Dillard's department stores, said it would no longer carry [Nygård's] fashion line."[2] In addition to the end of Nygård's business relationship with

---

[1] *See* https://www.law360.com/articles/1247279/feds-raid-fashion-mogul-peter-Nygard-s-ny-calif-offices
[2] *See* https://www.nytimes.com/2020/02/25/us/peter-Nygard-international-fbi-raid.html.

Dillard's, several other retailers cut their ties with Nygård as a result of the actions taken by Defendant and Network Agents in furtherance of the Network's Common Goal. For example, a media report stated that a "clothing store in Kentville is pulling some of its most popular lines to make a point," and its owners "have decided to stop selling brands owned by [Nygård] after a class-action lawsuit was filed Feb. 13 on behalf of 10 women alleging that Nygård sexually assaulted them." "This includes: Tan Jay, Alia, Nygard & Nygard Slims," and "While these brands have been popular at Phinneys and often best-sellers, in good conscience, we cannot support Mr. Nygård's brands."[3]

53.    Plaintiff was in the process of establishing a new entity in which he was going to have dealings with Dillard's in the United States. As a result of Defendant's actions and the resulting activities, this deal was scuttled and the project was unable to proceed.

54.    On March 23, 2020, Robert L. Dean, the Executive Vice President and Managing Director of White Oak Commercial Finance LLC, submitted a Declaration to the U.S. Bankruptcy Court further explaining the ramifications of the filing of the Jane Does litigation in the Southern District of New York (which was financed by Defendant or one of the agents within the Network), the federal raids on the California and New York offices of Nygård, and the decision by Dillard's to terminate its relationship with Nygård, including the cancellation and rejection of current orders. These events, all resulting from the orchestrated actions designed by, funded by, or arranged by Defendant and Network Agents, caused damage to Nygård.

    B.    Loss of Real Property

55.    As a result of false statements procured by Defendant's agents and through actions taken by Defendant's agents, Plaintiff's Nygård Cay property was seized and held hostage until he

---

[3] *See* https://www.capebretonpost.com/news/provincial/kentville-clothing-store-pulls-some-popular-brands-amid-disturbing-allegations-against-fashion-mogul-peter-Nygard-414169/.

paid millions of dollars. During the seizure and occupation by Defendant's agents, the property was damaged, including physical damage to the property, its buildings, and personal effects.

C. Devaluation of Nygård's Intellectual Property Rights

56.     Prior to the actions undertaken by Defendant and those pursuing the Network's Common Goal, Plaintiff's name, image and likeness, and marketing opportunities, had a value well in excess of $100 million. Plaintiff's name adorned several companies he owned directly and indirectly, and his face and signature were prominently featured in advertising campaigns that produced revenue for Plaintiff. Not only did Plaintiff use his name with fashion companies, but his name had value in other industries, including biotechnology. As a result of Defendant's actions and those pursuing the Network's Common Goal, Plaintiff's name, image, likeness and signature has been devalued so much so that is has no appreciable value.

D. Damage to the Personal Property of Nygård

57.     As a result of the actions of Defendant and those pursuing the Network's Common Goal, Plaintiff sustained significant damage to his personal property including the loss of his personal property at Nygård Cay that resulted from the wrongful occupation and damage; loss of property that was seized by the U.S. Government as a result of false statements made to them at Defendant's behest, including the loss of property that was seized from Plaintiff's offices in California and New York, his cell phone that was seized in Minnesota in February 2020, his vehicles in California, photographs and other memorabilia, the diminution in value of other assets held by Plaintiff, and his personal effects that were taken from his offices around the world by the Receiver appointed in Canada.

E. Damage via Incurring Professional Fees

58.     As a result of the false statements and other fabricated information procured by

24

Defendant and Network Agents, a Bahamian Court issued an injunction and a contempt order against Nygård, which called for his incarceration and resulted in massive fines. The basis of these false statements arose from the entry into evidence of false statements about Nygård's use of documents supporting the disclosure of the conspiracy against Nygård.  These documents were claimed to have been previously subjected to an injunction in the Bahamas. Despite the impossibility of the claim that Nygård was using the enjoined documents, Defendant and Network Agents continue to seek to hold Nygård responsible for use of documents, which were not enjoined and were not used, and the fines are accumulating.

59.    As a result of the wrongful actions of Defendant and the Network Agents, including in connection with the media and social media publications, Plaintiff had to retain the services of various investigators, public relations and crisis management experts, social media contractors and attorneys to attempt to remediate the damage being caused by Defendant and the Network Agents in spreading false information in the media and social media, as well as to business acquaintances and personal acquaintances. The cost of these professionals resulted in the expenditure of millions of dollars, and is continuing.

F.    Loss of Liberty

60.    As a result of the false statements and other fabricated information procured by Defendant and Network Agents and provided to federal agents, the federal authorities proceeded with convening a grand jury whereat this false information was used to obtain an indictment of Nygård. This indictment was then used to obtain an arrest warrant for Nygård's arrest in Canada, seeking extradition to the U.S.

61.    On or about December 14, 2020, Nygård was arrested in Canada.

62.    The Record of the Case for Prosecution, which relies at least in part on the false

25

statements and other fabricated information procured by Defendant and Network Agents, is being used as the basis to keep Nygård incarcerated in Canada, and therefore unable to capitalize on his business ventures. Moreover, the Record of the Case for Prosecution was presented to the Canadian court, and presumably, was considered when denying Nygård bail, thus further depriving him of his liberty and the pursuit of happiness.

## CAUSES OF ACTION

### COUNT I – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

64.     Defendant's conduct alleged herein is extreme and outrageous. Defendant intended to cause, or disregarded a substantial probability of causing, severe emotional distress to Nygård. After Nygård declined to sell to Defendant the adjacent property Nygård owned in the Bahamas, Defendant utilized his enormous financial resources and connected agents to publicly destroy Nygård's professional and personal reputation, livelihood, fashion empire, and even personal freedom through arrest and imprisonment.

65.     A direct causal connection exists between Defendant's conduct and the utter destruction and damage to Nygård. Without Defendant unleashing his financial fortune and associated agents to destroy Nygård, including through Defendant's witness program, Nygård would not have had to endure all of the destructive events that destroyed his reputation, livelihood, fashion empire and personal freedom and caused him severe emotional distress.

### COUNT II – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

66.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

67.     Plaintiff is engaged in the fashion business and, until the ramifications of Defendant's misconduct had existing and prospective business relationships with consumers that

did or may purchase Plaintiff's fashion brands and wholesalers and retailers, including major department stores carry, or may carry, Plaintiff's fashion brands. Nygård's marketing livelihood, and his name and likeness also had considerable value and marketability in the fashion world, including with major and boutique fashion retailers.  Plaintiff previously benefitted from this value.

68.    Defendant and others acting with him or on his behalf interfered with Plaintiff's business relationships, including Nygård's opportunities to continue to serve in various companies involved in the fashion business, as well as new ventures, as Defendant's conduct necessitated Defendant's resignation or removal, and the disappearance of the opportunities to market Nygård's image, and sell the Nygård fashion brands.

69.    Defendant and these other individuals, knowingly and with malice, established, provided content for, or encouraged witnesses to provide false statements, including content for the Sistahsabused.com domain. The website contains disparaging content about Plaintiff. This content includes falsified accusations against Plaintiff, including encouraging actual or prospective consumers to not purchase Plaintiff's fashion products, and dissuading a department store customer from continuing its business relationship with him by ceasing to carry his fashion products. This includes the dropping of Plaintiff's fashion line by Dillard's, the largest client of Plaintiff's, and other retailers, and failing to consummate anticipated deals with Dillard's in connection with a new company he formed in the United States.

70.    Defendant and these other individuals, knowingly and with malice, established, provided content for, or encouraged purported witnesses to provide false statements, including content for The New York Times, the CBC, DiscoveryPlus, Chris Hanson, The Tamron Hall Show, The Dr. Oz Show, and other media outlets, and through public statements and press releases by individuals such as counsel retained to bring lawsuits in New York against Plaintiff. Based upon

27

statements made by the reporters to numerous witnesses interviewed to date and the stated goal of trying to bring down Nygård, the news stories and press releases unleashed against Nygård contained disparaging content about Nygård. This content includes falsified accusations against Nygård. These accusations have no legitimate purpose and are designed to injure Nygård in his business relationships with consumers and entities that sell his fashion brands, and use his marketing value, name and likeness.

71.     Defendant intentionally sought to frustrate the benefits that Nygård reasonably expected through the sale of the Nygård's fashion brands and his personal marketing value to consumers and retailers that carry his brands, and use his name and likeness. Nygård had a reasonable expectation that Nygård and these consumers and retailers would have entered into business and contractual relationships, with economic benefits to Nygård. Defendant wrongfully and intentionally prevented these relationships from developing. As a result, Nygård will not be able to enjoy the benefit of his bargain in selling his fashion brands and market his name and likeness to current and prospective future consumers and retailers that carry his brands, and monetizing his name and likeness.

72.     Nygård has been wrongfully prevented from expanding or continuing his business relationships with consumers or entities that carry or may carry his fashion brands, or use his name and likeness, as a result of Defendant's wrongful conduct. Nygård lost a long-standing client and expansion of business with Canadian retailers into the United States, harming Nygård, including business located in New York. This includes Dillard's, his largest client, dropping the fashion line of Nygård and scuttling a new deal. This also resulted in Nygård's resignation from companies involved in his fashion business, and collapse of his marketing value. Nygård's indictment and imprisonment destroyed any opportunity for future business for Nygård and destroyed his fashion

258651167v.1

line, and the value in his name and likeness.

73.     As a proximate cause of the wrongful conduct, Nygård's prospective and existing business relationships have been tortiously harmed, and Nygård has been significantly and irreparably injured in an amount to be determined at trial. Nygård has suffered quantifiable reputational and financial damages though the diminishment of ongoing and prospective customer and business relationships.

74.     As a result of Defendant's willful and wanton conduct, which was in reckless disregard for Nygård's rights, and which showed a high degree of moral turpitude, Nygård is entitled to punitive damages in an amount to be determined at trial.

75.     If Defendant's conduct is not enjoined, it will cause further irreparable harm to Nygård.

### COUNT III – ABUSE OF PROCESS

76.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

77.     Defendant caused legal process to be issued against Plaintiff in the lawsuits alleged herein that were filed against Plaintiff, and intended to harm Plaintiff without justification or excuse.

78.     Defendant used legal process in an improper manner to obtain a collateral objective against Plaintiff. Defendant misused legal process in the lawsuits that were filed against Plaintiff to obtain and utilize the false statements against Plaintiff, precipitate the coercion of witnesses and obtaining of additional false statements against Plaintiff, to coerce and cause businesses and customers not to do business with Plaintiff, and to refrain from and cease doing business with Plaintiff, and to cease to use his name and likeness or utilize his marketing value. This included influencing Dillard's, Plaintiff's largest client, and others to stop carrying the Nygård fashion

29

brands, scuttled a new deal with Dillard's, and forced Nygård's resignation from companies associated with his fashion business. Defendant further used legal process in an improper manner to extort Nygård to relinquish his property in the Bahamas.

79.      Defendant's purpose of this process was to achieve an end that was not legally obtainable, with an ulterior motive and with malice. Defendant acted with a conscious disregard for the rights of Plaintiff because his ulterior purpose in misusing legal process was: (1) harassing and damaging Plaintiff through the utilization and obtaining of false statements against Plaintiff to damage Plaintiff's business, good will, reputation, marketing value, and ability to utilize the Nygård name; (2) harassing and damaging Plaintiff through coercing and causing businesses and customers not to do business with Plaintiff, to refrain from and cease carrying and selling the fashion brands associated with Plaintiff, and to refrain from and cease using his name and likeness, or utilize his marketing value; and (3) harassing and extorting Nygård to resign his positons from companies associated with his fashion business and to turn over his property in the Bahamas to Defendant.

80.      Defendant's conduct was a substantial factor in causing Plaintiff's damages, and the depravity of Defendant's conduct fulfills the requirements for an award of exemplary damages.

## COUNT IV VIOLATIONS OF 18 U.S.C. § 1962(C)

81.      Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

82.      18 U.S.C. § 1964(c) provides a private right of action to any person whose business or property is injured by reason of a violation of the activities prohibited by 18 U.S.C. § 1962.

83.      Defendant has: (1) violated 18 U.S.C. § 1962; (2) Plaintiff has sustained injury to business or property; and (3) the injury was caused by the violation of 18 U.S.C. § 1962.

84.      As demonstrated in the above allegations, Defendant and those acting in concert

with him committed (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

85.    Defendant acted in concert with, and ratified the conduct alleged to have been done by others in this Second Amended Complaint.

WHEREFORE, Plaintiff Peter Nygård demands judgment in his favor and against Defendant Louis M. Bacon, as follows:

(1)    Awarding actual damages as will be determined at trial;

(2)    Awarding treble damages, attorney fees, interest and other relief provided by statute;

(3)    Preliminarily and permanently enjoining Defendant Louis Bacon and those acting in concert with him from paying or conferring benefits upon, or threatening individuals to make false statements to be used against Plaintiff in legal proceedings, anticipated legal proceedings, reports to authorities, and the dissemination of defamatory statements on line, in print publications, on television and any other media;

(4)    Awarding punitive damages; and,

(5)    Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: White Plains, New York          **WILSON, ELSER, MOSKOWITZ,**
   September 10, 2021          **EDELMAN & DICKER LLP**

   /s/ David M. Ross
David M. Ross, Esq., *admitted pro hac vice*
1500 K Street, N.W., Suite 330
Washington, DC 20005
Tel: (202) 626-7660
Fax: (202) 626-3606
david.ross@wilsonelser.com

31

Cynthia S. Butera, Esq.
Rebecca R. Gelozin, Esq.
1133 Westchester Avenue
White Plains, NY 10604
Tel: (914) 872-7000
Fax: (914) 323-7001
cynthia.butera@wilsonelser.com
rebecca.gelozin@wilsonelser.com

***Counsel for Plaintiff Peter Nygård***

32